# Virk Declaration
# Exhibit 2

Arbitration                                                December 15, 2005
                        Washington, DC

                                                                   Page 1

1              IN THE MATTER OF ARBITRATION BETWEEN

2       - - - - - - - - - - - - - - - X

3       HOTEL RESTAURANT EMPLOYEES,    :

4       Local 25 HAY-ADAMS HOTEL       :   Girdharry Merhai

5                                      :   Grievant

6       - - - - - - - - - - - - - - - X

7

8

9                          Washington, D.C.

10                         Thursday, December 15, 2005

11

12

13              Arbitration hearing in the above-entitled

14      matter, taken at the Seyfarth Shaw, 815 Connecticut

15      Avenue, NW, Suite 500, Washington, D.C., at

16      10:15 a.m., Thursday, December 15, 2005, and the

17      proceedings being taken down by Stenotype by PENNY M.

18      DEAN, RPR, and transcribed under her direction.

19

20

21

22

23

24                                              **Certified Copy**

25

Page 188

1  building that is my job.  I brought that to Gerard's
2  attention and that's why he, Roman, is taking
3  revenge.
4           When asked about Cynthia, who overheard
5  portions of the conversation, Harry says, Cynthia's
6  management, she would be against me to conspire.
7           Now this is testimony I think by a trouble
8  employee; would you agree with that.
9           THE WITNESS:  Um-hum.
10          ARBITRATOR ZUMAS:  And someone who needs
11 psychiatric counseling, would you agree with that?
12          THE WITNESS:  I'm not a psychiatrist, I
13 don't know.
14          ARBITRATOR ZUMAS:  But you've been
15 involved in the discipline grievance procedures with
16 the hotels --
17          THE WITNESS:  Yes.
18          ARBITRATOR ZUMAS:  -- and you were
19 directly involved I am assuming in the decision to
20 termination the grievant in violation of the Last
21 Chance Agreement.
22          THE WITNESS:  Correct.
23          ARBITRATOR ZUMAS:  But did you consider at
24 all the alternative of saying we've got to do
25 something about this man, 24 years is a long time and

Page 189

1   he needs help and we should give him that help,
2   instead of putting him out on the street?
3           THE WITNESS:  Well, you have to understand
4   that I mean we're -- we have not discussed everything
5   that lead up to the Last Chance Agreement, but a Last
6   Chance Agreement was a serious issue, okay.
7           There are other things that we -- that did
8   not lead to the termination that I might be aware of
9   with this particular employee and does he need -- you
10  know, I think you have to look at it from a
11  consistency and fairness and implementing the policy
12  of the hotel that we had a Last Chance Agreement,
13  this guy is going around and making false accusations
14  and so is it a psychological issue?  No, I don't --
15  no, I don't believe it is, no, I don't believe it is.
16          ARBITRATOR ZUMAS:  You don't think that --
17          THE WITNESS:  It is an issue where it was
18  blatant, it was in a public area, it was a clear
19  violation of how tell polices that were covered in
20  the Last Chance Agreement.  And so -- and so, no,
21  we -- we -- there are occasions where we have
22  certainly assisted employees and offered, you know
23  assistance through programs or through counseling and
24  things of that nature.  In this case, no, I don't
25  think that was appropriate.

```
 1              ARBITRATOR ZUMAS:  You don't have an
 2   employee assistance program at the hotel?
 3              THE WITNESS:  We don't have an employee
 4   assistance program necessarily, but we have assisted
 5   employees in many ways with counseling, yes.
 6              ARBITRATOR ZUMAS:  You don't think this
 7   employee should have been included in that --
 8              THE WITNESS:  No, I don't believe so --
 9              ARBITRATOR ZUMAS:  --in that umbrella?
10              THE WITNESS:  No.
11              ARBITRATOR ZUMAS:  He sounds paranoid to
12   me, doesn't he to you?  Roman is out to get revenge?
13              Nothing funny about that.
14              THE WITNESS:  No, I don't think it is
15   funny at all, I think it is hurtful.
16              ARBITRATOR ZUMAS:  And Cynthia is
17   conspiring against him.
18              THE WITNESS:  Um-hum.
19              ARBITRATOR ZUMAS:  What was his prior
20   employment record other than the incidents in 2003
21   and 2005?
22              THE WITNESS:  I'd have to look through the
23   files, but for the most -- I don't know, I'd have to
24   look through his entire file.
25              ARBITRATOR ZUMAS:  Would you, Mr.
```

