# Virk Declaration
# Exhibit 3

In the Matter of Arbitration    )
                                 )
        Between                  )          OPINION AND AWARD
                                 )
UNITE HERE, Local 25             )          Nicholas H. Zumas,
                                 )          Arbitrator
        And                      )
                                 )          Girdharry Merhai, Grievant
Hay-Adams Hotel                  )
                                 )

Appearances:

        For the Union:

                Devki K. Virk, Esq.

        For the Company:

                Peter Chatilovicz, Esq.

## BACKGROUND

This is an arbitration proceeding involving a grievance filed pursuant to the grievance and arbitration provisions of the collective bargaining agreement (hereinafter "Agreement") currently in effect between UNITE HERE, Local 25 (hereinafter "Union") and the Hay-Adams Hotel (hereinafter "Company"). Hearings were held in Washington, D.C. on December 15 and 16, 2005, during which time sworn testimony was taken, exhibits were offered and made part of the record and oral argument was heard. The hearings were stenographically reported and a transcript (numbering 341 pages) was provided. The parties filed Post–Hearing Briefs, which were received on March 10, 2006.

## STATEMENT OF THE CASE

This case involves the termination of Grievant for alleged infractions of Company work rules in violation of the conditions of a Last Chance Agreement.

The Union contends that the Company failed to bear its burden of proving a violation of Company work rules. It contends further that, even if a violation is found to have occurred, such was not intentional, and the penalty of termination was too harsh.

The Company contends that Grievant's termination for work rules violations is not grievable. It also contends that even if the Arbitrator were authorized to look beyond whether a work rule violation occurred, the seriousness of Grievant's misconduct and the inappropriateness of any alternative remedies warrant upholding the termination.

## ISSUE TO BE DECIDED

The parties did not agree on a formulation of the issue to be decided. Accordingly, I have determined that the issue to be decided can be stated as follows: whether Grievant violated the conditions of his Last Chance Agreement; and if so, whether the penalty of termination was appropriate?

## STATEMENT OF FACTS

The Company operates a small, luxury hotel located in Washington, D.C. directly across from the White House. During the time of the events in question in this dispute, its General Manager was Hans Bruland and its Director of Operations was Colette Marquez. Grievant was a Bellman at the hotel, and had worked there since April 27, 1981.

On the evening of July 21 and the early morning hours of July 22, 2005, the night manager on duty was Cynthia Okoth. Roman Zoechling was a management trainee who was also on duty and responsible for the front desk operation. Both employees worked from 11:00 p.m. until 8:00 p.m. Around 6:00 a.m. Grievant, who worked a 6:00 a.m. to 2:30 p.m. shift, arrived on the premises. At about 6:40 a.m., after performing his normal duties of delivering newspapers to the rooms throughout the hotel, Grievant came to the lobby/front desk area, where both Okoth and Zoechling were working.

3

Zoechling testified that he and Grievant exchanged words for 20-30 seconds and then Zoechling proceeded to walk to the fax machine behind the concierge desk. After a few minutes using the fax machine, Zoechling turned around and stood face to face with Grievant, who was standing behind him. He testified that Grievant said: "Don't look at me like that." Zoechling replied, "What do you mean?" or "What do you want to say?" In response, according to Zoechling, Grievant then said, "You, Colette, Mr. Bruland, you white people think we colored people are stupid."

Zoechling responded, "Harry, I never said anything like that, I didn't make any disrespectful comments or anything in regards to that." Zoechling testified that Grievant then got louder, seemed angry, and said, "I know you didn't make any comments, but I can see it in your eyes." Grievant also told him that "he was more intelligent than your type of people."

Grievant testified that Zoechling made unspecified derogatory statements to him, the details of which he could not recall, although Zoechling did not expressly mention Grievant's race, and that these comments made him "feel inferior" and "belittled." Believing that Zoechling was motivated by racial hostility, Grievant asked Zoechling, "You think I am stupid because of the color of my skin?"

Okoth testified that the hotel lobby is small, and because Grievant was speaking in a loud voice, she could hear what Grievant was saying. Specifically, she recalled Grievant using the term "white people" and saying "you think that us colored people are stupid." And, "I'm actually more intelligent than you are." Okoth came out from behind the reception desk and headed for the concierge desk to stop the conversation. As she approached the concierge desk, Zoechling was already coming towards Okoth and she told both employees to keep quiet. There was no further discussion between Grievant and Zoechling.

4

During the course of investigating the July 22 incident, the Company learned that Grievant had engaged in a loud conversation on July 20 in the cafeteria with Credit Manager Kathleen Vernem, who had been out of work due to a leg injury. Vernem testified that Grievant told her that when he had an injury, Controller Marina Kazlausky was constantly calling him at home and harassing him to come back to work. He also stated that he had to get a lawyer to stop Kazlausky from harassing him. Vernem testified that the cafeteria was full and that Grievant was "brazen and loud" and that he was trying to talk over everyone else. In fact, Kazlausky had never called Grievant at home, and Grievant testified at the hearing that Kazlausky herself had never called him at home to harass him about returning to work.

