# Virk Declaration
# Exhibit 5

**BEFORE**
**ARBITRATOR NICHOLAS ZUMAS**

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| HAY-ADAMS HOTEL, ) | |
|     Employer ) | |
| ) | |
|  - and - ) | **Re:**  **Girdharry Merhai** |
| ) | **(Discharge)** |
| UNITE HERE LOCAL 25, ) | |
|     Union. ) | |

## POST-HEARING BRIEF ON BEHALF OF THE UNION

Devki K. Virk
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, N.W., 10th Floor
Washington, D.C. 20005
(202) 842-2600 (Telephone)
(202) 842-1888 (Facsimile)

*Counsel for UNITE HERE, Local 25*

### Introduction

On July 28, 2005, the Hay-Adams Hotel ("the Hotel") discharged Girdharry Merhai, a bellman who had served the Hotel's guests for more than twenty-four years. The Union timely grieved the Hotel's action, and the case was heard by the Arbitrator on December 15-16. [1] Pursuant to the Arbitrator's ruling on December 14, the parties are submitting post-hearing briefs in lieu of making oral closing arguments.

As the Union demonstrates below, the grievance should be sustained.

### ISSUE

At the hearing, the Arbitrator initially stated the issue as whether there was "just cause" to support the Hotel's discharge of Mr. Merhai. Counsel for the Hotel agreed with that formulation. See Tr. (Vol. 1) at 6 (colloquy). The parties further agreed, however, that a 2003 settlement governs the Hotel's action. The Union therefore proposes that the issue before the Arbitrator is best stated as follows: Whether the Hotel had cause pursuant to the 2003 settlement agreement to terminate Mr. Merhai's employment. Although that precise formulation was not formally adopted by the parties at the hearing, the presentations by both sides show that they have assumed this is the standard that applies.

---

[1] A transcript of the proceedings was made of the proceedings at the Union's expense. The original volumes, plus a copy of the "miniscript," are enclosed with the Union's submission. A copy of the full transcript was earlier provided to the Hotel's counsel. In this brief, citations to the December 15 transcript will appear as "Tr. (Vol. 1) at ____," and citations to the December 16 transcript will appear as "Tr. (Vol. 2) at ____." The witness's or speaker's name will appear in parentheses following the citation (e.g., Tr. (Vol. 1) at 232 (Merhai)). The Union will cite to joint exhibits as "JX __," to Hotel exhibits as "HX __," and to Union exhibits as "UX ___."

# FACTS[2]

Girdharry Merhai began working for the Hay-Adams on April 27, 1981, less than six months after he and his wife immigrated to the United States from British Guyana. Tr. (Vol. 1) at 214-215 (Merhai). First employed as a houseman, Mr. Merhai promoted to the position of bellman in 1988, and continued in that capacity – greeting and providing front-line service and attention to the needs of the Hotel's guests – for seventeen years. Tr. (Vol. 1) at 216-220 (Merhai).

On the morning of July 22, 2005, Mr. Merhai reported to work at 5:50 a.m.,[3] changed into his uniform, and began the first task of his day: sorting newspapers for delivery to the Hotel's guests. Tr. (Vol. 1) at 227-228 (Merhai). This task is performed at the concierge desk, located directly to the right of the front doors if one is standing inside the lobby facing the front doors. See generally UX 1 (videotape taken by Hotel security camera inside front lobby).[4] Roman Zoechling, a management trainee working the overnight shift, was behind the front desk, which is located directly to the left of the front doors viewed from the same perspective. See id.

Mr. Zoechling and Mr. Merhai frequently overlapped for the first hour of Mr. Merhai's shift, and the two shared a supervisor, front desk manager Gerard Folly. On July 22, Mr. Zoechling and Mr. Merhai had no history of interpersonal difficulties; however, on the previous

---

[2] Except where noted, this section summarizes the testimony and evidence presented by the Union. We address factual disputes between the parties in the argument section of the brief.

[3] As the morning bellman, Mr. Merhai's regular shift was Monday through Friday, 6:00 a.m. to 2:30 p.m. Tr. (Vol. 1) at 71 (Okuth).

