# Virk Declaration
# Exhibit 2

Arbitration                                                December 15, 2005
                          Washington, DC

                                                                  Page 1

1              IN THE MATTER OF ARBITRATION BETWEEN

2         - - - - - - - - - - - - - - - X

3    HOTEL RESTAURANT EMPLOYEES,      :

4    Local 25 HAY-ADAMS HOTEL         :   Girdharry Merhai

5                                      :   Grievant

6         - - - - - - - - - - - - - - X

7

8

9                             Washington, D.C.

10                            Thursday, December 15, 2005

11

12

13              Arbitration hearing in the above-entitled

14    matter, taken at the Seyfarth Shaw, 815 Connecticut

15    Avenue, NW, Suite 500, Washington, D.C., at

16    10:15 a.m., Thursday, December 15, 2005, and the

17    proceedings being taken down by Stenotype by PENNY M.

18    DEAN, RPR, and transcribed under her direction.

19

20

21

22

23

24                                    Certified Copy

25

Arbitration                                                      December 15, 2005
                        Washington, DC

Page 188

1    building that is my job.  I brought that to Gerard's

2    attention and that's why he, Roman, is taking

3    revenge.

4              When asked about Cynthia, who overheard

5    portions of the conversation, Harry says, Cynthia's

6    management, she would be against me to conspire.

7              Now this is testimony I think by a trouble

8    employee; would you agree with that.

9              THE WITNESS:  Um-hum.

10             ARBITRATOR ZUMAS:  And someone who needs

11   psychiatric counseling, would you agree with that?

12             THE WITNESS:  I'm not a psychiatrist, I

13   don't know.

14             ARBITRATOR ZUMAS:  But you've been

15   involved in the discipline grievance procedures with

16   the hotels --

17             THE WITNESS:  Yes.

18             ARBITRATOR ZUMAS:  -- and you were

19   directly involved I am assuming in the decision to

20   termination the grievant in violation of the Last

21   Chance Agreement.

22             THE WITNESS:  Correct.

23             ARBITRATOR ZUMAS:  But did you consider at

24   all the alternative of saying we've got to do

25   something about this man, 24 years is a long time and

Arbitration                                                                     December 15, 2005
                              Washington, DC

                                                                    Page 189

1    he needs help and we should give him that help,

2    instead of putting him out on the street?

3              THE WITNESS:  Well, you have to understand

4    that I mean we're -- we have not discussed everything

5    that lead up to the Last Chance Agreement, but a Last

6    Chance Agreement was a serious issue, okay.

7              There are other things that we -- that did

8    not lead to the termination that I might be aware of

9    with this particular employee and does he need -- you

10   know, I think you have to look at it from a

11   consistency and fairness and implementing the policy

12   of the hotel that we had a Last Chance Agreement,

13   this guy is going around and making false accusations

14   and so is it a psychological issue?  No, I don't --

15   no, I don't believe it is, no, I don't believe it is.

16             ARBITRATOR ZUMAS:  You don't think that --

17             THE WITNESS:  It is an issue where it was

18   blatant, it was in a public area, it was a clear

19   violation of how tell polices that were covered in

20   the Last Chance Agreement.  And so -- and so, no,

21   we -- we -- there are occasions where we have

22   certainly assisted employees and offered, you know

23   assistance through programs or through counseling and

24   things of that nature.  In this case, no, I don't

25   think that was appropriate.

Page 190

1          ARBITRATOR ZUMAS:  You don't have an

2   employee assistance program at the hotel?

3          THE WITNESS:  We don't have an employee

4   assistance program necessarily, but we have assisted

5   employees in many ways with counseling, yes.

6          ARBITRATOR ZUMAS:  You don't think this

7   employee should have been included in that --

8          THE WITNESS:  No, I don't believe so --

9          ARBITRATOR ZUMAS:   --in that umbrella?

10         THE WITNESS: No.

11         ARBITRATOR ZUMAS:  He sounds paranoid to

12  me, doesn't he to you?  Roman is out to get revenge?

13         Nothing funny about that.

14         THE WITNESS:  No, I don't think it is

15  funny at all, I think it is hurtful.

