# Virk Declaration
# Exhibit 6

BEFORE NICHOLAS H. ZUMAS
ARBITRATOR

| | |
|---|---|
| IN THE MATTER OF ARBITRATION ) | |
| BETWEEN ) | |
| ) | |
| HAY ADAMS HOTEL ) | |
| ) | |
| AND ) | DISCHARGE OF GIRDHARRY MERHAI |
| ) | |
| UNITE HERE, LOCAL 25 ) | |

**POST-HEARING BRIEF OF THE COMPANY**

Peter Chatilovicz, Esq.
Seyfarth Shaw LLP
815 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006-4004
(202) 463-2400

BEFORE NICHOLAS H. ZUMAS
ARBITRATOR

| | |
|---|---|
| IN THE MATTER OF ARBITRATION ) | |
| BETWEEN ) | |
| ) | |
| HAY ADAMS HOTEL ) | |
| ) | |
| AND ) | DISCHARGE OF GIRDHARRY MERHAI |
| ) | |
| UNITE HERE, LOCAL 25 ) | |

## POST-HEARING BRIEF OF THE COMPANY

Pursuant to the terms of the collective bargaining agreement ("the Agreement") between the Hay Adams Hotel (the "Hotel") and the UNITE HERE Local 25 (the "Union"), the above-captioned matter was submitted for binding arbitration before Arbitrator Nicholas H. Zumas. The hearing was held on December 15 and 16, 2005, in Washington, D.C. This post-hearing brief is submitted on behalf of the Hotel pursuant to the parties' agreement.[1]

## ISSUE PRESENTED

Whether the Hotel had just cause to terminate the Grievant under his "Last Chance" Settlement Agreement?

## RELEVANT SETTLEMENT LANGUAGE AND WORK RULES

Settlement Agreement (Hotel Ex. 6):

> 3. Should the Grievant[2] engage in behavior in the future that is similar in nature to that which gave rise to the instance grievance -- including violating the Hotel's "The Work Environment is No Place for the Rumor Mill" policy, its Performance Improvement policy and its Harassment policy -- and as a result be terminated from employment, the Union agrees that is shall waive its right to grieve said future incident.

---

[1] References herein to the transcript of the proceedings are designated as (Tr. __), first day of hearing, December 15, and (Tr2. __), second day of hearing, December 16; joint exhibits are designated as (Joint Ex. __); the Hotel's exhibits are designated as (Hotel Ex. __); and Union's exhibits are designated as (Union Ex. __).

[2] The Grievant in the Settlement Agreement was Girdharry Merhai, the Grievant in the instant case. This Settlement Agreement reduced the Grievant's termination to a suspension with the further understandings in paragraph 3.

This Agreement shall not, however, preclude the Union from carrying out its due diligence in investigating the factual claim of wrong doing.

Hay Adams Rules and Regulations (Union Ex. 2):

20. Making or publishing false, malicious, vicious or derogatory statements concerning an employee, supervisor, [or] the Hotel . . . within the hearing range of customers.

Rumor Mill Policy (Hotel Ex. 6; Union Ex. 2):

The Hay-Adams Hotel strives to create a positive work environment for all employees.

| Rumor: | 1: | talk or opinion widely disseminated with no credible source; |
| | 2: | a statement or report with no authority or known truth |

| Slander: | 1: | verbal statements or false charges; |
| | 2. | misrepresentations of fact which defame and damage another's reputation |

. . . .

Immediately report to management any verbal or physical behaviors which are offensive or unwelcome. Any conversation or statement which falls into one of the definitions may be construed as a very serious breach of professional behavior.

Harassment Policy (Hotel Ex. 6: Union Ex. 2):

The Hay-Adams expects that all employees will treat each other with fairness and respect. Harassment on the basis of race, religion, color, gender, sexual orientation, age, national origin or disability or as otherwise provided under state or local law, will not be tolerated and is strictly prohibited. Harassment is illegal and contrary to the policy of the Hotel. The Hotel strives to foster a work environment free of harassment, discrimination, intimidation and insult. Harassment is a form of misconduct that undermines both personal and professional relationships in the workplace. Every employee must be assured that he or she can work in an environment that is free from unwanted and unwelcome harassment and discrimination.