Page 214

1   what was said, just the fact that you knew they were
2   talking, correct?
3       A.    Yes.
4       Q.    The only thing you're saying is that
5   neither of them looked upset.  I have no other
6   questions.
7       A.    Yes.
8             MR. CHATILOVICZ:  I have no further
9   questions.
10            MS. VIRK:  No further questions,
11  Mr. Cooper, your five minutes of fame are over, thank
12  you.
13            (Witness excused.)
14  Whereupon,
15                  GIRDHARRY MERHAI,
16  the witness, having been previously duly sworn, was
17  examined and testified as follows:
18            ARBITRATOR ZUMAS:  You're under oath,
19  you've been sworn.
20                  DIRECT EXAMINATION
21            BY MS. VIRK:
22      Q.    Mr. Merhai, were you born in this country?
23      A.    No, ma'am.
24      Q.    Where were you born?
25      A.    British Guyana, South America.

Arbitration                                                December 15, 2005
                        Washington, DC

                                                                  Page 215

| | | |
|---|---|---|
| 1 | Q. | And how old are you, sir? |
| 2 | A. | Fifty-nine years. |
| 3 | Q. | When did you immigrate to the United |
| 4 | States? | |
| 5 | A. | November, 15th, 1980. |
| 6 | Q. | 1980? |
| 7 | A. | Yes. |
| 8 | Q. | When did you begin working at The |
| 9 | Hay-Adams Hotel? | |
| 10 | A. | April 27th, 1981. |
| 11 | Q. | The Hay-Adams Hotel, is that a job that |
| 12 | you've held continuously approximately since April of | |
| 13 | 1981? | |
| 14 | A. | Yes, ma'am. |
| 15 | Q. | Is that basically the only job of any |
| 16 | significance you've held since you came to the United | |
| 17 | States? | |
| 18 | A. | Yes, ma'am. |
| 19 | Q. | Are you married, Mr. Merhai? |
| 20 | A. | Yes, ma'am. |
| 21 | Q. | How long have you been married? |
| 22 | A. | To my wife for 36 years. |
| 23 | Q. | So you came here with your wife, then? |
| 24 | A. | Yes, ma'am. |
| 25 | Q. | How many children do you have? |

Arbitration                                                December 15, 2005
Washington, DC

Page 216

1     A.    Four.

2     Q.    What -- at the time that you were

3  discharged in July of 2005, what was your position at

4  The Hay-Adams?

5     A.    Bellman, bellman doorman.

6     Q.    Prior to that, had you held any other

7  positions within the hotel?

8     A.    Yes, I was house man for seven years.

9     Q.    Seven years?

10    A.    Yes, ma'am.

11    Q.    I want to focus on your time as a bellman,

12 the majority of your time at The Hay-Adams, can you

13 describe for the arbitrator a little bit about what

14 your regular duties -- let me start this way, around

15 the time of your discharge, what was the regular

16 shift that you worked?

17    A.    My regular shift was from 6:00 a.m. to

18 2:30 p.m.

19    Q.    Was that Monday through Friday?

20    A.    Monday through Friday.

21    Q.    And just describe for the arbitrator in

22 general what is the bellman's job at The Hay-Adams?

23    A.    My bellman job is 6 o'clock in the morning

24 I distribute The Washington Post to every occupied

25 room.