In 2003, Grievant had been terminated for a number of incidents which involved a violation of the Company's rules prohibiting false and/or slanderous remarks about managers and fellow employees. Grievant had been accused of making false, slanderous and insubordinate statements in public areas at the hotel about Bruland, specifically accusing Bruland of stealing money from the employees and of being a thief, and then calling for him to be fired.

The Company and the Union agreed that Grievant would be given another chance and reinstated after serving a lengthy suspension, and entered into a Last Chance Agreement ("LCA") in December, 2003. The Agreement reads in pertinent part:

> 3. Should the Grievant engage in behavior in the future that is similar in nature to that which gave rise to the instant grievance - including violating the Hotel's "The Work Place Environment is No Place for the Rumor Mill" policy, its Performance Improvement policy and its Harassment policy -- and as a result be terminated from employment, the Union agrees that it shall waive its right to grieve such future incident. This Agreement shall not, however, preclude the Union from carrying out its due diligence in investigating the factual claim of wrong doing.

The work rules applicable to the LCA include, in pertinent part:

Hay Adams Rules and Regulations

20. Making or publishing false, malicious, vicious or derogatory statements concerning an employee, supervisor, [or] the Hotel...within the hearing range of customers.

Rumor Mill Policy

The Hay-Adams Hotel strives to create a positive work environment for all employees.

Rumor:      1: talk or opinion widely disseminated with no credible source;
            2: a statement or report with no authority or known truth.

Slander:    1: verbal statements or false charges;
            2: misrepresentations of fact which defame and damage another's reputation.

. . . . . .

Immediately report to management any verbal or physical behaviors which are offensive or unwelcome. Any conversation or statement which falls into one of the definitions may be construed as a very serious breach of professional behavior.

Grievant was terminated by the Company on July 28, 2005 for allegedly violating the terms of this LCA, and the Union grieved the termination. Pursuant to the provisions of the Agreement, the Union invoked arbitration, and the undersigned was subsequently designated by the parties to resolve the dispute.

## POSITION OF THE UNION

The Union contends that, as in all discharge cases, the burden rests on the Company to prove its underlying charge of misconduct. Nothing in the 2003 LCA affects that threshold inquiry. The evidence presented at the hearing establishes, at most, that Grievant, upset by what

he believed to be "belittling" treatment by Roman Zoechling, simply told Zoechling how he felt: that he was being mistreated because of the color of his skin.

While perhaps Grievant should have aired his grievance differently, there is no doubt that Grievant honestly believed that he was a victim of Zoechling's racial hostility. That much was borne out by Grievant's visible agitation when he recounted the incident almost five months later before the Arbitrator. Thus, whatever one might say about his choice of forum, discipline clearly is not an appropriate response to his complaint.

Even if the Arbitrator finds that Grievant's conduct violated one of the Company's policies identified in the 2003 LCA, cause for termination still is absent, as there is substantial evidence that Grievant did not *intentionally* breach the LCA. If the Company's witnesses are fully credited, Grievant simply lashed out at Zoechling without provocation, and railed against Zoechling, Hans Bruland, and Colette Marquez as racists - all based only on a "look" Grievant perceived in Zoechling's eyes.

In the course of its investigation, the Company also determined that Grievant had accused Marina Kazlausky of conspiring against him, and had explained manager Cynthia Okoth's and Zoeckling's statements as part of a management conspiracy. If, as the Arbitrator suggested is possible, Grievant suffers from a psychological condition that causes or contributes to his behavior, then that behavior is by definition not within his control. If Grievant could not control his behavior, he could not avoid a breach, and thus should not be subject to termination for the conduct.

As the Company's witnesses admitted, the parties, in drafting the 2003 LCA, never even considered the question of whether Grievant suffered from any emotional condition that might have contributed to his behavior. Because the issue was not contemplated, the parties drafted the

LCA to apply only to intentional behavior - simply because that was the only type of behavior they believed to be at issue.

As the Supreme Court observed in United Steelworkers v. Warrior & Gulf Navigation, 363 U.S. 574 (1960), "[a]rbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties." In American Postal Workers v. United States Postal Serv. 789 F.2d. 1 (D.C.Cir. 1986), the court observed that "the adoption of an arbitration clause indicates that the parties have agreed to employ an arbitrator as their 'contract reader' and empowered him or her to render a binding interpretation of the collective bargaining agreement.... [h]is interpretation of the law becomes part of the contract and thereby part of the private law governing the relationship between the parties..."