[4] At the hearing, the Union played UX 1 in DVD format on a laptop computer. In the event that counsel or the Arbitrator preferred a videotape format, the Union, after the hearing, asked its vendor to make videotapes from the DVD shown at the hearing. A copy of the video-format UX 1 has been provided to counsel for the Hotel, and a copy is enclosed for the Arbitrator.

morning, July 21, a bellman had observed Mr. Zoechling taking a "front" – that is, handling a guest and luggage upon check-in. Tr. (Vol. 1) at 226 (Merhai). Such work traditionally belongs to the bellman; further, the performance of such duties usually results in tips, which account for a substantial portion of a bellman's income. Tr. (Vol. 2) at 66-69, 70 (Folly). Mr. Merhai therefore complained to Mr. Folly about Mr. Zoechling's conduct, and Mr. Folly subsequently corrected Mr. Zoechling. Tr. (Vol. 2) at 66-67 (Folly).

At approximately 6:30 a.m. on July 22, Mr. Merhai saw one of the Hotel's regular guests, Mr. Corderi, enter the lobby and proceed to the front desk to check out. Tr. (Vol. 1) at 228 (Merhai). As Mr. Zoechling assisted the guest, Mr. Merhai, seeing the guest's luggage and sensing that he would need assistance, came out from behind the concierge desk. Tr. (Vol. 1) at 229 (Merhai). After finding the guest a taxi and loading the luggage, Mr. Merhai re-entered the lobby. Coming out from behind the front desk, Mr. Zoechling approached Mr. Merhai, who was standing on the carpet directly in front of the doors, and delivered a rebuke, stating that, rather than taking the initiative to assist the guest, Mr. Merhai "should have waited" for Mr. Zoechling to "hand him" the guest, because the Hay-Adams was a "five-star hotel." Tr. (Vol. 1) at 229-230 (Merhai). Mr. Merhai responded by commenting that the Hay-Adams' rating was in fact four, not five, stars. Tr. (Vol. 1) at 231. Mr. Zoechling crossed to the concierge desk to use the copier/ fax machine; Mr. Merhai also went behind the desk to complete his interrupted newspaper count. Tr. (Vol. 1) at 232 (Merhai).

As Mr. Merhai testified, it was then that Mr. Zoechling made derogatory statements to Mr. Merhai. Although Mr. Zoechling did not expressly mention Mr. Merhai's race, his comments made Mr. Merhai "feel inferior," "belittled," "like a little piece of sand." Tr. (Vol. 1) at 233-234 (Merhai). Stunned, and believing that Mr. Zoechling's mistreatment was motivated

by racial hostility, Mr. Merhai asked Mr. Zoechling, "You think I am stupid because of the color of my skin?" Tr. (Vol. 1) at 234 (Merhai) (direct examination); Tr. (Vol. 2) at 24 (Merhai) (cross-examination). Mr. Zoechling made no response.

Mr. Merhai proceeded with his duties and had no further interaction with Mr. Zoechling. Nor did the overnight manager, Cynthia Okoth, or Mr. Merhai's supervisor, Gerard Folly, indicate at any time during the day that they felt Mr. Merhai had conducted himself inappropriately. Tr. (Vol. 1) at 236-237, 237-238 (Merhai). At the end of his shift, however, Mr. Merhai was approached by Mr. Folly and told to report to the office of Colette Marquez, the Hotel's Director of Operations. Tr. (Vol. 1) at 238 (Merhai). Once in the meeting, Ms. Marquez confronted Mr. Merhai, repeatedly demanding that he admit or deny that he had called her and Hans Bruland, the Hotel's general manager, racists. Tr. (Vol. 1) at 239 (Merhai). Ms. Marquez also insisted that Mr. Merhai answer whether he had complained about Marina Kazlausky, the Hotel's controller, in a conversation with Kay Varnum, another manager, in the employee cafeteria two days before. Tr. (Vol. 1) at 240 (Merhai). Ms. Marquez then suspended Mr. Merhai and, on July 28, formally terminated his employment. See HX 1 (Personnel Action Form).