16         ARBITRATOR ZUMAS:  And Cynthia is

17  conspiring against him.

18         THE WITNESS:  Um-hum.

19         ARBITRATOR ZUMAS:  What was his prior

20  employment record other than the incidents in 2003

21  and 2005?

22         THE WITNESS:  I'd have to look through the

23  files, but for the most -- I don't know, I'd have to

24  look through his entire file.

25         ARBITRATOR ZUMAS:  Would you, Mr.

Arbitration                                                                December 15, 2005

Washington, DC

Page 214

```
 1    what was said, just the fact that you knew they were

 2    talking, correct?

 3         A.    Yes.

 4         Q.    The only thing you're saying is that

 5    neither of them looked upset.  I have no other

 6    questions.

 7         A.    Yes.

 8              MR. CHATILOVICZ:  I have no further

 9    questions.

10              MS. VIRK:  No further questions,

11    Mr. Cooper, your five minutes of fame are over, thank

12    you.

13              (Witness excused.)

14    Whereupon,

15                   GIRDHARRY MERHAI,

16    the witness, having been previously duly sworn, was

17    examined and testified as follows:

18              ARBITRATOR ZUMAS:  You're under oath,

19    you've been sworn.

20                   DIRECT EXAMINATION

21              BY MS. VIRK:

22         Q.    Mr. Merhai, were you born in this country?

23         A.    No, ma'am.

24         Q.    Where were you born?

25         A.    British Guyana, South America.
```

Arbitration                                                    December 15, 2005
                          Washington, DC

                                                              Page 215

1          Q.     And how old are you, sir?

2          A.     Fifty-nine years.

3          Q.     When did you immigrate to the United

4     States?

5          A.     November, 15th, 1980.

6          Q.     1980?

7          A.     Yes.

8          Q.     When did you begin working at The

9     Hay-Adams Hotel?

10         A.     April 27th, 1981.

11         Q.     The Hay-Adams Hotel, is that a job that

12    you've held continuously approximately since April of

13    1981?

14         A.     Yes, ma'am.

15         Q.     Is that basically the only job of any

16    significance you've held since you came to the United

17    States?

18         A.     Yes, ma'am.

19         Q.     Are you married, Mr. Merhai?

20         A.     Yes, ma'am.

21         Q.     How long have you been married?

22         A.     To my wife for 36 years.

23         Q.     So you came here with your wife, then?

24         A.     Yes, ma'am.

25         Q.     How many children do you have?

Arbitration                                                    December 15, 2005
                            Washington, DC

Page 216

1      A.     Four.

2      Q.     What -- at the time that you were

3   discharged in July of 2005, what was your position at

4   The Hay-Adams?

5      A.     Bellman, bellman doorman.

6      Q.     Prior to that, had you held any other

7   positions within the hotel?

8      A.     Yes, I was house man for seven years.

9      Q.     Seven years?

10     A.     Yes, ma'am.

11     Q.     I want to focus on your time as a bellman,

12  the majority of your time at The Hay-Adams, can you

13  describe for the arbitrator a little bit about what

14  your regular duties -- let me start this way, around

15  the time of your discharge, what was the regular

16  shift that you worked?

17     A.     My regular shift was from 6:00 a.m. to

18  2:30 p.m.

19     Q.     Was that Monday through Friday?

20     A.     Monday through Friday.

21     Q.     And just describe for the arbitrator in

22  general what is the bellman's job at The Hay-Adams?

23     A.     My bellman job is 6 o'clock in the morning

24  I distribute The Washington Post to every occupied

25  room.

Page 233

1        Q.    Oh, all in one?

2        A.    Yes.

3        Q.    What, if anything, did Mr. -- do you

4    recall Mr. Zoechling saying to you?

5        A.    Mr. Zoechling walk over to me and just

6    like we are right here and he said so many derogatory

7    statement to me and it made me feel like a little

8    piece of sand.

9        Q.    What statement did he say to you?

10        A.    I can't -- he make me feel inferior,

11    that's one, and of my color of skin, that's what I

12    felt.

13        Q.    He did not, just to be clear, say -- use

14    any explicitly racial terms with you?