## STATEMENT OF FACTS

The Hay Adams Hotel is a small, luxury hotel located in the heart of Washington, D.C. directly across from the White House. The Hotel's General Manager is Hans Bruland and its

Director of Operation is Colette Marquez. (Tr. 31, 32, 128) Girdharry Merhai, the Grievant in the instant case, was a bellman at the Hotel. (Tr. 216)

A.    **The Events Leading to the Grievant's Termination**

Grievant's False, Racially Charged Accusations on July 22:

On the evening of July 21 and the early morning hours of July 22, 2005, the Night Manager on duty was Cynthia Okoth. Roman Zoechling was a Management Trainee who was also on duty and responsible for the front desk operation. Both employees worked from 11:00 p.m. until 8:00 a.m. (Tr. 24-26, 71) Around 6:00 a.m., Bellman Girdharry Merhai, the Grievant, who worked a 6:00 a.m. to 2:30 p.m. shift, arrived at the Hotel. Around 6:40 a.m., after performing his normal duties of delivering newspapers to the rooms throughout the Hotel, the Grievant came to the lobby/front desk area, where both Ms. Okoth and Mr. Zoechling were working. Ms. Okoth was working behind the reception desk. Mr Zoechling had just finished helping a guest in the same area as Ms. Okoth and was about to fax some papers when the Grievant arrived in the lobby area. (Tr. 27-29, 71-73)

When the Grievant arrived in the lobby, Mr. Zoechling was walking from the reception desk to the concierge desk. Mr. Zoechling stated that he and the Grievant exchanged words for 20-30 seconds and then Mr. Zoechling proceeded to walk to the fax machine behind the concierge desk.[3] The Grievant followed Mr. Zoechling behind the concierge desk. (Tr. 29-31)

It is at this point that the problem ensued. After doing a few things at the fax machine, Mr. Zoechling turned around and stood face to face with the Grievant who was standing behind him. The Grievant stated to Mr. Zoechling: "Don't look at me like that." (Tr. 31) Surprised at the Grievant's comment, Mr. Zoechling said, "What do you mean?" or "What do you want to

---

[3]   Mr. Zoechling did not recall exactly what he and the Grievant said to each other, but he was certain that it was simply an exchange of normal pleasantries such as "Good morning," etc. (Tr. 29) There is no allegation that Mr. Zoechling said anything to antagonize the Grievant at this time.

3

say?" (Tr. 31) In response, the Grievant then said, "You, Colette [Marquez], Mr. Bruland, you white people think we colored people are stupid." (Tr. 32) Mr. Zoechling, who was a relatively new employee, was shocked by the Grievant's statements and said, "Harry, I never said anything like that, I didn't make any disrespectful comments or anything in regards to that." The Grievant then got louder, seemed angry, and said, "I know you didn't make any comments, but I can see it in your eyes." (Tr. 32-34) The Grievant also stated that "he [the Grievant] was more intelligent than your type of people." (Tr. 36) Mr. Zoechling took this to mean that the Grievant was more intelligent than white people. (Tr. 36) Mr. Zoechling stated that he was upset and offended at being called a racist, but since he could not control or do anything about the situation, he left the area behind the concierge desk and began walking back toward the reception desk. (Tr. 36)[4]

At the time the Grievant was making his accusations to Mr. Zoechling, Night Manager Okoth was helping a limousine driver at the reception desk only a short distance away. (Tr. 71-73) Because the Hotel's lobby is so small and because the Grievant was speaking in a relatively loud voice, Ms. Okoth could hear what the Grievant was saying. Specifically, Ms. Okoth recalled the Grievant using the term "white people" and saying "you think that us colored people are stupid." And, "I'm actually more intelligent than you are." (Tr. 75) Disturbed at what she was hearing, Ms. Okoth came out from behind the reception desk and headed toward the concierge desk to stop the conversation. As she approached the concierge desk, Mr. Zoechling was already coming toward Ms. Okoth and she told both employees to keep quiet. There was no further discussion between the Grievant and Mr. Zoechling. (Tr. 36, 75-76)