Page 233

```
 1       Q.    Oh, all in one?
 2       A.    Yes.
 3       Q.    What, if anything, did Mr. -- do you
 4  recall Mr. Zoechling saying to you?
 5       A.    Mr. Zoechling walk over to me and just
 6  like we are right here and he said so many derogatory
 7  statement to me and it made me feel like a little
 8  piece of sand.
 9       Q.    What statement did he say to you?
10       A.    I can't -- he make me feel inferior,
11  that's one, and of my color of skin, that's what I
12  felt.
13       Q.    He did not, just to be clear, say -- use
14  any explicitly racial terms with you?
15       A.    He did raise some kind of issue of racist
16  term, so I feel belittled, so I ask him, why you do
17  that, because of the color of my skin?
18       Q.    And did he say anything with respect to
19  your race, did he expressly refer to your race?
20       A.    No, he did not.
21       Q.    But you felt belittled by what he said to
22  you?
23       A.    Yeah, it is a racist remark, that's what I
24  considered.
25       Q.    What, if any, response did you make to him
```

Arbitration                                                December 15, 2005
Washington, DC

Page 234

```
 1    at that time?
 2         A.    My conversation ended right there and he
 3    went away.
 4         Q.    What did you say to him?
 5         A.    I said because of the color of my skin you
 6    think I'm stupid.
 7         Q.    You said those words?
 8         A.    Yes.
 9         Q.    Why did you say those words?
10         A.    Because he belittled me and the word he
11    use I can't really recall what he use, he make me
12    feel very little.
13         Q.    Did you mention Mr. -- let me ask you
14    this, had you ever had any confrontations or
15    arguments with Mr. Zoechling before that time?
16         A.    No, ma'am.
17         Q.    What was your tone of voice when you spoke
18    with him?
19         A.    Normal conversation.
20         Q.    As loud or louder than it is now?
21         A.    No, no.  Just like how we're talking here
22    now.
23         Q.    Is there any doubt in your mind that he
24    heard you?
25         A.    Yeah, he was next to me.
```

Arbitration                                                    December 16, 2005
                              Washington, DC

```
                                                                Page 1
 1                              BEFORE

 2                   ARBITRATOR NICHOLAS ZUMAS

 3       - - - - - - - - - - - - x
                                 :
 4       HOTEL & RESTAURANT      :
         EMPLOYEES, LOCAL 25,    :
 5       UNITE HERE,             : Grievance:
                                 : G. Merhai - Termination
 6            v.                 :

 7                               :

 8       HAY-ADAMS HOTEL.        : VOLUME 2

 9                               :

10       - - - - - - - - - - - - x

11

12

13            Friday, December 16, 2005

14            Seyfarth Shaw

15            815 Connecticut Avenue, NW

16            Washington, D.C. 20006

17

18   The hearing in the above-entitled matter

19   convened, pursuant to notice, at 10:08 a.m.

20

21   BEFORE:

22

23            NICHOLAS H. ZUMAS

24            Arbitrator                Certified Copy

25
```

Page 24

1    A    No. Because Colette was so hostile
2    towards me, and she was keep pounding me, why you
3    did say this, did you say this about Bruland and me
4    racists. That's all I heard all the time. No one
5    was taking notes at that time, sir.
6    Q    Okay. All right, let's go back to your
7    testimony yesterday regarding this incident. Ms.
8    Virk asked you about the incident that occurred
9    behind the desk.
10   A    Yes, sir.
11   Q    And would you please describe to me what
12   Roman said to you.
13   A    Sir, I can't really remember what he said
14   to me. He made me feel so little that I was so
15   embarrassed, and I think that it was racist. So I
16   told him why you say this is because the color of
17   my skin. That's all I said to him, sir. It was a
18   closed conversation. It wasn't a provocative way.
19   It was just a regular conversation.
20   Q    It was just a regular conversation?
21   A    Yes, sir. We didn't have any argument,
22   nothing at all.
23   Q    But you didn't have an argument -- didn't
24   that upset you, what he said?
25   A    No, sir.

Arbitration                                                       December 16, 2005
                          Washington, DC

Page 27

1      A    No, sir, he didn't say that.
2      Q    Didn't you think it was important to tell
3  Colette and Gerard what Roman had said to you if
4  something he said was racist?
5      A    It was not necessary for me to say that.
6  No one asked me about it.
7      Q    Well, Colette was accusing you of being
8  racist.
9      A    Yes.  Yeah.
10     Q    Don't you think that in -- I mean wouldn't
11 it be logical in response for you to say, wait, I
12 didn't say anything racist, Roman was the one that
13 said it?
14     A    No one asked me about that, sir, no
15 question.
16     Q    You knew your job was on the line, did you
17 not?
18     A    If I used derogatory remarks, I know my
19 job is on the line, sir.
20     Q    No, but when you were at that meeting, you
21 knew your job was on the line?
22     A    I know she going to hire me right away.
23     Q    You knew she was going to --
24     A    Yeah, because she was trying to set me up
25 all the time.