The Arbitrator, as the parties' authorized "contract reader" in this case, accordingly is empowered - and even required - to fashion a balanced solution that fills in the unforeseen interstices in the parties' agreement.

Of course, whether Grievant's alleged conduct in fact resulted from any psychological or emotional condition is not a question that can be answered either by the Arbitrator or the parties, but one that must be addressed by an expert. If, however, an expert's evaluation determines that a medical condition did cause or contribute to Grievant's behavior, then Grievant should be provided an opportunity to seek treatment for that condition, and, if judged by competent professionals to be fit, to return to his position at the Company with full responsibility for strict adherence to any treatment or medication schedule.

Grievant has expressed his willingness to undertake this course of action, to cooperate in a psychological evaluation, and to seek any professional assistance indicated. Accordingly,

8

should the Arbitrator determine that the events in question occurred as the Company has charged, reinstatement with full seniority, conditioned upon a psychological evaluation and a fitness-for-duty release, should be granted so that Grievant can finish his career as a productive employee of the Company.

Based on all of the foregoing considerations, the Union requests that the grievance be sustained.

## POSITION OF THE COMPANY

The Company contends that Grievant violated the Company's work rules and his December, 2003 LCA. That LCA states that if Grievant engaged in any behavior similar to that which occurred in 2003, any action taken by the Company (including termination) was not grievable under the Agreement. To make clear those work rules to which the parties were referring, copies of the rules were attached to the LCA.

The LCA was crystal clear as were the work rules he was bound not to violate. Grievant clearly violated the work rules in question, not once but at least twice, and did so in a public area where guests could have heard him accuse General Manager Bruland and Operations Manager Marquez of being racists, and where other employees heard him accuse Controller Kazlausky of harassing him over his workers' compensation absence. It cannot be disputed that Grievant engaged in similar conduct for which he had been suspended in 2003, and his violation of the LCA warranted his termination.

The Company contends that its decision to terminate Grievant is not grievable. There is no principle of arbitration law more fundamental than that which binds an arbitrator to rule consistent with the plain language of the Agreement. In this case, the just cause provision of the Agreement has been modified, and what is binding upon the parties and the Arbitrator is the 2003 LCA applicable to Grievant. The LCA specifically waives any right by the Union to grieve the Company's action, in this case the termination of Grievant, if Grievant engages in behavior similar to that which he previously engaged in.

As has been acknowledged by the Arbitrator, the question of whether misconduct occurred is not the issue in this case. Accordingly, the Arbitrator is proscribed from considering whether the Company's decision to terminate was appropriate, because the parties have agreed to remove that authority in this case. Clearly, this is an exception to the Arbitrator's normal authority, but that exception was something which the Company received as part of its bargain under which it agreed to suspend Grievant in 2003 rather than to terminate him. The Arbitrator cannot now take away the most important benefit of the bargain which the Company received from the Union and Grievant. The sole question to be decided is whether Grievant violated the LCA, and if that is answered in the affirmative, the discharge must be upheld.

Although the Company submits that the Arbitrator is not authorized to look beyond whether Grievant engaged in conduct which violated one or more of the work rules in his LCA, should he do so, the facts of this case dictate that Grievant's termination must be upheld. From the discourse at the hearing, it appears that the Arbitrator's principal question is whether it would be appropriate for Grievant to undergo some type of psychological analysis and then, if appropriate, therapy to alleviate Grievant's psychological problems so that he may return to work

10

without the risk that he would engage in similar conduct. The Company submits that this is an untenable alternative and not appropriate in this instance.

The parties all agree that they are not capable of determining Grievant's psychological state and why he acted as he did in 2003 and then again in the instant case. Had the Union thought that therapy was an appropriate alternative, it should have suggested it to Grievant in 2003 so that he would not repeat his acts. The practical problems with sending Grievant for analysis are many. What happens if a therapist says, this individual has no real psychological problems or some minor emotional issues? What if Grievant is deemed to have some serious psychological problems? Does Grievant undergo therapy for six months, one year, or two years, after which the Company will be expected to take him back and bump another employee from his or her position? The Company submits that none of these options work at this point in the process, nor is it appropriate to put the Company in such a position.

There are other reasons why the termination should not be modified. First, when confronted at his disciplinary meeting and at the arbitration hearing with what had taken place in the lobby with Zoechling and with what he was accused of saying abut Controller Kazlausky, Grievant offered no rational excuse for his conduct, and simply denied everything. As the record shows, this is precisely what he did in 2003 when confronted with a series of false and slanderous statements which were witnessed by several unbiased witnesses.

Second, the gravity of what Grievant said in this case and its implications also need to be considered in deciding whether Grievant should be given another chance. This is not a situation where an employee swore in public at another employee or called a manager "a jerk" in the heat of anger. To accuse the two highest managers in the Company of thinking that "colored people are stupid" while in a public area and without any basis for support, is about as reckless a

11

statement as one can make and one that can have long-lasting effects if heard by other employees, especially in a small hotel.