### ARGUMENT

As in all discharge cases, the burden rests on the Hotel to prove its underlying charge of misconduct. Nothing in the 2003 settlement agreement affects that threshold inquiry. As we demonstrate below, the Hotel's case fails at this initial stage, for two reasons. *First*, the evidence presented at the hearing establishes, at most, that Mr. Merhai, upset by what he believed to be "belittling" treatment by Mr. Zoechling, simply told Mr. Zoechling how he felt: that he was being mistreated because of the color of his skin. While perhaps Mr. Merhai should have aired

his grievance differently, there is no doubt that Mr. Merhai honestly believed that he was a victim of Mr. Zoechling's racial hostility: that much was borne out by Mr. Merhai's visible agitation when he recounted the incident almost five months later before the Arbitrator.[5] Thus, whatever one may say about his choice of forum, discipline clearly is not an appropriate response to his complaint.

*Second*, even if the Arbitrator were to find that Mr. Merhai acted unreasonably and that his conduct breached Hotel policy, termination still is unwarranted. There is substantial evidence to indicate that Mr. Merhai's reactions resulted from his mental state, and were not the product of willful disregard for the Hotel's policies. The Hotel's representatives candidly acknowledged that a medical explanation for Mr. Merhai's behavior was not considered when the Hotel made its decision to terminate Mr. Merhai. Absent volition, no violation of the 2003 agreement can be found. Accordingly, the Hotel's termination of Mr. Merhai should not stand.[6]

We address each of these arguments in turn.

A.    **The Hotel's Evidence Fails to Establish Misconduct By Mr. Merhai**

1.    The July 22, 2005 Incident.  Mr. Merhai acknowledges that he felt extremely upset -- as he described it, "like a little piece of sand" -- by what he perceived to be Mr. Zoechling's "belittl[ing]" treatment, and that he expressed to Mr. Zoechling his belief that he

_____

[5] The second incident cited by the Hotel, Mr. Merhai's conversation with Kay Vernem in the employee cafeteria some days earlier, clearly was not the precipitating event in the Hotel's decision to terminate Mr. Merhai. See Tr. (Vol. 1) at 174-175 (Marquez).

[6] None of the participants in this case, of course, is an expert in such matters. However, should evaluation by an expert identify a psychological reason for Mr. Merhai's behavior, Mr. Merhai has testified that he is willing to adhere to whatever course of therapy might be prescribed to ensure his fitness to return to duty at the Hotel, and to ensure his continuing ability to work for his remaining years of service without a recurrence of this behavior. Tr. (Vol. 1) at 51-52 (colloquy with Mr. Merhai), 95 (Arbitrator's suggested resolution).

was being mistreated because of his color. Although Mr. Zoechling clearly was offended by Mr. Merhai's statement in this regard, his offense alone does not make out a violation of any Hotel policy by Mr. Merhai. To the contrary, although Mr. Merhai admittedly did not take advantage of the Hotel's internal procedures for reporting discriminatory behavior, the Hotel's policy expressly prohibits "[r]etaliation in any form against an employee who complains of discrimination." HX 6 (attachment).[7]

The Hotel, however, claims that Mr. Merhai's acknowledged statement is not all that occurred that morning. Mr. Zoechling contends that Mr. Merhai accused not only him, but the Hotel's two top managers, Hans Bruland and Colette Marquez, of being racists and that he, Mr. Merhai, could "see [racism] in [Mr. Zoechling's] eyes." Tr. (Vol. 1) at 32 (Zoechling). Further, Mr. Zoechling asserts that Mr. Merhai was "in a rage," and "was raising his voice" so that "everybody in the lobby could hear." HX 2 (Zoechling report). Mr. Zoechling also has claimed that a guest was present in the lobby at the time. (Id.). In addition to Mr. Zoechling's testimony, the Hotel offered the testimony of overnight manager Cynthia Okoth, who claims that she overheard "bits and pieces" of a conversation between Mr. Zoechling and Mr. Merhai – conveniently, these "bits and pieces" include almost word-for-word some of the statements Mr. Zoechling attributes to Mr. Merhai – and told both men that they should be quiet. See HX 4 (Okoth report).