15        A.    He did raise some kind of issue of racist

16    term, so I feel belittled, so I ask him, why you do

17    that, because of the color of my skin?

18        Q.    And did he say anything with respect to

19    your race, did he expressly refer to your race?

20        A.    No, he did not.

21        Q.    But you felt belittled by what he said to

22    you?

23        A.    Yeah, it is a racist remark, that's what I

24    considered.

25        Q.    What, if any, response did you make to him

Page 234

1    at that time?

2         A.    My conversation ended right there and he

3    went away.

4         Q.    What did you say to him?

5         A.    I said because of the color of my skin you

6    think I'm stupid.

7         Q.    You said those words?

8         A.    Yes.

9         Q.    Why did you say those words?

10        A.    Because he belittled me and the word he

11   use I can't really recall what he use, he make me

12   feel very little.

13        Q.    Did you mention Mr. -- let me ask you

14   this, had you ever had any confrontations or

15   arguments with Mr. Zoechling before that time?

16        A.    No, ma'am.

17        Q.    What was your tone of voice when you spoke

18   with him?

19        A.    Normal conversation.

20        Q.    As loud or louder than it is now?

21        A.    No, no.  Just like how we're talking here

22   now.

23        Q.    Is there any doubt in your mind that he

24   heard you?

25        A.    Yeah, he was next to me.

Arbitration                                          December 16, 2005
                        Washington, DC

                                                              Page 1

1                              BEFORE

2                  ARBITRATOR NICHOLAS ZUMAS

3    - - - - - - - - - - - - - x
                               :
4    HOTEL & RESTAURANT         :
     EMPLOYEES, LOCAL 25,       :
5    UNITE HERE,                : Grievance:
                               : G. Merhai - Termination
6         v.                    :

7                              :

8    HAY-ADAMS HOTEL.           : VOLUME 2

9                              :

10   - - - - - - - - - - - - - x

11

12

13             Friday, December 16, 2005

14             Seyfarth Shaw

15             815 Connecticut Avenue, NW

16             Washington, D.C. 20006

17

18   The hearing in the above-entitled matter

19   convened, pursuant to notice, at 10:08 a.m.

20

21   BEFORE:

22

23             NICHOLAS H. ZUMAS

24             Arbitrator

Certified Copy

25



Page 24

1          A     No.  Because Colette was so hostile

2     towards me, and she was keep pounding me, why you

3     did say this, did you say this about Bruland and me

4     racists.  That's all I heard all the time.  No one

5     was taking notes at that time, sir.

6          Q     Okay.  All right, let's go back to your

7     testimony yesterday regarding this incident.  Ms.

8     Virk asked you about the incident that occurred

9     behind the desk.

10         A     Yes, sir.

11         Q     And would you please describe to me what

12    Roman said to you.

13         A     Sir, I can't really remember what he said

14    to me.  He made me feel so little that I was so

15    embarrassed, and I think that it was racist.  So I

16    told him why you say this is because the color of

17    my skin.  That's all I said to him, sir.  It was a

18    closed conversation.  It wasn't a provocative way.

19    It was just a regular conversation.

20         Q     It was just a regular conversation?

21         A     Yes, sir.  We didn't have any argument,

22    nothing at all.

23         Q     But you didn't have an argument -- didn't

24    that upset you, what he said?

25         A     No, sir.

```
 1        A     No, sir, he didn't say that.

 2        Q     Didn't you think it was important to tell

 3   Colette and Gerard what Roman had said to you if

 4   something he said was racist?

 5        A     It was not necessary for me to say that.

 6   No one asked me about it.

 7        Q     Well, Colette was accusing you of being

 8   racist.

 9        A     Yes.  Yeah.

10        Q     Don't you think that in -- I mean wouldn't

11   it be logical in response for you to say, wait, I

12   didn't say anything racist, Roman was the one that

13   said it?

14        A     No one asked me about that, sir, no

15   question.

16        Q     You knew your job was on the line, did you

17   not?

18        A     If I used derogatory remarks, I know my

19   job is on the line, sir.

20        Q     No, but when you were at that meeting, you

21   knew your job was on the line?

22        A     I know she going to hire me right away.

23        Q     You knew she was going to --

24        A     Yeah, because she was trying to set me up

25   all the time.
```