Shortly after the incident, Mr. Zoechling spoke with Ms. Okoth about what the Grievant had said and they agreed to bring it to the attention of Gerard Folly, the Front Office Manager,

---

[4] The Grievant denies saying these things. Rather, the Grievant states that Mr. Zoechling said something that "belittled" him. Of course, the Grievant has no recollection of what Mr. Zoechling may have said to cause the Grievant to say that he believed Mr. Zoechling, Mr. Bruland and Ms. Marquez thought colored people were stupid.

4

when he came to work a short time later. When Mr. Folly arrived, Mr. Zoechling and Ms. Okoth spoke with him about the incident and Mr. Folly asked the employees to give him a written statement of the events which had taken place. (Tr. 36-38, 77-78) Both Mr. Zoechling and Ms. Okoth wrote out statements before leaving work on the morning of July 22. (Hotel Exs. 2, 4; Tr. 38, 78)

<u>The Grievant's False Statements Regarding Controller Marina Kazlausky</u>:

During the course of investigating the July 22 lobby incident, the Hotel learned that the Grievant had engaged in further misconduct just two days before. Kathleen (Kay) Vernem, who is the Credit Manager at the Hotel, had been out of work due to a leg injury. (Tr. 114-115) On July 20, the day Ms. Vernem returned to work, she was in the cafeteria getting her lunch when the Grievant approached her. (Tr. 116) After welcoming Ms. Vernem back to work, the Grievant proceeded to tell Ms. Vernem in a very loud voice that he too had had an injury and that the Controller, Marina Kazlausky, was constantly calling the Grievant at his home and harassing him to come back to work. The Grievant also stated that he had to get a lawyer to stop Ms. Kazlausky from harassing him. Ms Vernem stated that the cafeteria was filled at the time and that the Grievant was "brazen and loud" in what he was saying and that he was trying to talk over everyone else. (Tr. 116-118)

As a result of this incident and because she felt Grievant's conduct was inappropriate, Ms Vernem reported it to Ms. Kazlausky. (Tr. 118) In fact, Ms. Kazlausky had never called the Grievant at his home nor harassed him to come back to work. (Tr. 192) Even the Grievant admitted at the hearing that Ms. Kazlausky never called him at home to harass him about returning to work. (Tr. 222) This incident was reported to Director of Operations, Colette Marquez, who was in the process of investigating the July 22 incident involving the Grievant. (Tr. 138-140)

5

### B.    The Hotel's Investigation and its Decision to Terminate the Grievant

In 2003, the Grievant was terminated for a number of incidents which involved violation of the Hotel's rules prohibiting false and/or slanderous remarks about managers and fellow employees. The Grievant had been accused of making false, slanderous and insubordinate statements in public areas at the Hotel about the General Manager. More specifically, the Grievant accused the General Manager of stealing money from the employees and of being a thief, and then calling for him to be fired. (Tr. 130-135; Hotel Exs. 7, 8, 9, 10)

Although Grievant's 2003 conduct was most egregious and grounds for termination, because he had been employed by the Hotel for over 20 years, the Hotel and the Union agreed that the Grievant would be given another chance and reinstated after serving a lengthy suspension. (Tr. 137) That concession by the Hotel was in exchange for the clear understanding that should the Grievant engage in any conduct which was similar in nature to that involved in his suspension, he would have no right to grieve the disciplinary action taken by the Hotel. (Hotel Ex. 6) Stated otherwise, the parties agreed that if the Hotel should terminate the Grievant over similar behavior, the termination penalty could not be challenged. So that there would be no question as to which rules were "similar in nature" to those involved in Grievant's 2003 suspension, those rules were attached to the Settlement Agreement. (Hotel Ex. 6; Tr. 130, 137)

### The Investigation:

On July 22, later on day as the incident which took place in the Hotel lobby, the Hotel met with the Grievant to give him the opportunity to explain his side of the story. (Tr. 140-141) The meeting was attended by Front Office Manager Folly, Director of Operations Marquez, Union Representative Tawana Reel, and the Grievant. Mr. Folly opened the meeting and asked the Grievant to explain what had happened in the lobby earlier that morning. Mr. Folly also showed the Grievant the statements from both Mr. Zoechling and Ms. Okoth. (Hotel Ex. 11; Tr.