Arbitration                                                December 16, 2005
                    Washington, DC

Page 28

```
1       Q     She was?
2       A     Yes.
3       Q     How was that?
4       A     Because she don't like me, she and
5    Bruland.
6       Q     She and Bruland don't like you?
7       A     Yeah, because of the last incident.
8       Q     Because of the last incident?
9       A     Yes.  They won't even speak to me.
10      Q     But it's been -- it's been a year and a
11   half since the last incident?
12      A     Yes, sir.
13      Q     And you worked for three years under
14   Colette and Mr. Bruland before the last incident
15   occurred; correct?
16      A     No, Colette was just came there about a
17   year.
18      Q     She's been there four and a half years.
19      A     That means it happened in '03.
20      Q     Okay, so you had worked with her for three
21   years before that happened.
22      A     That's Bruland.  Colette came later after
23   that.
24      Q     Well, Colette has been here four and a
25   half years.
```

Page 29

```
 1     A    That's to now.  It's '03 I'm talking
 2  about.
 3     Q    Right.  So that would be --
 4     A    She wasn't there -- she was there about a
 5  year.
 6     Q    Well, but you worked -- all right.  So you
 7  think they were out to get you?
 8     A    Yes, sir.
 9     Q    Now you know Cynthia Okoth; correct?
10     A    Yes.
11     Q    And did -- was there anything that had
12  occurred between the two of you that would make her
13  dislike you?
14     A    Sir, no animosity.  We are workers, good
15  relationship, sir.
16     Q    Okay.  And you are aware of the fact that
17  -- and you heard her testimony yesterday?
18     A    Yes, sir.
19     Q    That she gave a statement that same
20  morning; correct?
21     A    Yes, sir.
22     Q    Okay.  Why -- do you have any idea why
23  Cynthia would lie about what she heard?
24     A    Her job security, sir.
25     Q    Her job security?
```

Page 30

```
 1      A    Yes, sir.
 2      Q    So do you think that Roman and Cynthia got
 3  together and made this story up?
 4      A    Yes, sir.
 5      Q    Okay.
 6      A    And with Ms. Colette, the three of them.
 7      Q    Let me just ask you, you were eventually
 8  terminated by the hotel; correct?
 9      A    Yes, sir.  A week after.
10      Q    A week after.  I know you didn't agree
11  with why you were terminated, but you understood
12  why you were being terminated; correct?
13      A    Mr. Folly came -- called me to the hotel
14  and told me see him at HR.  So we went there, me
15  and Tawana.
16      Q    Right.
17      A    And Mr. Green.  And they said they
18  terminate me under the last chance agreement.
19      Q    But you understood it was over the -- what
20  Roman had accused you about?
21      A    Yes, sir.
22      Q    And it was about the issue involving Kay
23  Vernem?
24      A    Yes, sir.
25      Q    So you were aware of that?
```

```
                                                          Page 76
 1    all skewed.  They are in some cases bizarre.  You
 2    worked with this man for eight years?
 3            THE WITNESS:  Two years.
 4            THE ARBITRATOR:  Two years.  You have had
 5    an opportunity to observe him, and you have had an
 6    opportunity to view his interactions with other
 7    employees, and you are still saying that this is
 8    not a troubled employee?
 9            THE WITNESS:  I don't think he's a
10    troubled employee.
11            THE ARBITRATOR:  Okay.  All right.  Thank
12    you, sir.
13                                      [Witness excused.]
14        [Recess.]
15    Whereupon,
16                    ROMAN ZOECHLING
17    was called as a witness, and having been previously
18    duly sworn, was examined and testified as follows:
19            THE ARBITRATOR:  Good morning.
20                  DIRECT EXAMINATION
21            BY MR. CHATILOVICZ:
22        Q   Roman, would you restate your name for the
23    record again, please?
24        A   My name is Roman Zoechling.
25        Q   And I just want to remind you, you are
```