Finally, the Arbitrator should also consider the fact that Grievant repeated his misconduct of 2003 shortly after Zoechling started working at the Company (in late 2004 or early 2005). Grievant told him the story of the Japanese guest who had given Bruland an envelope of money which was for the employees, but which Grievant said Bruland kept for himself. Of course, the incident in question is the one which took place in 2003, and calling Bruland a thief in 2003 was what Grievant was originally terminated for and which led to his long-term suspension. Despite this discipline, Grievant had no hesitation again about calling the General Manager and Operations Manager "thieves" to a brand new employee and in direct violation of his LCA.

This is not a situation which warrants a modification of management's decision. To the contrary, it is a situation which cannot be tolerated in the workplace today where employers generally and this Company specifically work hard to establish an atmosphere free of racial and cultural discrimination and teamwork among a group of virtually diverse co-workers.

Based on all of the foregoing considerations, the Company requests that the grievance be denied.

## FINDINGS AND CONCLUSIONS

After a review of the entire record, and having had an opportunity to weigh and evaluate the testimony and credibility of the witnesses, this Arbitrator finds that Grievant violated the conditions of his LCA, but that the penalty of termination was inappropriate under all the facts and circumstances of this case. Grievant is accordingly to be reinstated under the conditions set forth below.

The Company presented credible evidence that Grievant in fact committed a number of violations of Company work rules, thereby violating the conditions for his reinstatement under the 2003 LCA. Among other things, he accused Bruland, Marquez and Zoechling of being racially prejudiced, for reasons he was unable to clearly articulate in his testimony. He also falsely accused Kazlausky of calling him at home to harass him during a period of time when he was off work because of a work-related injury.

In 2003 he had accused Bruland of stealing money intended by a hotel guest for distribution to other employees, calling Bruland a thief and demanding that he be fired. This led to Grievant's termination at that time, followed by the execution of the 2003 LCA. According to Zoechling, Grievant repeated this same accusation about Bruland to Zoechling, only a short time after he had returned to work under the LCA, when Zoechling was a newly-hired management trainee.

As these hearings progressed, it became apparent to this Arbitrator that Grievant is a troubled employee, who clearly displays symptoms of an underlying psychological imbalance. Grievant believes that numerous individuals in the ranks of management were out to get him, and were conspiring together to bring about his downfall. He believes that fellow employees whose

13

testimony corroborated the Company's charges of misconduct were lying about him out of fear, in order to protect their own jobs. For reasons he could not articulate, and based on statements by others he was unable to specifically recall, he is convinced that many at the Company view him through a prism of racial prejudice.

Grievant is a long-term employee of the Company, with an otherwise good overall record. The possibility of an underlying psychological problem as a cause of Grievant's suddenly bizarre behavior was evidently not contemplated by the parties when the 2003 LCA was negotiated. Management witnesses testified that the Company's view in 2003, and its present view, is that this is purely a disciplinary matter, and the possibility of extending some form of employee assistance to Grievant was not contemplated by the Company.

The question to be addressed then is whether it is more appropriate to (1) simply terminate this employee under the terms of the LCA, without further investigation, or (2) provide for a careful inquiry by a qualified professional into possible psychological problems which might have caused a long-term employee to begin engaging in this kind of misconduct.

It is this Arbitrator's finding that the prudent course is to order Grievant to undergo a nine-month period of psychological evaluation and counseling, including a course in anger management, to determine whether he can in fact perform as a satisfactory employee and successfully finish out his career.

Such an arrangement would contain some built-in provisions to safeguard the Company's legitimate interests. After Grievant is evaluated by a professional, and after being certified for fitness to return to work, he would be reinstated, with seniority unimpaired and without back pay, and then required to perform his duties satisfactorily, while completing the full period of psychological counseling, including the anger management course.

If Grievant commits any further, similar, work rules violations at any time during that period, he would automatically be terminated. Similarly, if Grievant fails to successfully complete the full period of psychological counseling, or fails the course in anger management, he would be terminated. The undersigned will retain jurisdiction during this period to ensure compliance with these conditions, with all reports by outside authorities to be submitted directly to me.

## AWARD

Grievant is to undergo a professional psychological evaluation and a nine-month period of counseling, including a course in anger management, all to be undertaken during Grievant's off-duty hours and all expenses to be borne by the Union. He is to be reinstated, with seniority unimpaired but without back pay, upon certification of his fitness to return to duty. All reports from outside authorities are to be submitted directly to the undersigned, who will retain jurisdiction during this period to ensure compliance. In the event Grievant commits similar work rules violations during this period, or fails to successfully complete psychological counseling, or fails the anger management course, he will be automatically terminated.

Nicholas H. Zumas, Arbitrator

Dated: April 13, 2006

15