---

[7] The Union takes particular issue with the Hotel's notion that an employee who complains that others are acting in a discriminatory manner is himself guilty of harassment or defamation simply because the investigating manager decides that no discrimination has taken place. To be sure, an employee who knowingly levels false accusations against a coworker is engaged in wrongdoing; but there is no such charge here, and in fact it is undisputed that Mr. Merhai in fact believed that Mr. Zoechling had "belittle[d]" him and thought him "inferior" because of his race.

Neither of these accounts should be credited.  The claims that Mr. Merhai called Mr. Bruland and Ms. Marquez racists are plainly gratuitous:  while Mr. Merhai readily admits that he does not think the two managers like him, Tr. (Vol. 1) at 235-236 (Merhai), he does not ascribe racial motives to them, id..  The Hotel has advanced no reason as to why Mr. Merhai draws any distinction between Mr. Zoechling's motives and those of Mr. Bruland or Ms. Marquez, or why he would acknowledge statements made about Mr. Zoechling, but not about the other two.  The plain fact is that there *is* no explanation for why Mr. Merhai would admit one statement but deny the other – that is, no explanation other than the obvious one that Mr. Merhai is telling the truth about what he said.

As for the allegations that Mr. Merhai was disruptive or loud, Ms. Okoth herself acknowledged that when the lobby is quiet, voices pitched at a normal conversational level on one side of the lobby can be heard on the other side of the lobby.  Tr. (Vol. 1) at 84 (Okoth). Moreover, although Ms. Okoth asserted that the limousine driver who was in the lobby was within earshot, she admitted that he made no comment.  Tr. (Vol. 1) at 112 (Okoth).  Nor does the videotape indicate any gestures of alarm or concern, either by Ms. Okoth or by the driver. See UX 1 (from 6:45:10 to 6:45:49).[8]  Thus, to the extent that the Hotel contends that Mr. Merhai's inappropriately raised his voice, that contention cannot be supported by the simple fact that Ms. Okoth was able to hear some of their conversation.[9]  Further, Ms. Okoth acknowledged that *both* men used raised voices, Tr. (Vol. 1) at 75 (direct), and that her instruction to be quiet

---

[8] The numerals refer to the time-stamp that appears in the left-hand corner of the tape. This was the period during which Ms. Okoth contended that voices were raised.  See Tr. (Vol. 1) at 102 (Okoth).

[9] We note, however, that although Ms. Okoth recounted words she attributed to Mr. Merhai, she claimed that she could not recall anything Mr. Zoechling said.  Tr. (Vol. 1) at 113 (Okoth).

was directed at both, Tr. (Vol. 1) at 82 (cross). Yet, in contrast to the Hotel's swift termination

of Mr. Merhai, not even the slightest rebuke was delivered to Mr. Zoechling. In the end, the

plainest evidence that this incident was not disruptive is the Hotel's decision – confirmed by

three separate managers -- to allow Mr. Merhai to remain working *for his entire shift*, despite the

Hotel's professed belief of Mr. Zoechling's and Ms. Okoth's version of the events. Tr. (Vol. 1)

at 89 (Okoth) (overnight manager); Tr. (Vol. 1) at 176-179 (Marquez) (Director of Hotel

Operations); Tr. (Vol. 2) at 63-66 (Folly) (front desk manager).

Moreover, numerous inconsistencies between the Hotel's own witnesses (and even within

the testimony of each witness) render the Hotel's description of the events of July 22

implausible. Most tellingly, the references by Ms. Okoth and Mr. Zoechling to a "guest" being

present in the lobby during the conversation are admittedly embellishment: both of these

witnesses conceded that the limousine driver in the lobby was not a "guest." Tr. (Vol. 1) at 105

(Okoth); see also Tr. (Vol. 1) at 46 (Zoechling). Compare HX 2 (Zoechling report) (asserting

that he "saw one guest" at front desk); HX 4 (Okoth report) (claiming that she was "with a guest"

at the front desk).