Page 28

```
 1        Q     She was?

 2        A     Yes.

 3        Q     How was that?

 4        A     Because she don't like me, she and

 5    Bruland.

 6        Q     She and Bruland don't like you?

 7        A     Yeah, because of the last incident.

 8        Q     Because of the last incident?

 9        A     Yes.  They won't even speak to me.

10        Q     But it's been -- it's been a year and a

11    half since the last incident?

12        A     Yes, sir.

13        Q     And you worked for three years under

14    Colette and Mr. Bruland before the last incident

15    occurred; correct?

16        A     No, Colette was just came there about a

17    year.

18        Q     She's been there four and a half years.

19        A     That means it happened in '03.

20        Q     Okay, so you had worked with her for three

21    years before that happened.

22        A     That's Bruland.  Colette came later after

23    that.

24        Q     Well, Colette has been here four and a

25    half years.
```

Arbitration                                                      December 16, 2005
                        Washington, DC

Page 29

```
 1      A     That's to now.  It's '03 I'm talking

 2   about.

 3      Q     Right.  So that would be --

 4      A     She wasn't there -- she was there about a

 5   year.

 6      Q     Well, but you worked -- all right.  So you

 7   think they were out to get you?

 8      A     Yes, sir.

 9      Q     Now you know Cynthia Okoth; correct?

10      A     Yes.

11      Q     And did -- was there anything that had

12   occurred between the two of you that would make her

13   dislike you?

14      A     Sir, no animosity.  We are workers, good

15   relationship, sir.

16      Q     Okay.  And you are aware of the fact that

17   -- and you heard her testimony yesterday?

18      A     Yes, sir.

19      Q     That she gave a statement that same

20   morning; correct?

21      A     Yes, sir.

22      Q     Okay.  Why -- do you have any idea why

23   Cynthia would lie about what she heard?

24      A     Her job security, sir.

25      Q     Her job security?
```

Arbitration                                                December 16, 2005
                        Washington, DC

                                                              Page 30

1        A    Yes, sir.

2        Q    So do you think that Roman and Cynthia got

3   together and made this story up?

4        A    Yes, sir.

5        Q    Okay.

6        A    And with Ms. Colette, the three of them.

7        Q    Let me just ask you, you were eventually

8   terminated by the hotel; correct?

9        A    Yes, sir.  A week after.

10       Q    A week after.  I know you didn't agree

11  with why you were terminated, but you understood

12  why you were being terminated; correct?

13       A    Mr. Folly came -- called me to the hotel

14  and told me see him at HR.  So we went there, me

15  and Tawana.

16       Q    Right.

17       A    And Mr. Green.  And they said they

18  terminate me under the last chance agreement.

19       Q    But you understood it was over the -- what

20  Roman had accused you about?

21       A    Yes, sir.

22       Q    And it was about the issue involving Kay

23  Vernem?

24       A    Yes, sir.

25       Q    So you were aware of that?

Page 76

1     all skewed.  They are in some cases bizarre.  You

2     worked with this man for eight years?

3              THE WITNESS:  Two years.

4              THE ARBITRATOR:  Two years.  You have had

5     an opportunity to observe him, and you have had an

6     opportunity to view his interactions with other

7     employees, and you are still saying that this is

8     not a troubled employee?

9              THE WITNESS:  I don't think he's a

10    troubled employee.

11             THE ARBITRATOR:  Okay.  All right.  Thank

12    you, sir.

13                                      [Witness excused.]

14        [Recess.]

15    Whereupon,

16                      ROMAN ZOECHLING

17    was called as a witness, and having been previously

18    duly sworn, was examined and testified as follows:

19             THE ARBITRATOR:  Good morning.

20                    DIRECT EXAMINATION

21        BY MR. CHATILOVICZ:

22    Q     Roman, would you restate your name for the

23    record again, please?

24    A     My name is Roman Zoechling.

25    Q     And I just want to remind you, you are