53-54, 141). The testimony, as well as the notes from that meeting show that the Grievant denied all of the statements attributed to him and what was contained in the statements from Mr. Zoechling and Ms. Okoth. Grievant's specific statement was, "I said nothing to this guy." The Grievant was also asked about his discussion with Kay Vernem and whether he had accused Ms. Kazlausky of harassing him. The Grievant denied this as well. (Hotel Ex. 11; Tr. 55; Tr2. 141)

Front Office Manager Folly said that the investigatory meeting was civil and quiet and in no way intimidating. (Tr2. 54-56) Thus, there was no reason why the Grievant, who has never been afraid to state his position, not to have given his side of the story had it been different from what was in the written statements.

### The Hotel's Decision to Terminate:

After meeting with the Grievant, Director of Operations Marquez reviewed the facts which she had gathered and the last chance Settlement Agreement which was applicable to the Grievant. Ms. Marquez concluded that without cause or basis, the Grievant had accused Management Trainee Zoechling, General Manager Bruland and her of being prejudiced against "colored people" in that they believed "colored people were stupid." (Tr. 142) The Grievant also made what can only be characterized as his own racist remark when he said that he was actually much more intelligent than "you people" (*i.e.*, white people like Zoechling, Bruland and Marquez). (Tr. 142-144) Ms. Marquez concluded that these statements were not true, unprovoked, and made in a small public area where anyone including guests could have heard what was being said. In addition to this misconduct, Ms. Marquez also concluded that the Grievant had made false/slanderous statements about Ms. Kazlausky when he accused her of calling the Grievant at home and harassing him in an attempt to get him to return to work for an injury. Ms. Marquez saw no basis to disbelieve Ms. Vernem who reported the incident. (Tr. 142-144)

7

Ms. Marquez reviewed the misconduct in this case and concluded that it was nearly identical to the kind of conduct for which the Grievant had been suspended in 2003 and in which he agreed not engage in the future. Finally, Ms. Marquez considered the fact that the Grievant was given the opportunity to explain what had been said or to acknowledge what he had done and offer mitigating circumstances. (Tr. 180) The Grievant did not acknowledge what was said or offer an explanation. Rather, the Grievant did exactly what he had done in 2003 when he was being disciplined: he denied all of the allegations even when the evidence to the contrary was overwhelming. (Tr. 142-144)

Before implementing the decision to terminate, Ms. Marquez consulted with General Manager Bruland and the Owner of the Hotel who had been familiar with the Grievant's previous misconduct. (Tr. 142-143) After hearing the facts, both concurred with Ms. Marquez's recommendation. The Grievant was then terminated on July 28, 2005.

## ARGUMENT

### THE GRIEVANT COMMITTED SEVERAL ACTS WHICH WERE SIMILAR IN NATURE TO HIS PREVIOUS MISCONDUCT AND VIOLATIVE OF THE SAME WORK RULES AND, THEREFORE, HIS TERMINATION IS NOT GRIEVABLE UNDER HIS LAST CHANCE AGREEMENT

A.   **The Grievant Violated the Hotel's Work Rules and His Last Chance Agreement**

The Arbitrator has already made clear to the parties that the issue for him in this case is not culpability, but rather whether termination was the appropriate penalty. At the time of his termination, the Grievant was working under what is commonly known as a "Last Chance" Settlement Agreement. (Hotel Ex. 6; *supra* at pp. 1, 6) That agreement stated that if the Grievant engaged in any behavior similar in nature to that which occurred in 2003, any action taken by the Hotel (including termination) was not grievable under the bargaining agreement. To make clear those rules to which the parties were referring, copies of the rules were attached to the Settlement Agreement. There is no question that several of these rules were violated. (Hotel Ex. 6)