Further, while Ms. Okoth claimed in her statement that she "approached" Mr. Zoechling

and Mr. Merhai to tell them to be quiet, Mr. Zoechling's statement says nothing about that. See

HX 2 (Zoechling report); Tr. (Vol. 1) at 52 (Zoechling).[10] Nor does the security tape show Ms.

Okoth either speaking to Mr. Merhai or approaching the concierge desk where he was located

during the relevant time-frame. See UX 1 (6:45:10 to 6:45:49). At most, the tape establishes

that Ms. Okoth momentarily crossed paths with Mr. Zoechling near the front door. Id. at

---

[10] Mr. Zoechling's statement also failed to acknowledge that he raised his own voice
when speaking with Mr. Merhai. See Tr. (Vol. 1) at 52-53 (Zoechling).

- 8 -

6:45:49. Confronted with this problem, Ms. Okoth claimed that she had not really approached Mr. Zoechling and Mr. Merhai, but had issued her instruction from *more than halfway across the lobby*. Tr. (Vol. 1) at 82 (Okoth) (stating that Mr. Zoechling was "coming from [behind] the concierge desk" at the time she gave instruction to be quiet); see UX 1 (tape showing Mr. Zoechling leaving the concierge desk at 6:45:48).

In all, Mr. Merhai's recounting of the events of July 22 is far more credible than the accounts of the Hotel's witnesses and, moreover, is more strongly corroborated by the only unbiased observer: the security tape. Mr. Merhai described a conversation with Mr. Zoechling before the two went to the concierge desk (something that was noticeably absent from Mr. Zoechling's statement). That conversation is shown on the videotape. See UX 1 (6:43:14 to 6:43:48). The videotape further shows that both were behind the concierge desk for a total of two minutes (see UX 1 (6:43:51 to 6:45:48). Of this time, indisputably at least a minute and a half – from 6:43:51 to 6:45:10, the earliest time identified by Ms. Okoth for the events to have begun, see Tr. (Vol. 1) at 102 (Okoth) -- was without any incident. At most, then, their interaction took place over thirty-eight seconds – hardly enough time for Mr. Merhai to have said all of the things that Mr. Zoechling claims, but easily sufficient for Mr. Merhai to make the statement that he acknowledges making.

2.    The Conversation in the Cafeteria. Even the testimony of the Hotel's witnesses regarding this incident shows that nothing of consequence took place. The only point of dispute is whether, as the Hotel contends, Mr. Merhai told Kay Vernem that the Hotel's controller, Marina Kazlausky, had called him to come back to work from an injury (Tr. (Vol. 1) at 116 (Vernem)); or whether, as Mr. Merhai remembers it, he told Ms. Vernem that he had experienced difficulties with the Hotel in connection with his return to work, and may have mentioned Ms.

- 9 -

Kazlausky's name, as she was the person responsible for workers' compensation matters for the Hotel. Tr. (Vol. 1) at 222 (Merhai).

It is undisputed that Mr. Merhai did encounter problems in returning to work from his injury, and did, in fact, hire an attorney to handle his claim. See UX 5-8 (documents relating to treatment, return to work, and scheduled mediation). Likewise, it is undisputed that Ms. Kazlausky served as the Hotel's administrator for workers' compensation issues, and was the primary interface with the insurance company and Mr. Merhai's doctors. See Tr. (Vol. 1) at 193-194 (Kazlausky); see also UX 5 (note dated 3/28/05 from Mr. Merhai's surgeon not releasing Mr. Merhai for work, with follow-up in four weeks, with Ms. Kazlausky's handwritten notes below); UX 7 (fax transmission dated 3/30/05 from Ms. Kazlausky to Mr. Merhai's surgeon requesting release for light duty work). Mr. Merhai agreed that Ms. Kazlausky never personally called him; however, given that Ms. Kazlausky *was* contacting Mr. Merhai's physician, and Mr. Merhai *was* being called by the insurance company and told to contact Ms. Kazlausky, Tr. (Vol. 1) at 222-224 (Merhai), Mr. Merhai agrees that he identified Ms. Kazlausky with these troubles and may have mentioned her name when speaking with Ms. Vernem. Tr. (Vol. 1 ) at 222 (Merhai). Mr. Merhai's testimony in this regard is consistent with the written statement prepared by Kumbi Chiweshe, Ms. Marquez's assistant. UX 3-B (Chiweshe statement, noting reference to Ms. Kazlausky, but no recollection of exact statement).