8

Thus, on July 22, the Grievant, imagining that he could see it in the eyes of Management Trainee Zoechling, said to him: "You, Colette and Mr. Bruland, you white people think we colored people are stupid." A minute later he added: "In fact, I'm much more intelligent than your kind of people." (*Supra* at p. 4) The Grievant made this statement without any provocation, in a voice that could be heard throughout the lobby area, and without any factual basis. His conduct clearly violated the Hotel's rules against making false or slanderous remarks against fellow employees. (*Supra* at p. 2) It is significant that the Grievant not only wrongly accused Mr. Zoechling, the person he was addressing, of being a racist, he also made the same false accusations about General Manager Bruland and Operations Manager Marquez, who he later claimed were out to get him. (Tr. 227-228)[5]

Although this conduct clearly fell within the parameters of Grievant's last chance agreement and by itself justified termination, Grievant also violated his agreement a few days earlier when he wrongfully accused the Hotel's Controller, Marina Kazlausky of calling him at his home and harassing him about coming back to work from a workplace injury. The Grievant added that he needed to get a lawyer to stop Ms. Kazlausky from harassing him. This accusation was made in a filled cafeteria in a loud voice where countless number of employees could hear him. (*Supra* at pp. 5-6) Like his statements to Mr. Zoechling, the Grievant's statements about Ms. Kazlausky were false and slanderous. While his statements about Ms. Kazlausky, may not been as vicious as accusing someone of being a racist, they were reckless and in wanton disregard of the truth, since Grievant admitted that Ms. Kazlausky had not harassed him by continually calling him at home. (*Supra* at p. 6; Tr. 222)

---

[5] The Grievant's testimony, when compared with that of Mr. Zoechling and Ms. Okoth, who had no reason to lie, cannot be credited. Grievant claims that he felt Mr. Zoechling belittled him, but can't recall what was said. It is noteworthy that the Grievant never mentioned being belittled by Mr. Zoechling when he was asked about the incident in the lobby at his disciplinary meeting. (Hotel Ex. 10)

9

The last chance agreement that applied to the Grievant was crystal clear as were the work rules which he was bound not to violate. The Grievant clearly violated the work rules in question, not once but at least twice. And finally, the Grievant did so in a public area where guests could have heard him accuse the General Manager and Operations Manager of being racists and where other employees heard him accuse Controller Kazlausky of harassing him over his workers' compensation absence. It cannot be disputed that the Grievant engaged in similar conduct for which he had been suspended in 2003 and his violation of the last chance Settlement Agreement warranted his termination.[6]

### B.     The Hotel's Decision to Terminate the Grievant Is not Grievable

There is no principal of arbitration law more fundamental than that which binds an arbitrator to rule consistent with the plain language of the governing labor agreement. In this case, the just cause provision of the parties Agreement has been modified and what is binding upon the parties and the Arbitrator is the 2003 Settlement Agreement applicable to the Grievant. That Agreement specifically waives any right by the Union to grieve the Hotel's action, in this case the termination of the Grievant, if the Grievant engages in behavior similar to that which he previously engaged in. As shown in section A, next above, and as has been acknowledged by the Arbitrator, the question of whether misconduct occurred is not the issue in this case. Accordingly, the Arbitrator is proscribed from considering whether the Hotel's decision to terminate was appropriate, because the parties have agreed to remove that authority in this case. Clearly, this is an exception to the Arbitrator's normal authority, but that exception was something which the Hotel received as part of its bargain under which it agreed to suspend the

---

[6]     The Grievant readily admitted that he knew the rules to which he was bound not to violate and that if he made any racial, false or other statements that might harm someone's reputation, he could be terminated. (Tr. 2, 5-6, 27)

10

Grievant in 2003 rather than to terminate him. The Arbitrator cannot now take away the most important benefit of the bargain which the Hotel received from the Union and the Grievant.