In any event, even if Mr. Merhai attributed the calls to Ms. Kazlausky, he only did so because it was his understanding that she was ultimately responsible for them – an understanding that was, in fact, correct. Thus, although one again could perhaps question his judgment in voicing his feelings to one of Ms. Kazlausky's subordinates (who admitted she would have been offended regardless of the truth of Mr. Merhai's statements, Tr. (Vol. 1) at 125-126) (Vernem)),

his brief comments, made outside the presence of any guests, do not rise to the level of the

reputational damage contemplated by the Hotel's policies. <u>See</u> UX 2 (handbook) ("rumor mill"

policy).

**B.      The Hotel Has Not Shown that Mr. Merhai's Behavior was Intentional**

Even if the Arbitrator finds that Mr. Merhai's conduct violated one of the Hotel policies

identified in the 2003 agreement, HX 6, cause for termination still is absent, as there is

substantial evidence that Mr. Merhai did not *intentionally* breach his agreement. As noted in a

leading text, "[w]here it is demonstrated that the basis of a discharge was due not to an

intentional individual fault of the grievant but rather to a defect in mental or physical capacity,

arbitrators have not hesitated to order reinstatement conditioned upon a proper showing of

mental or physical fitness." M. Hill & A. Sinicropi, <u>Remedies in Arbitration</u> 43 (1981); <u>see also</u>

A. Sinicropi, "Remedies: Another View of Old and New Problems," <u>Proceedings of the</u>

<u>National Academy of Arbitrators</u> 134-170, 139 (1981).

Such surely would be the case here, where, if the Hotel's witnesses are fully credited, Mr.

Merhai simply lashed out at Mr. Zoechling without provocation, and railed against Mr.

Zoechling, Mr. Bruland, and Ms. Marquez as racists – all based only on a "look" Mr. Merhai

perceived in Mr. Zoechling's eyes. In the course of their investigation, the Hotel also determined

that Mr. Merhai had accused Marina Kazlausky was conspiring against him, and had explained

Ms. Okoth and Mr. Zoechling's statements as part of a management conspiracy. If, as the

Arbitrator suggested is possible, Mr. Merhai suffers from a psychological condition that causes

or contributes to his behavior, then that behavior is by definition not within his control.[11]   As

---

[11] Our discussion of this issue necessarily assumes that the Arbitrator fully credits the
Hotel's version of events. That assumption is made for purposes of addressing the question

(continued . . .)

- 11 -

one arbitrator put it, "[a]lthough cause for discharge is not *always* based on fault on the employee's part, it normally requires such a finding." Consolidated Foods Corp., 58 LA 1285, 1288 (1972) (Casselman, Arb.). If Mr. Merhai could not control his behavior, he could not avoid a breach – and thus should not be subjected to termination for the conduct.

That was the conclusion reached by Arbitrator Kathleen Doepken, and approved by the Chairman of the Board of Arbitration, Shyam Das, in LTV Steel Mining Co., 110 LA 283 (1997). In that case, the grievant, who had accumulated an abysmal attendance record, was initially placed on antidepressant medication and ordered to undergo therapy and adhere to medical treatment as a condition in two successive "last chance agreements" that were reached in lieu of termination. Sometime later, his diagnosis was changed to bipolar affective disorder, but his medication was not changed. The grievant had a history of spotty adherence to treatment protocols and the Company argued that "it [was] at the end of its rope" with him and "[could] do no more than it already ha[d] done." Id. at 287. Much like the Hotel in this case, the Company claimed that the grievant's violation of the "last chance agreement" should not entitle him to a "third last chance" as an employee. Id. The Union, however, pointed out that, with the assistance of treatment and the corrected medication, the grievant had an opportunity to function as a productive employee and, if released to work by his providers, should be permitted to do so. Id. Agreeing with the Union that it was at least possible that the wrong medication had contributed to the grievant's breach of his "last chance agreement," the arbitrator concluded that the grievant "never should have been released to work" during that period and should not be held responsible for the breach. Id. at 288. She therefore ordered the Company to treat the grievant