Indeed, a last chance agreement is to be "strictly construed and enforced" by the arbitrator. *In Re Ingersoll-Dresser Pump Co.*, 114 LA 297, 301 (1999). The Arbitrator's job in cases where a last chance agreement controls the parties relationship is limited to establishing whether the Grievant violated the terms of such agreement. *Id.*

> However harsh or strict such terms and even though the arbitrator might well regard such conditions as unfair, that cannot be his concern. Once the arbitrator starts substituting his judgment for that of the parties he has exceeded his jurisdiction and, more importantly, has jeopardized the future use of such agreements for other employees. *Why would an employer who has been willing to forego assertion of its right of termination for just cause in return for a strict and absolute agreement of this nature take a chance on such agreement in another case if arbitrators will not give full recognition to the agreement of the parties?*

*In Re Kaydon Corp.*, 89 LA 377, 379 (1987) (emphasis added). There is simply no authority for an arbitrator under such circumstances to consider mitigating factors. *Id.* The sole question to be decided is whether the grievant violated the last chance agreement and if that is answered in the affirmative, the discharge must be upheld. *Id.*

An arbitrator "ignoring the explicit terms of a last chance agreement is owed no deference, and his award must be closely scrutinized." *Intern'l Union of Operating Engineers v. Cooper Natural Resources*, 163 F.3d 916, 919 (5th Cir. 1999) (overturning arbitrator's refusal to enforce last chance agreement and holding that an arbitrator does not have authority to ignore the parties' agreement in fashioning a remedy); *see also Coca-Cola Bottling Co. v. Teamsters Local Union No. 688*, 959 F.2d 1438 (8th Cir. 1992) (vacating arbitration award where arbitrator failed to enforce terms of last chance agreement); *Ohio Edison Co. v. Ohio Edison Joint Council*, 947 F.2d 786 (6th Cir. 1991) (same); *Tootsie Roll Indus., Inc. v. Local Union No. 1*, 832 F.2d 81 (7th Cir. 1987) (vacating arbitrator's award where his failure to enforce last chance agreement was viewed as the "dispens[ing of] his own brand of industrial justice"). Accordingly, the terms of

11

the Settlement Agreement between the Grievant and the Hotel must be enforced without reference to potential mitigating factors.

### C. Should the Arbitrator Choose to Consider a Penalty Other than Termination, It is Not Warranted in This Case

Although the Hotel submits that the Arbitrator is not authorized to look beyond whether the Grievant engaged in conduct which violated one or more of the work rules in his Settlement Agreement, should he do so, the facts of this case dictate that Grievant's termination must be upheld. From the discourse at the hearing, it appears that the Arbitrator's principal question is whether it would be appropriate for the Grievant to undergo some type of psychological analysis and then, if appropriate, therapy to alleviate the Grievant's psychological problems so that he may return to work without the risk that he would engage in similar conduct. The Hotel submits that this is an untenable alternative and not appropriate in this instance.

The parties all agree that they are not capable of determining the Grievant's psychological state and why he acted as he did in 2003 and then again in the instant case. Does he have serious psychological problems which may take years to correct? Are his problems minor personality issues which short-term therapy that anger management counseling might help? Or, is the Grievant simply an employee who has a brazen disregard for authority and one who cannot control his mouth whenever he "perceives" the smallest slight, whether or not his statements have any basis and may cause serious harm to others? Had the Union thought that therapy was an appropriate alternative, they should have been suggested it to the Grievant in 2003 so that he would not repeat his acts. The practical problems with sending the Grievant for analysis are many. What happens if a therapist says, this individual has no real psychological problems or some minor emotional issues (like low self-esteem, lack of appreciation of authority, etc.)? Does the Grievant simply get a free pass for his misconduct and be allowed to come back to work? What if the Grievant is deemed to have some serious psychological problems? Does

12

the Grievant undergo therapy for six months, one year, or two years, after which the Hotel will be expected to take him back and bump another employee from his or her position? The Hotel submits that none of these options work at this point in the process, nor is it appropriate to put the Hotel in such a position.