---

raised by the Arbitrator at the hearing, and is not intended to waive or otherwise detract from our factual points set out in Part A.

as if he were on sick leave during the relevant period, and return him to active employment "upon presentation of satisfactory evidence that he is medically fit to return to work." Id.; see also Cross Oil Refining Co., 111 LA 1013, 1024 (1999) (reinstating employee on "last chance agreement" for multiple confrontations with supervisors, co-workers, and customers, where employee was a diabetic whose condition may have caused short temper, but requiring employee to undergo mental and emotional fitness test to ensure that he would not be a disruption to the workplace, and to adhere to strict medical regimen and rules of conduct upon reinstatement).

Nothing in the parties' CBA or in the 2003 agreement (HX 6) precludes such a solution. Indeed, as the Hotel's witnesses admitted, the parties, in drafting the 2003 agreement, never even considered the question of whether Mr. Merhai suffered from any emotional or mental condition that might have contributed to his behavior. Tr. (Vol. 1) at 189-190 (Marquez); Tr. (Vol. 2) at 87-88 (statement of counsel). Because the issue was not contemplated, the parties drafted the agreement to apply only to intentional behavior – simply because that was the only type of behavior they believed to be at issue. As the Supreme Court observed, "[a]rbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578-79 (1960). See also American Postal Workers v. United States Postal Serv., 789 F.2d 1, 6-7 (D.C. Cir. 1986) ("the adoption of an arbitration clause indicates that the parties have agreed to employ an arbitrator as their 'contract reader' and empowered him or her to render a binding interpretation of the collective bargaining agreement. . . . [h]is interpretation of the law becomes part of the contract and thereby part of the private law governing the relationship between the parties . . . ."). The Arbitrator, as the parties' authorized "contract

- 13 -

reach [?] in this case, accordingly is empowered – and even required – to fashion a balanced resolution that fills in the unforeseen interstices in the parties' agreement.

Of course, whether Mr. Merhai's alleged conduct in fact resulted from any psychological or emotional condition is not a question that can be answered either by the Arbitrator or by the parties, and is one that must be addressed by an expert. If, however, an expert's evaluation determines that a medical condition did cause or contribute to Mr. Merhai's behavior, then Mr. Merhai should be provided an opportunity to seek treatment for that condition, and, if judged by competent professionals to be fit, to return to his position at the Hotel with full responsibility for close adherence to any treatment or medication schedule. Mr. Merhai has expressed his willingness to undertake this course of action, to cooperate in a psychological evaluation, and to seek any professional assistance indicated. Accordingly, should the Arbitrator determine that the conduct in question occurred as the Hotel has charged, reinstatement with full seniority, conditioned upon a psychological evaluation and a fitness-for-duty release, should be granted so that Mr. Merhai can finish his career as a productive employee of the Hotel.

**Conclusion**

For all of the foregoing reasons, the Union respectfully requests that the Arbitrator either (1) sustain the grievance and order Mr. Merhai made whole; or (2) if the Arbitrator finds that the conduct occurred as charged by the Hotel, order reinstatement with full seniority conditioned upon psychological evaluation by an appropriate professional and a release stating that Mr. Merhai may resume duty without a recurrence of similar incidents.

Respectfully submitted,

Devki K. Virk
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C.  20005
(202) 842-2600 (Telephone)
(202) 842-1888 (Facsimile)

*Counsel for UNITE HERE Local 25*

Dated: March 10, 2006