Besides the fact that the last chance Settlement Agreement does not provide the Arbitrator with the authority to modify the termination here and besides the impracticability of the therapy option, there are other reasons why the termination should not be modified:

First, when confronted at his disciplinary meeting and at the arbitration hearing with what had taken place in the lobby with Mr. Zoechling and with what he was accused of saying about Controller Kazlausky (*i.e.*, that she harassed him at his home over his workers compensation claim), the Grievant offered no rational excuse for his conduct, and simply denied everything. As the record shows, this is precisely what he did in 2003 when confronted with a series of false and slanderous statements which were witnessed by several unbiased witnesses. (Hotel Ex. 10) The Grievant maintains a state of mental denial after he does things which are violative of the Hotel's rules and harmful to others and this is not a situation which calls for mitigation.

Second, the gravity of what the Grievant said in this case and its implications, also need to be considered by the Arbitrator in deciding whether the Grievant should be given another chance. This is not a situation where an employee swore in public at another employee or called a manager "a jerk" in the heat of anger. Rather, the accusations lodged by the Grievant in this case -- that the General Manager, the Operations Manager, and Mr. Zoechling thought colored people were stupid, was, in this day of racial and culturally diversity and sensitivity, one of the worst things that an employee could say about a fellow employee or manager. What makes this incident even more egregious is the fact that the Grievant himself admitted that he did not think

13

that either General Manager Bruland or Operations Marquez were racists.[7] To accuse the two highest managers in the Hotel of thinking that "colored people are stupid" while in a public area and without any basis or support, is about as reckless a statement as one can make and one that can have long-lasting effects if heard by other employees, especially in a small hotel like the Hay Adams. The Hotel works hard to establish and maintain an environment of mutual respect and teamwork. Grievant's conduct could not be more inconsistent with those efforts.

Finally, the Arbitrator should also consider the fact that during the course of the investigation of this matter, the Hotel learned that the Grievant repeated his misconduct of 2003. Thus, shortly after Mr. Zoechling started working at the Hotel (in late 2004 or early 2005), the Grievant, upon seeing General Manager Bruland and Operations Manager Marquez crossing the lobby, said to Mr Zoechling: "Look, they are all thieves." When Mr. Zoechling asked the Grievant what he meant, the Grievant told him the story of the Japanese guest who had given Mr. Bruland an envelope of money which was for the employees, but which the Grievant said Mr. Bruland kept for himself. (Tr2. 78-81) Of course, the incident in question is the one which took place in 2003, and calling Mr. Bruland a thief in 2003 was what the Grievant was originally terminated for and which led to his long-term suspension. (*Supra* at p. 6) Despite this discipline, the Grievant had no hesitation again about calling the General Manager and Operations Manager "thieves" to a brand new employee and in direct violation of his last chance settlement agreement.

This is not situation which warrants a modification of management's decision. To the contrary, it is a situation which cannot be tolerated in the workplace today where employers

---

[7]   Although the Union made a feeble attempt to deny that these words were used, the testimony of Mr. Zoechling and Ms. Okoth and the written statements made on the morning of the incident were clear, unwavering and credible. This is in direct contrast with the Grievant's testimony which was simply a series of denials.

14

generally and this Hotel specifically work hard to establish an atmosphere free of racial and cultural discrimination and teamwork among a group of virtually diverse co-workers.

## CONCLUSION

Based upon the foregoing facts, arguments and authorities, the Company submits that the grievance should be denied.

By: /s/ Peter Chatilovicz
Peter Chatilovicz
SEYFARTH SHAW LLP
815 Connecticut Avenue N.W.
Suite 500
Washington, D.C. 20006-4004
Telephone: (202) 463-2400
Facsimile: (202) 828-5393

15

DC1 30162304.1