# Virk Declaration
# Exhibit 7

EATON CUTLER-HAMMER CORP.                           110 LA 467

by the elimination of the three (3) positions in question.

[2] This finding must stand even though the bargaining unit was reduced by three (3) positions. Although the number of positions was lowered by three (3), the number of bargaining unit employees was reduced by only one (1), and that was done voluntarily. Indeed, the type of evidence that would be used to justify reversing a subcontracting decision, namely the layoff of current employees, was specifically lacking due to the Company's promoting the affected employees here. Thus, the fact that the number of bargaining unit positions was reduced, alone, is insufficient to find that the Agreement was violated.

For all these reasons, the grievances must be, and are, denied.

### AWARD

The grievances are denied.

---

### EATON CUTLER-HAMMER CORP. —

#### Decision of Arbitrator

In re EATON CUTLER-HAMMER CORPORATION and BEAVER SALARIED EMPLOYEES ASSOCIATION, FMCS Case No. 98/00752, April 10, 1998

Arbitrator: Matthew M. Franckiewicz, selected by parties through procedures of the Federal Mediation and Conciliation Service

### DRUG TESTING

**1. Last chance agreement ▶118.653 ▶118.815**

Employer properly discharged employee, who failed alcohol test while working under terms of last chance agreement, despite contention effect of provision in agreement allowing for random testing was to incorporate schedule of penalties from substance abuse policy, which included suspension for first test failure, where agreement provided that grievant's responsibility was to work without violating company rules, and that violation will lead to discharge.

**2. Validity ▶118.653**

Alcohol test results upon which employer relied to discharge employee were valid, despite decrease in blood alcohol level from 0.066 to 0.056 percent in 19 minutes between test and retest, where second test would likely show at least some decline in blood alcohol content inasmuch as alcohol is metabolized over time, both tests were over company standard of 0.040 percent even if it is assumed that decline indicates that machine had margin of error of +0.01 percent,

apparatus did not have history of false positives, and nurse detected odor of alcohol about grievant.

Appearances: For the employer — Francis W. Sullivan, Jr. For the union — Patrick J. Thomassey, attorney.

### VALIDITY

#### Contract Provisions Involved

FRANCKIEWICZ, Arbitrator: — [The contract provisions involved are: — ]

#### SECTION IV
#### COOPERATION

1. The Company and the BSEA recognize that mutual respect and confidence will aid greatly in carrying out the provisions of this Agreement and will also go far toward bringing about the harmonious relations which both desire. The Company and the BSEA further agree that collective bargaining can best succeed in a friendly atmosphere in which both parties bargain in good faith and with an honest desire to understand each other's point of view.

2. The BSEA recognizes that it is the responsibility and right of the Company to maintain discipline and efficiency, and agrees that Management shall have the freedom of action necessary to discharge its responsibility for the successful operation of the Company. These responsibilities and rights of the Company do not in any way limit any other specific provision of this Agreement. The BSEA and the Company agree to administer the provisions of this Agreement in good faith.

#### SECTION XVI-A
#### ARBITRATION OF DISCIPLINE, RELEASE AND DISCHARGE MATTERS

* * *

It shall be the function of the arbitrator and he shall be empowered, except as his powers are limited below, to make necessary investigation and hold a hearing:

A.) To make decisions in cases of alleged violations of the terms of this Agreement or any written supplements thereto;

B.) To make a decision in cases of alleged improper disciplinary action where the issue is whether the employee was disciplined for just cause with the discretion to make appropriate modification of the penalty.

#### The Facts

W— is a long term employee of the Company, and its predecessor Westinghouse Electric Corp. (Eaton Cutler-Hammer purchased the operation effective February 1994.) Beginning with an oral warning dated January 17, 1995, he received a series of disciplinary actions based on absenteeism and failure to report off work, culminating in his discharge on May 7, 1997.

110 LA 468                    EATON CUTLER-HAMMER CORP.

The discharge was grieved, and after the Union presented the Employer with documentation that W— had been enrolled in a rehabilitation program at Gateway Rehabilitation Center, the parties entered into the following agreement, quoted in its entirety.

*LAST CHANCE AGREEMENT*

In full consideration of the circumstances surrounding the discharge of employee W—, the Company has determined that the discharge date of May 7, 1997 until his return to work will be considered a suspension with no compensation for lost benefits or wages.

Effective with the signing of the parties W— will be eligible to return to work under the following conditions. Failure to comply with any of the conditions of this agreement will result in his immediate discharge.

1). W— will be required to successfully complete a return to work physical.

2). It is W—'s responsibility to work without violating Company policies or rules and maintain an exemplary work attendance record in 1997 & 1998.

3). W— must submit documentation to Management that he is currently attending and has successfully completed the treatment program outlined by the Gateway Rehabilitation Center.

4). W— must continue treatment recommended by his physicians including prescribed medication.

5). W— must submit documentation from a sponsor indicating he is attending Alcoholics Anonymous (AA) meetings as required by Gateway Rehabilitation Center or his own a minimum of two times per week.

6). W— will be randomly tested for alcohol as per the Eaton Corporation's Substance Abuse Program for a five (5) year period commencing the day he returns to work.

7). W— will make every attempt to schedule doctor appointments on his own time. If this is not possible W— must provide his immediate supervisor with a minimum of twenty four hours notice of any appointments made with a physician. Also, W— must provide documentation to support his appointment.

This agreement is entered into with the understanding that it is made without prejudice or precedence to the parties.

This agreement was entered into by W— voluntarily, without compulsion, coercion or duress from the Company or the Union.

W— certifies that he has carefully read and fully understands the letter and intent of this Last Chance Agreement.

The agreement is dated June 6, 1997 and is signed by W—, as well as by representatives of the Union and the Employer. From the time of the last chance agreement through his discharge, W— did not miss any work, other than excused absences to visit his doctor.

Plant Nurse and Benefits Administrator Ann Bittner is responsible for drug and alcohol testing. She tested W— on June 6, 1997 as part of his back to work physical. Bittner also is responsible for selecting employees who

are subject to random testing, and for scheduling their tests. W— was subjected to a random test on July 8, 1997, and the results were negative. Bittner selected W— for another random test on Monday August 18, shortly after the 7:30 a.m. starting time. There had been a Steelers' exhibition game on Sunday. When W— appeared for the test, he showed no outward signs (slurred speech, glassy eyes) of impairment, although Bittner did detect an odor of alcohol.

The test is performed by machine. The machine purges itself, and runs a "blank" test between other tests. The machine had been in use only since around May 1997. It appears that a total of 48 tests were performed prior to the tests involved in this case, of which none was positive. W— test result was 0.066 percent at 8:07 a.m. according to the printout. A blank test was run at 8:24. W— was given a second test, with reading of 0.056 percent at 8:26.

After his positive test result, W— was discharged by the Company. This was W—'s first substance abuse violation.

The Company's substance abuse policy states in part:

The breath alcohol technician (BAT) will ask you to blow forcefully into the breath testing device. It takes about a 5-6 seconds of steady exhaled breath to get an adequate breath sample. Even if you have a cold, asthma, or other respiratory problems you should be able to produce a sufficient breath specimen. If the first breath sample reads 0.02 or greater on the breath testing device, you will be required to give another specimen. The breath alcohol technician will have you wait at least 15 minutes before the second breath test to insure that you have no alcohol from breath mints, mouthwash, cough syrup, etc. in your mouth. The test is to measure the alcohol in your blood by analyzing the air from your lungs. The second breath reading is the one that counts. Any reading over 0.02 means that you have drunk alcohol and it is still in your blood stream.

Whenever alcohol is in the blood stream it reaches the brain and effects mental and physical functions. Since alcohol is a depressant, it slows down thinking, judgment, reactions, and motor coordination. Because even small amounts of alcohol can effect job performance, the cut-off level for a positive test is 0.04. This level is considerably less than what the DWI laws use. If your alcohol test result is 0.04 or above you are in violation of the company policy. You will be provided transportation home and will be subject to discipline in accordance with the company policy. There is a chart in the back of this booklet that shows the number of drinks per hour based on a person's body weight that results in a given alcohol level in the blood or breath.

The policy was discussed with the Union, but it was implemented as a unilateral policy rather than an agreed-to policy. During the discus-

EATON CUTLER-HAMMER CORP.                                    110 LA 469

sions, the Employer gave the Union a document captioned "for discussion purposes only." This one page document outlined the proposed substance abuse policy. Under the heading "discipline," the document contains the following:

| Discipline will apply as follows: | |
| --- | --- |
| • Positive alcohol test | |
|     first offense: | 3 day suspension |
|     second offense: | Termination |
| • Positive drug test | |
|     first offense: | Termination |
| • Refusal to test drugs | |
|     first offense: | Termination |
| • Refusal to test alcohol | |
|     first offense: | 3 day suspension |
|     second offense: | |

According to Manager of Manufacturing Paul Cole, the schedule of penalties was agreed to with the Union for usual, normal cases, although Cole was not personally involved in the discussions. According to the Union, the policy was presented to the Union as a non-negotiable, "set in concrete" program. The policy was implemented some months before the last chance agreement was signed.

As the policy notes, the standard for driving under the influence is higher. Under 75 Pa.C.S.A. §3717, a person shall not drive while the alcohol by weight in the blood is 0.10 percent or greater. The Company's standard of 0.04 percent was patterned after Department of Transportation regulations.

The plant rules state, in part:

In any industrial plant, there are certain standards of conduct recognized as necessary in order to provide a safe, pleasant and orderly workplace for all employees. The standards below are posted for general information. They also provide a guide for the administration of discipline in those incidents where misconduct occurs. While not intended to be a complete listing of all possible types of misconduct which may result in discipline, they outline many of those areas of behavior which are not in the best interest of the Beaver Plant or its employees. Any disciplinary action will, of course, be based on the facts and circumstances in each specific case as well as the total record of the employee(s) involved.

A. Actions such as the following are considered to be extremely serious misconduct and may result in immediate discharge.
* * *
7. Use, possession or passing of alcoholic beverages, or hallucinogens, depressants, stimulants or others drugs on Company premises, or conspiring or attempting to do same. (Use of drugs prescribed by a legally licensed physician must be reported to the Medical Department which will determine work restrictions, if any, required in the interest of safety.)

B. Actions such as the following are considered serious misconduct. The first offense of this type will result in a three-day suspension without pay, except that offenders with a record or prior disciplinary action may be discharged.
* * *

4. Reporting to work under the influence of intoxicants, hallucinogens, depressants, stimulants or other drugs. (Use of drugs prescribed by a legally licensed physician must be reported to the Medical Department which will determine work restrictions, if any, required in the interest of safety.)

## Issue

The issue, as agreed to by the parties, is whether the discharge of W— was for just cause, and if not what should the remedy be.

## Position of the Union

The Union points out that the Company has the burden of establishing that the discharge was for just cause, and it submits that the Company has failed to sustain that burden.

It considers the only pertinent provision in the last chance agreement to be paragraph 6. It notes that paragraph 6 refers to the Company's substance abuse program, which in turn provides that an employee who tests positive (over 0.04 percent) is to be suspended for three days. It argues that the Employer is attempting to ignore the clear intent of the language of paragraph 6. It asserts that testimony about the intent of the last chance agreement from Company representatives who were not parties to its negotiation, is worthless.

In the Union's view, paragraph 6 of the last chance agreement was included in order to allow the substance abuse policy to govern any discipline for a positive test. It considers any effort by the Company to rely on other provisions of the last chance agreement to be improper bootstrapping, since the Company's September 15 grievance response refers only to W— having failed the alcohol test.

It compares arbitrations in other last chance agreement cases, in which the agreements specified that discharge would result from a positive test, and it argues that under the

terms of the current last chance agreement, the grievant was required to submit to the test, but the last chance agreement was silent about the effect of a positive result, leaving the appropriate discipline to the substance abuse policy. The Union maintains that if the Company intended that discharge would result from a positive result, it had every opportunity to specifically say so in the last chance agreement.

The Union also contends that the alcohol test was fatally flawed. It observes that Company nurse Bittner was unsure whether the breath testing device had complied with State requirements for calibration and accuracy inspection. It submits that a dissipation of .01 percent (from 0.066 to 0.056) in 19 minutes is implausible, especially for a 135 pound man with only one kidney. Further, the Company policy uses the phrase "under the influence," which the Union considers a term of art that by statute means a blood alcohol content of 0.10 or greater.

It asks that the grievant be reinstated with lost wages and benefits, and seniority intact.

**Position of Management**

The Employer argues that by failing the breath alcohol test, W__ violated the substance abuse policy and the Plant Rules, and therefore he was in violation of paragraphs 2 and 6 of the last chance agreement. (It reads paragraph 6 of the last chance agreement as logically implying that the grievant was required, not simply to submit to, but also to pass, the random test.) It considers him also in violation of paragraph 3, in that this failure breached his agreement with Gateway. It asserts that it could have discharged him earlier for failing to provide documentation under paragraph 3 and 5 of the last chance agreement.

It disputes the Union's position that the proper discipline should be a three day suspension (which it considers something of an afterthought), on the basis that doing so would ignore the last chance agreement. Citing arbitral decisions on the effect of last chance agreements, it maintains that the grievant was not entitled to the same progressive discipline as other employees who were not subject to last chance agreements. In its view, he already received his progressive discipline before the discharge leading to the last chance agreement. In any event, the Company considers the Union's position as an implied admission that the grievant violated the policy. It argues that the last chance agreement prescribes discharge, rather than suspen-

sion, for violation of any of its conditions. It maintains that if a three day suspension were the appropriate penalty under paragraph 6 of the last chance agreement, the agreement would be internally inconsistent, since discharge would be the penalty for a violation of policy under paragraph 2.

The Employer asserts that the breath test results were accurate, noting that the machine involved is self-calibrating and self-purging. It claims that there is no evidence that the machine was not operating properly or that proper procedures were not followed, and it considers the Union's arguments about machines used by the State police as irrelevant in that the current machine is a different one. Likewise, it sees the 0.10 standard for driving under the influence as irrelevant, since the Company policy follows the more stringent Department of Transportation regulations.

It submits that to give the grievant another chance would be inconsistent with the purpose of a last chance agreement, and would render it meaningless, as well as unfair to other employees who are entitled to work in a safe environment.

It asks that the grievance be denied.

**Analysis and Conclusions**

There are probably as many forms of last chance agreements as there are people who negotiate them. Certain elements, however, are common to nearly all of them. Last chance agreements are normally entered into when an employee has been, or is about to be, discharged by the employer. The employee gains the opportunity to continue his employment, rather than risk the uncertainty of an arbitration over the original discharge. The employer likewise avoids the uncertain result of an arbitration, and normally also gains a stricter code of conduct to which the employee will be subjected for some period of time.

The typical collective bargaining agreement establishes a discharge standard of "just cause" without much elaboration. The usual last chance agreement sets forth in detail what just cause will mean for the particular employee involved. Normally the standard is more stringent than that applicable to other employees under the just cause standard, and provides that the company may discharge the employee if he engages in conduct of the type specified in the agreement. As a definition of just cause in the context of the particular employee, a last chance agreement is binding on an arbitrator no less than on the parties. The typical last chance agreement removes from the arbitrator two

**CHILDREN'S HOSPITAL**                    110 LA 471

aspects of judgment which arbitrators normally exercise under the just cause standard: proportionality and even-handedness. Thus under the usual last chance agreement, the arbitrator no longer has the discretion to consider whether the discipline imposed is too harsh for the offense involved. Likewise, the arbitrator may not consider whether the discipline imposed on the grievant is in keeping with that administered to other employees.

In an arbitration proceeding pursuant to a last chance agreement, the arbitrator's first task is normally to examine whether the misconduct alleged is covered by the last chance agreement. If the last chance agreement provides that the employer may discharge an employee for the type of conduct of which the grievant is accused, the arbitrator's function is usually limited to determining whether in fact the employee engaged in the misconduct alleged. On the other hand, if the arbitrator concludes that the last chance agreement does not apply to the type of misconduct alleged, the arbitrator applies the traditional just cause standard, as if there had been no last chance agreement.

[1] Like most last chance agreements, the current agreement specifies that the Employer may discharge the grievant for "failure to comply with any of the conditions of this agreement." Paragraph 2 states that "It is W__'s responsibility to work without violating company policies or rules and maintain an exemplary work attendance record in 1997 & 1998." This is about as broad a requirement as can be imagined, but it is one to which all parties agreed. I believe that the necessary interpretation is that the company was privileged to discharge the grievant if he violated any Company rule or policy in 1997 or 1998. The substance abuse policy states "If your alcohol test result is 0.04 or above you are in violation of the company policy." If a valid test showed that W__ had a blood alcohol level over 0.04 percent, he was in violation of the substance abuse policy, for which he could be discharged under paragraph 2 of the last chance agreement.

I do not agree with the Union's contention that the effect of paragraph 6 of the last chance agreement was to incorporate the schedule of penalties from the substance abuse policy. The whole point of a last chance agreement is normally to dispense with the usual requirement of progressive discipline, and to permit the employer the discretion to discharge for even minor offenses. This seems to me the effect of the statement in the current agree-

ment that "failure to comply with any of the conditions of this agreement will result in his immediate discharge."

[2] Having concluded that, based on the last chance agreement, the Company could discharge the grievant over a positive alcohol test, I must consider whether the test results were valid. As the Union observes, the rapid decrease in the blood alcohol level reported (from 0.066 to 0.056 percent in 19 minutes) raises the suspicion of some error in the test. But the standard of proof in arbitration is the preponderance of the evidence, and while this rapid decline certainly indicates the possibility of an error, under all the circumstances, I do not feel that it is sufficient to indicate the probability of an error. Several factors lead me to this conclusion. First, because alcohol is metabolized over time, it is to be expected that the second test would show at least some decline in blood alcohol content. But even if it is assumed that the decline indicates that the machine had a margin of error of ±0.01 percent, subtracting this factor from both tests would still show both tests over the Company standard of 0.040 percent. Second, the apparatus does not have a history of false positives. All prior tests (including the grievant's) had produced negative results. Finally, Bittner also detected an odor of alcohol about the grievant. Based on these considerations, I conclude that it is more likely than not that W__ in fact had a blood alcohol content in excess of 0.04 percent when tested on August 18.

No arbitrator takes any joy in sustaining the discharge of a long term employee, with the knowledge that it will be difficult for him to obtain another equally desirable job. But it is my responsibility to apply an agreement to which all involved consented. Under the terms of that last chance agreement, I conclude that the Company had the prerogative to discharge the grievant over his August 18 positive breath alcohol test. Accordingly, I have no alternative but to deny the grievance.

**AWARD**

The grievance is denied.

━━━━━━━━

**CHILDREN'S HOSPITAL —**

**Decision of Arbitrator**

In re CHILDREN'S HOSPITAL, WASHINGTON, D.C. and SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 722, April 20, 1998

## LTV STEEL MINING CO. —

### Decision of Arbitrator

In re LTV STEEL MINING COM-PANY and UNITED STEELWORK-ERS OF AMERICA, LOCAL 4108, Case No. IOI-3066, Grievance Nos. 7480 and 7481, November 24, 1997

Arbitrator: Recommended findings and award by Kathleen M. Doepken, associate IOI arbitrator; approved by Board of Arbitration, Shyam Das, chairman

### DISABILITY

### 1. Improper treatment — Discharge
▸118.655 ▸118.815

Employer did not have just cause to dis-charge employee, even though he violated terms of last-chance agreement when he was absent from work, where he had not been given proper medication after his psy-chiatrist had changed his diagnosis, his continued use of improperly prescribed medication might have had unpredictable effects on him, and he was taking no medi-cation that might have helped him control his diagnosed disorder.

### 2. Improper treatment — Discharge
▸118.655 ▸118.815

Employee, who was discharged without just cause for absenteeism because he was prescribed improper medication for his psy-chological condition, is reinstated, he is to be treated as if he remained on sick leave, and he shall be returned to work upon pre-sentation of satisfactory evidence that he is medically fit.

---

### IMPROPER TREATMENT

#### Subject

DOEPKEN, Arbitrator: — Dis-charge—Violation of Terms of a Last Chance Agreement

#### Contract Provisions Involved

Article XII, Section 1 of the Septem-ber 4, 1993 Basic Labor Agreement

#### Statement of the Award

The grievance is resolved as set forth in the above Findings.

#### Background

These grievances were filed to pro-test the suspension and discharge of Mining Department Shovel Operator M__ for alleged violation of an August 29, 1996 Memorandum of Agreement reinstating him to his employment fol-lowing a previous discharge. In the present case, Grievant was notified on December 31, 1996 that he was being suspended for five days, and by July 19, 1997 letter he was notified that his suspension was converted to dis-charge.

Grievant was hired in 1988, and there is no dispute that his rate of absenteeism has been excessive. Mike Sterk has been Area Manager of Min-ing since 1988, and Senior Coordinator of Human Relations Joseph Hocking has 19 years of experience in Human Relations. At the arbitration hearing, both men testified that Grievant's ab-senteeism record is the worst in the Mining Department they have seen.

Beginning in late 1990 or early 1991, Sterk counseled Grievant informally about the necessity for him to improve his attendance. During these sessions, Sterk also informed Grievant as to how he could arrange to obtain confi-dential assistance through the Em-ployee Assistance Program (EAP). Over the years Grievant also received progressive discipline for failure to maintain an acceptable schedule. Ad-ditionally, from 1991 to 1996, the Com-pany sent Grievant a total of five cer-tified letters routinely sent to employees who have been absent for more than five days without contact-ing the Company. (One of these letters, dated May 12, 1995, appears to have been sent in error, since at the time Grievant was on suspension through May 13, 1995.)

A disciplinary hearing was held on January 18, 1994, after Grievant was absent for 15 days, and at the hearing Grievant was issued a one-day, three-day and five-day suspension for record purposes only. The minutes of this hearing reflect that Grievant was warned about the need to improve his attendance and again given informa-tion regarding the EAP. During the hearing Grievant stated that he was receiving treatment at the Range Mental Health Center and was taking medication. No diagnosis of the nature of Grievant's emotional problems is mentioned in these minutes (C-4).

On May 12, 1995, the Company sent Grievant the certified letter men-tioned above. This letter notified Grievant that if he failed to respond in specified ways within ten days, he would be subject to suspension and discharge, and after 15 days his con-tinuous service would be broken (C-5). Apparently Grievant did not respond, so his continuous service was broken effective May 30, 1995. Subsequently,

110 LA 284                                LTV STEEL MINING CO.

Grievant was reinstated with no back-pay under an October 23, 1995 Last Chance Agreement. Under the terms of this Agreement: Grievant was removed from the absenteeism program for a nine-month period, during which he was required to verify that each absence was necessary; and he received refresher training to resume his position as a Shovel Operator.

According to Sterk, Grievant's attendance improved for a while, but toward the end of the nine-month period his absences became excessive again, with no advance notice for the absences and no verification of their necessity provided. On July 18, 1996, Grievant was suspended for five days, and on July 19, 1996 this suspension was converted to discharge, for alleged violation of the October 1995 Last Chance Agreement.

Shortly thereafter, an EAP representative presented to appropriate Management a July 22, 1996 letter signed by Psychiatrist Katherine Cohen and Psychiatric Nurse Susan Topping of the Range Mental Health Center. The letter states that Grievant has been diagnosed with Major Depression, Recurrent, for which he has been prescribed Prozac, but that he never has continued to take this medication long enough to obtain its full benefits. Additionally, the letter explains regarding Grievant's absenteeism:

He is in most ways his own worst enemy. When he doesn't go to work, he becomes paralyzed with guilt and therefore misses even more work. The consequences of his negative thinking and hopelessness are all too apparent in his absenteeism. M__'s remorse for his behavior is real and quite apparent. It is not defiance that causes him to violate the last chance agreement that he signed; rather it is the effects of suffering from the severe functional impairment of depression. The loss of motivation and energy involved in the illness can feel insurmountable to the severely depressed individual. Normally if he misses a shift; he will be at home in bed with the covers pulled over his head, stuck in his negative barrage of self-talk. There are no consequences nearly as severe as those he inflicts on himself.

The letter expresses optimism about Grievant's chance of becoming a better employee if he receives proper treatment, most likely to include medication for the rest of his life. Finally, the letter asks that the Company grant Grievant S&A leave until his medication has a chance to become effective, in order to preserve his insurance coverage of his treatment.

Grievant was placed on S&A, and on August 29, 1996 the Last Chance Agreement here in issue became effective (C-11). Under this Agreement,

Grievant's reinstatement date was established as August 12, 1996, for the purpose of maintaining his insurance coverage.

At the hearing, Area Manager Sterk stressed that, as is typical of Last Chance Agreements, this August 1996 Agreement was tailored specifically to address Grievant's particular circumstances. In the present case, the Company contends that Grievant violated the conditions established in Items A and B, which, in relevant part, respectively require that Grievant continue under the care of the Range Mental Health Center and adhere to this treatment program, and that Grievant continue to take all medications prescribed for him by the Health Center for treatment of depression. Additionally, the Company contends that Grievant violated the provision in the Agreement regarding maintenance of his work schedule. Sterk stressed that, as opposed to the requirement under the 1995 Last Chance Agreement that Grievant verify all absences for nine months, the 1996 Last Chance Agreement provides that he be removed from the absenteeism program for a full year after his reinstatement, during which time he would be discharged if he failed to maintain his schedule.

Sterk emphasized also that under the terms of his Last Chance Agreement Grievant would not be reinstated until he was cleared to return to work by the Range Mental Health Center. He added that no pressure was put on Grievant to return before the Health Center released him as ready to return. When he was released, said Sterk, he was scheduled to work the day shift, from December 3 through 7, 1996, so that he could be assigned under a Senior Shovel Operator for refresher training after his extended time away from work.

With no advance notice to the Company, Grievant failed to return to work any of his scheduled shifts from December 3 through 7, 1996. As a result, on December 10, 1996 the Company sent him a certified letter of the sort referred to above. Grievant did return to work the daylight shifts he was scheduled for from December 12 through 17, 1996, but he failed to call in or to work the night shifts he was scheduled for from December 20 through 26, 1996.

Meanwhile, the Company received a letter dated December 10, 1996, from Cohen and Topping at the Range Mental Health Center. The entire text of this letter bears quoting here:

This letter is written to advise LTV Mining Company of our continued involvement in M__'s treatment of his depression.

LTV STEEL MINING CO.                                      110 LA 285

We are well aware of M__'s continued problems. M__ called the day that he failed work (sic). Unfortunately he was not able to reach me due to the fact that I was attending a family funeral. He tried again the next day. Dr. Cohen and I were unavailable due to nursing home rounds. M__ became quite despondent. He did contact me on Friday and explained that he had not been able to start work.

We have been assessing M__'s thyroid function as it may relate to his depression. We prescribed Synthroid in an attempt to get better results from the antidepressant medication. M__ has been very financially stressed from being out of work. He did not get or take the Synthroid as we had ordered. We planned that M__ be on the medication for a week prior to his return to work in order that the response and/or side effects would be known.

M__ has asked us repeatedly for permission to return to work. He has been feeling guilty about being off for this extended period. He did convince us that he could try. He tried and failed. He is now on the Synthroid as of 12/19/96. I am speaking with him daily. We have also put him on Benadryl in an attempt to improve his sleep. Sleep disturbance has been a major problem this past week and a half because of his stress around returning to work.

Dr. Cohen and I have discussed this case at length this week. The medication response is not as good as we would have hoped it would be as yet. We can continue to increase it. We are not satisfied that we are where we need to be in his treatment.

M__'s mood this past week has plummeted. He is not sleeping. He is obsessing. He is self-loathing. He is overwhelmed and quite frankly, I am concerned about his suicide potential.

We understand that M__ plans to make another attempt to go to work on Thursday, 12/12/96.

If he can manage to gather his strength to complete that first shift, we will have cleared one major hurdle.

We understand the dilemma that exists when an employee does not show up for work or at least follow a protocol and notify the employer. We were afraid of this very thing happening. This situation is disappointing to us all.

Should M__ be unable to manage the Thursday shift, we will be forced to consider that he may be disabled long term.

Thank you very much for all of your assistance and patience.

As a result of Grievant's absence from work from December 20 through 26, 1996, he had a pre-suspension hearing on December 27, 1996. The minutes reflect that he acknowledged that although he was taking his prescribed medication when he worked the day-shift from December 12 through 17, he stopped taking the Synthroid on December 20, the first of the seven consecutive days he was absent from his scheduled night shift. According to Grievant, this medication not only was not helping him but was "screwing him up". Regarding his December 3 through 7 absences, Grievant stated

that after being off work for so long he could not deal with returning (C-15).

On December 31, 1996, Grievant was suspended for five days for violating his August 1996 Last Chance Agreement, and on July 19, 1997, this suspension was converted to the present discharge.

R.N. Susan Topping has specialty training and 18 years of experience as a psychiatric nurse. She testified that at the Range Mental Health Clinic she works very closely with psychiatrist Dr. Katherine Cohen, and that she prepared for Cohen's signature the two letters to the Company regarding Grievant's treatment which were submitted into this record as C-8 and C-14. Topping stated that she first saw Grievant in 1994 and that she had become more closely involved with his treatment program during the year preceding this arbitration hearing. Topping testified on the basis of Range Mental Health Clinic records regarding Grievant's treatment which she reviewed in preparation for the arbitration hearing. Certain of these treatment records were submitted into the arbitration record as U-1.

Topping stated that Grievant's treatment at the Range Mental Health Clinic began in 1991 and continues to date. He has been treated by various physicians there, with some breaks in his treatment. According to Topping, Grievant was seen by a physician in March, April and December of 1991, in June of 1992, twice in January of 1994, in May of 1995, in June of 1996 and consistently thereafter. In addition to physicians, other personnel have participated in Grievant's treatment, including Topping, L.P.N. Mary Leas, Licensed Psychologist Robert McAllister and Mental Health Practitioner Karen Sussman.

Topping testified that in 1991 Grievant's psychiatrist initially diagnosed him as having a generalized anxiety disorder and a single episode of major depression with obsessive-compulsive features, and Trazodone and Xanax were prescribed. Grievant's symptoms of depression persisted, said Topping, and later in 1991 he was prescribed Prozac, along with another medication to ease his sleep disorder.

According to Topping, in 1991, 1992, 1994 and 1996, Grievant continued to be prescribed Prozac, with a daily dosage which eventually was increased to the maximum dosage. Even at this maximum dosage, said Topping, Grievant was not improving to the extent expected so in November of 1996, he also was prescribed a thyroid-related medication called Synthroid. Topping explained that recent studies

have shown that a small dosage of Synthroid often enhances the beneficial effects of Prozac.

Topping testified that when she was reviewing Grievant's record to prepare for this arbitration hearing, she discovered that on September 3, 1996, Dr. Cohen had changed Grievant's diagnosis to Bipolar Affective Disorder II, which is a mood disorder. Topping said that Depakote, not Prozac, is the medication used to treat Bipolar Affective Disorder II. According to Topping, she questioned Dr. Cohen about why, despite Grievant's September 1996 diagnosis, he had been continued on Prozac rather than a mood stabilizer, and Dr. Cohen could provide no answer. According to Topping, Dr. Cohen accepted her recommendation that Grievant's medication be changed, and as of August 25, 1997, Depakote rather than Prozac has been prescribed to Grievant. Topping testified that as of the date of the arbitration hearing Grievant had not been taking Depakote long enough to realize its full benefits, which she estimated would not take effect for at least two and perhaps several months. She added that at this time Grievant was on an initial dosage of this medication and had an appointment for a follow-up appointment. During this appointment, she said, Grievant's blood would be tested and his medication dosage would be adjusted to achieve proper therapeutic range.

According to Topping, a patient with Bipolar Affective Disorder II normally is not put on an antidepressant without also being on a mood stabilizer, because an antidepressant alone can cause a manic episode in such a patient. In her opinion, it is possible that in Grievant's case the mixture of Prozac and Synthroid caused him to experiences a hypomanic episode in December of 1996. She noted that Grievant's Health Clinic record shows that on December 23, 1996, he reported that this combination of medications was making him feel "goofy" and making it difficult for him to wake up from sleep.

Topping acknowledged that since Grievant began treatment in 1991 he has had a history of interrupting his treatment and failing to continue to take his medication as prescribed. She does not believe, however, that he ever has received the proper treatment for his mood disorder, which was not diagnosed until September of 1996. She stressed that even after this diagnosis had been made, Grievant erroneously had been continued on Prozac, which is not the medication used to treat his mood disorder.

In Topping's view, all this explains why Grievant's treatment personnel never could make sense of his irrational behavior, including an unexplained inability to attend work even though he likes his job and suffers extreme guilt and remorse when he does not go to work. Typically, said Topping, a patient in depression who does not respond to treatment will experience a worsening of the symptoms of fatigue, a sense of helpless and hopelessness, and perhaps suicidal thoughts. She added that while Grievant has suffered from all these symptoms, his treatment personnel have been unable to understand or explain his persistent irrational behavior. She stated that this is why eventually Dr. Cohen began to suggest that Grievant go on S&A.

Topping testified that if Grievant's present treatment for Bipolar Affective Disorder II is successful, it is possible that he will improve to a level of functioning which he never before has achieved. She added that continued use of Depakote does not impair a person's ability to function and that while on this medication Grievant safely could perform a full range of job responsibilities, including operating large equipment.

**Company Contentions**

The Company contends that the evidence shows that there was just cause for Grievant's discharge. The Company stresses that throughout Grievant's employment his absenteeism has been excessive, and he was counseled informally and formally, disciplined progressively, and advised as to the availability of the EAP before he finally was placed under a Last Chance Agreement in 1995.

After he violated that Agreement, says the Company, he was reinstated under a second Last Chance Agreement in August, 1996, shortly after Management became aware that he had been diagnosed clinically as having depression. The Company agrees that depression is a treatable condition, but only as long as a person adheres to his treatment program. Thus, says the Company, it spent a great deal of time structuring Grievant's August 1996 Last Chance Agreement in a manner which would permit him to demonstrate that he can be a reliable employee.

According to the Company, Grievant's pattern of unreliability continued, and he violated his August 1996 Last Chance Agreement by failing to adhere to his treatment program, failing to take any or all medications pre-

scribed and failing to maintain his work schedule. On this latter point, the Company stresses that after Grievant was released to return to work by the Range Mental Health Clinic, he missed 11 out of 18 scheduled shifts in December 1996, for which he failed to call off and failed to provide verification that his absences were necessary. Moreover, says the Company, the evidence shows that from late August of 1996 Grievant was failing to take his medication as prescribed and that this continued even after his discharge, during the period when he was attempting to regain his employment.

The Company states that it is at the end of its rope with Grievant, and it can do no more than it already has done to induce him to be a responsible employee. The Company points out that during his pre-suspension hearing Grievant admitted that he violated his August 1996 Last Chance Agreement as charged, and that in its correspondence to the Company Grievant's treatment team at the Range Mental Health Clinic also acknowledged that he violated this Agreement. In the Company's view, the Union is not entitled to expect that Grievant be given a third "last chance" as an employee, and, accordingly, the present grievance should be denied.

**Union Contentions**

The Union acknowledges that Grievant agreed to and signed his August 29, 1996 Last Chance Agreement, but it notes that this Agreement had very stringent terms. More importantly, says the Union, when Grievant was reinstated under that Agreement no one, including the Company, was in the position to take into consideration that he was not getting the proper treatment for his medical condition. On this score, the Union stresses that Grievant had been prescribed two medications he should not have been taking: the first one, Prozac, had been prescribed since 1991; the second one, Synthroid, was prescribed in 1996 to be taken along with the Prozac.

According to the Union, the evidence shows that Grievant's medication should have been changed in September 1996, when his diagnosis was changed from depression to Bipolar Affective Disorder II. Moreover, the Union stresses that Grievant had no way of knowing this and no way of controlling the treatment program designed for him by the Range Mental Health Clinic.

The Union stresses that R.N. Topping testified that as soon as she dis-covered that Grievant was on the wrong medication she convinced his psychiatrist to change his medication to the proper one, beginning in August 1997. The Union points out also that Topping expressed her confidence that once Grievant's new treatment takes effect he can resume his employment and be a good employee who does not miss work.

The Union considers Grievant to be a victim of improper medical treatment who now can and should be saved from the results of that mistreatment. It urges the Arbitrator to give Grievant the opportunity to demonstrate that he can be a productive, reliable employee by reinstating him to his employment after the Range Health Clinic is satisfied that he is ready to return to work.

**Findings**

There is no disagreement between the parties that during Grievant's employment his rate of absenteeism has been excessive. The evidence also leaves no doubt that the Company responded to Grievant's unacceptable attendance by applying progressive discipline, and that after each instance of discipline he failed to respond, at least for very long, by correcting his attendance problem. This progressive discipline finally included two Last Chance Agreements, the first in 1995 and the second in 1996. Following Grievant's reinstatement under the 1996 Last Chance Agreement, he missed 11 of the first 18 shifts he was scheduled to work, and he gave no notice or verification for any of these absences.

In addition to the strict condition that Grievant miss no work during a one-year period following his reinstatement, the Last Chance Agreement required him to adhere to his treatment program at the Range Mental Health Clinic and to continue to take all medications prescribed for him. The evidence shows that Grievant did not abide by his agreement to take all prescribed medications for any significant period of time between August 29, 1996, when he signed the Last Chance Agreement, and the period in December, 1996—less than four months later—when he failed to work as scheduled immediately after his reinstatement.

During the entire period in issue, everyone involved in Grievant's employment situation believed that he was being treated by the Range Mental Health Clinic for diagnosed clinical depression. Management had been so informed in a July 22, 1996 letter from

Grievant's treatment personnel which states: M— is a client of Range Mental Health Center. He has been diagnosed with Major Depression, Recurrent. He has recently been prescribed Prozac in an effort to combat the serious symptoms of depression" (C-8). It was in reliance on this representation from Grievant's treating psychiatrist that the parties carefully structured Grievant's Last Chance Agreement by including specific conditions tailored to his actual circumstances which were intended to enhance the possibility that he finally could overcome his attendance problems and become a reliable employee. This reliance is obvious in Item B. of the Agreement, which requires: M— will continue in his use of the prescription drug *Prozac, or other medications used in the treatment of depression,* as prescribed for him at the Range Mental Health Clinic" (Emphasis Added; C-14). There is no question that the parties who structured this Agreement were aware that Grievant's past pattern of excessive absenteeism was related to the emotional problems he had sought treatment for at the Range Mental Health Clinic. Indeed, by its own terms the Agreement tacitly acknowledged that his ability to meet the strict requirement of unbroken attendance for one year very likely depended on his success in satisfying the other two requirements that he adhere to his treatment program and continued to take all prescribed medications.

At the arbitration hearing, R.N. Topping disclosed that when she reviewed Grievant's medical records in preparation for the September 4, 1997 arbitration hearing she discovered that in September 1996 his psychiatrist, Dr. Cohen, had changed his diagnosis to Bipolar Affective Disorder II. Topping testified that when she questioned Dr. Cohen, she could provide no explanation for why she also had not changed Grievant's medication from Prozac, which treats depression, to Depakote, which is a mood stabilizer which treats Bipolar Affective Disorder II. Cohen implicitly acknowledged her error, however, by immediately taking Grievant off Prozac and prescribing Depakote instead, effective August 25, 1997.

[1] There is no way to determine whether Grievant's failure to respond to his psychiatric treatment over the last several years, including prescribed medication, is attributable to the possibility that his illness may have been misdiagnosed from the beginning. For purposes of the present case, however, the evidence clearly shows that from September 1996 to August 1997 his treatment included the prescription of medications which are not designed to control the disorder identified in his diagnosis. This includes virtually the entire period in issue here, from September through December of 1996, when he violated his Last Chance Agreement by failing to take his medication and subsequently failing to come to work.

This record does not contain the sort of expert medical evidence which might provide information as to the range of potential consequences to Grievant of being prescribed the wrong medication for his diagnosed disorder. It seems apparent, however, that continued use of the prescribed medication might have certain unpredictable effects on him. He also was taking no medication which might be expected to assist him in controlling his diagnosed disorder.

[2] Under these very unusual circumstances, I cannot find that there was just cause for Grievant's discharge for violating his Last Chance Agreement by failing to take his medication and subsequently failing to come to work. The evidence shows that although Grievant did work for six shifts beginning on December 12, 1996, he never should have been released to return to work at the beginning of that month, during the period of time when the Range Mental Health Clinic was prescribing him the wrong medication for his diagnosed disorder. Thus, under this Award the Company is directed to treat Grievant as if he remained on sick leave from the time of that erroneous certification that he was able to return to work until the present time. Also, Grievant shall be returned to active employment upon presentation of satisfactory evidence that he is medically fit to return to work.

**AWARD**

The grievance is resolved as set forth in the above Findings.

CROSS OIL REFINING CO. 111 LA 1013

niority to hourly rate instructors. As the evolution of this provision indicates, safeguards were built into this provision, such as Section A.3.

During the years the Grievant taught at WLAC he apparently made no effort to inquire into his seniority status, notwithstanding the pivotal importance of seniority in obtaining teaching assignments. This was true when he enjoyed six (6) hour teaching assignments during a time period following the establishment of the Finance discipline and its seniority list and during the early '90s when the Grievant did not receive any teaching assignments for a few semesters.

During none of the above did the Grievant question WLAC about either his seniority or teaching assignments. Given the importance of seniority to teaching assignments and continued teaching opportunities, it is incredulous that the Grievant neither reviewed the available seniority lists, and they were available, nor made any inquiry. This conduct can not be construed as "reasonable diligence."

The inference drawn by the Arbitrator from this evidence record is that the Grievant was satisfied with the scheduling until the Fall '95 semester when there was an adverse impact on his familial situation given a change in the teaching assignment, particularly the days involved. In making inquiry into this change in August and September '95, the Grievant discovered what he considered to be contractual violations by WLAC dating back to the '78-'80 Agreement.

The bottom-line is that the Arbitrator must find that the remaining issues in the September 22, 1995, grievance are not timely filed. The consequences of this are expressly stated in Article 28.C.1; thus, the Arbitrator is effectively stripped of any discretion as to the remedy.

Absent "mutual agreement to extend the time," and there was none, and given the finding that the September 22, 1995, grievance was not timely filed as to the issues stated, the grievance must be found "concluded." As noted, such a conclusion is mandated.

With reference to the underlying issues of the grievance, these were addressed, but, given the above conclusion, constitute what the judicial forum would call obiter dictum.

### AWARD

Based on the evidence record as a whole, it is the AWARD of this Arbitrator that the September 22, 1995, grievance was not timely filed in ac-

cord with Article 28.D.1; therefore, pursuant to Article 28.C.1 the grievance is considered concluded.

---

### CROSS OIL REFINING CO. —

#### Decision of Arbitrator

In re CROSS OIL REFINING COMPANY and INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 382, FMCS Case No. 980821-15446-3, January 25, 1999

Arbitrator: Ronald E. Bumpass, selected by parties through procedures of the Federal Mediation and Conciliation Service

### DISCHARGE

**1. Last chance agreement** ▸118.815 ▸94.117 ▸118.646

Union may challenge discharge of employee who was discharged because of customer complaint, even though he was subject of last chance agreement that stated he would be terminated for further incidents regarding his personal conduct with others, since employer must be required to show cause for discharge.

**2. Customer complaint** ▸118.646

Employer did not have just cause to discharge employee because of customer complaint, despite contention complaint was straw that broke camel's back for employee already subject to last chance agreement, where grievant followed protocol and called his shift leader to intercede in his difficulty with customer, and grievant's refusal to load customer's truck as demanded by truck driver was result of employee's understanding of order in which he should be scheduling his work.

**3. Customer complaint — Emotionally unstable employee** ▸118.646 ▸118.655 ▸118.815

Employee, who was discharged without just cause for customer dispute, is reinstated conditioned upon proof of his mental and emotional fitness by psychologist or psychiatrist that grievant is mentally and emotionally fit to perform his duties without disruption to workplace, and employer may require employee's retraining with counselor to improve grievant's ability to relate to customers, where grievant was already under last chance agreement for difficulties in his personal dealings with others at time of incident.

**4. Customer complaint — Diabetic employee** ▸118.646 ▸118.655 ▸118.806 ▸118.815

Diabetic employee, who was discharged without just cause for his dispute with cus-

111 LA 1014                                     CROSS OIL REFINING CO.

tomer, is reinstated without back pay, should be subjected to specific rules of conduct, should be warned to eliminate harassing comments, vulgarity and profanity from his workplace vocabulary, and is ordered to take extraordinary care to keep sugar levels under control, where he was under last chance agreement and is responsible for personal behavior.

### 5. Diabetic employee ▸118.655

Employer may have to accommodate diabetic employee who had problems dealing with others with some additional breaks for snacks or medicine as needed and employee should not be required to work through "lunch" or miss meal, inasmuch as failure to medicate and eat in timely fashion can cause attitude and personality changes in diabetic.

———————

Appearances: For the employer — Charles E. Clark, manager human resources; Robert Compton. For the union — Byron Thomason, business representative; Maurice Faulkner.

## CUSTOMER COMPLAINT

### Issue

BUMPASS, Arbitrator: — [The issue is: — ]

Whether or not the grievant was discharged for just cause and if not what is the appropriate remedy?

### Factual Background

On June 22, 1998 a meeting was held to discuss the employment of the grievant with Cross Oil. A letter of the same date to the grievant contained the following information:

Dear M__:
A meeting was held on Friday, June 19, 1998, to discuss your employment with Cross Oil. Those in attendance were Ryker McDaniel, Charlie Clark, Maurice Faulkner, and yourself.
Over the last several months, your personal conduct with employees, customers, truck drivers and contractors, while on the job, has been unacceptable to Cross Oil. Also, in a recent incident with a lube oil customer, Cross could possibly lose some business. Since you have violated the terms of the signed agreement (see attached), you were terminated from Cross Oil on June 19, 1998.

### Company's Position

The termination of M__ is not arbitrable. Specifically the Company argues that a certain agreement entered into between the grievant, M__, and the Company on or about June 11, 1996 regarding the conditions for future employment at Cross Oil & Mar-

keting, Inc., takes the grievant outside of the Collective Bargaining Agreement entered into between the Union and the Company and which is a part of the record on Company Exhibit 1. The particular agreement in question is exhibit 2B, page 2.

In the alternative, it is the Company's position that there was just cause to terminate the employee based upon various incidents which occurred after the implementation of the agreement of June 11, 1996 and the date of termination.

### Union's Position

The Union contends that the grievance is arbitrable, and that the Company must prove just cause as the basis for the termination of the employee. Further, there is no just cause present and the grievant should be reinstated with back pay and made whole.

### Evidence

M__, (hereinafter the Grievant) is age 50 and a diabetic. He has been afflicted for approximately 30 years. He has been employed by Cross Oil Refining & Marketing, Inc., (hereinafter Company) for over 20 years, with his seniority date being August 18, 1978. During his employment at Cross Oil there have been a number of reprimands given to the grievant by the Company and which were introduced into evidence without objection. A two-week suspension without pay was imposed on or about May 28, 1996.

His position with the Company involves interaction with various customers of the Company and the truck drivers who are contracted by various customers of the Company. Based upon a number of complaints over the years about the grievant by a number of customers and his interaction with co-workers is the basis for the Company's decision to terminate his employment.

Critical to the analysis made by Management for the Company in terminating the grievant are reasons that are given in a memorandum from Mr. Charlie Clark to Mr. Maurice Faulkner which includes the following:

Listed below are items that we began to discuss but did not complete in our meeting on June 19, 1998, which led to M__'s discharge.
1. On two different occasions in the month of April, a shift manager was called to the lube plant to resolve problems between M__ and truck drivers.
2. In late April or early May, M__ had an incident with Ryker McDaniel during a conversation with Charlie Higgs and Trey Martin. While Ryker was trying to give M__ an answer about loading a truck, M__ continued to rant while failing to listen. M__

then accused Ryker of not responding to his question. M— turned, through up his hands, and left the office. M— was trying to tell Ryker how to do his job.

3. Early in the month of June 1998, M— had a confrontation with an employee of H.M.T. at their water cooler.

4. Also in the early part of June, an incident occurred between M— and the H.M.T. supervisor over cold roll.

5. On June 5, 1998, M— had an outburst at the new truck loading dock in the presence of Trey Martin, Ronnie Jackson, and Systems Contractors.

6. On June 8, 1998, Ryker called the lube plant to tell M— not to use 272 for any more loads or blends. Before Ryker could continue with his instruction, M— interrupted by asking what he thought would be used to blend B-200. This was done in a very sarcastic tone. Ryker then told M— to shut up and listen to what to do.

7. On June 13, 1998, Ryker was giving M— a ride back to his truck and during the entire ride, M— ranted and complained about not getting lunch. He then told Ryker that he had lied about lunch. Ryker then became aggravated and got out of the truck leaving M— complaining to himself.

8. On June 16, 1998, M— was working graveyards when he had another confrontation with a Technical Chemical driver and the shift manager.

Mr. Glenn Doss, a long time employee of Cross Oil and currently a chemist and formerly a member of the Collective Bargaining Unit, testified that the grievant is a very productive employee. He considered the grievant a friend and took it upon himself to visit with the grievant some time in April 1998 to tell him that "I've heard that you are getting back to your old ways." He had been a party to the "last chance agreement" which was entered into by the Company and the grievant in June 1996. The basis for Mr. Doss speaking to the grievant and Mr. Faulkner, Chairman of the Union Committee at the plant was testified to as follows:

Q. So, let's go to your meeting with M— in April of '98 prior to his discharge. You went to him, friend to friend, you said, "There are problems. I've heard problems."

A. Correct.

Q. And if I ask you to be very specific, what had you heard, just one example of a particular problem?

A. Okay. A truck driver—I'm not gonna call his name—they come to the lab all the time. They have to have paperwork to leave—and this one particular truck driver—of course, I had heard others—but this one particular one says, "mad Dog"—which is what they call him—" is getting back in the same old boat he was in before, and he pissed me off." I said, "Well, there's noting I can do about it."

Q. Did he say how he pissed him off?

A. No, he didn't.

Q. So, he just made that statement?

A. Right.

Q. Have you heard—let's skip along here. Have you heard any specific examples of what M— did to any particular person, either directly to you, in other words, some

driver comes into the lab and he says, "M— did so and so"? Can you relate to a specific comment that somebody related to you directly?

A. No, I can't.

Q. Have you heard from any other person a particular conversation that someone objected to? Well, I guess we're talking about truck drivers. If you want to distinguish between that and a co-worker, that's fine. I'm interested in anything.

A. I've had a couple of co-workers say something.

Q. All right. And what have they said?

A. They was just repeating what they heard so I'd rather not elaborate on it because I really don't know.

Q. What they had heard someone else say?

A. Correct.

Q. Have you had any personal confrontation with M—?

A. Do you mean arguments?

Q. Yes, arguments.

A. Not that I can recall. I haven't.

Q. Nothing that you have experienced personally and would think that the Company might be justified in terminating him for what he's talked to you about?

A. That's correct. I've never had an argument with M— at all.

Three of the seven complaints listed in exhibit 2F reflect confrontations between the grievant and his supervisor Ryker McDaniel.

Mr. McDaniel currently serves in the position of Product Manager. In that position he schedules production for Cross Oil's production rate. His responsibilities include management of the loading and blending of finished products and the inventory for Cross Oil. He reports to Mr. Tom Moore, Vice-President at Marketing. He supervises five (5) loader blenders including the grievant.

Mr. McDaniel has had problems in employment with the Company as well. He was fired when he was in the position of a lab technician and he had a confrontation with Mr. Charlie Clark. He is 33 years old currently and believes that he has overcome problems with his temper. He participated in the preparation of the Probation Agreement entered into between the grievant and the Company in June 1996.

Mr. McDaniel's testimony regarding the probationary contract is as follows:

Q. Well, let me just ask you first. Are you aware when M— was placed on probation in 1996, June of 1996?

A. Yes.

Q. And the terms of the probation?

A. Yes.

Q. Did you participate in that, in that determination of the probation letter?

A. Yes, I did.

Q. Was M— there, did he participate, did you all talk about it in this meeting?

A. Yes, we had a meeting, and I believe everybody signed the probation.

Q. What was the subject matter? What were you talking about M— changing his

conduct or not repeating this conduct in the future? What was the subject matter of that?

A. Well, it's basically just—M___ just having trouble communicating with his fellow employees, truck drivers, trucking companies through the truck drivers, with the lab, people in the lab, and again, that includes fellow employees, just kind of disrupting.

Q. When you say trouble communicating, can you give us any more specifics, any better examples? I mean, this is at the time of this meeting of this probation letter.

A. Have you got any specific on it, Charlie?

Q. No, I'm asking you if you remember anything at the time of that meeting?

A. No, I don't remember any specifics.

Q. Now, then after the probation, June of 1996, did you notice any change in M___'s conduct, or the way he was working, or his relationship with fellow employees, or contractors, or truck drivers?

A. This is after we. . .

Q. After June of '96.

A. Two weeks laid off and the probation, right?

Q. Yes.

A. Yes, M___ was as good a worker as you could ask for up until, I guess, it was June of '96 through about April of '97. '98, I'm sorry.

Q. So, June of '96 after he signed the probation letter, he started being—doing fine, you had no quarrel with his work, or his conduct, or his relationship with anybody else. . .

A. Right.

Q. . . . until about April of '98; is that your testimony?

A. That's right.

Mr. McDaniel observed the basis for some of the changes from good behavior to aberrant behavior and his testimony included the following:

Q. Can you be more specific about popping off or what he would say back over the radio?

A. No, not over the radio. It's just a general popping off on the radio.

Q. Would you classify the popping off as rude type remarks?

A. Rude, yes.

Q. Demanding?

A. Yes. But from my personal—between me and M___, the trouble came between him working under me, the popping off got to where it was—I was having trouble communicating orders to M___.

Q. Give me an example of what you're talking about and give me a time frame and be as specific as you can.

A. All right. Looking at sometime right after April, I don't know the specific time, but I was in the office, I had walked in in the morning to pick up paperwork.

Q. This is April '98?

A. Right. It was after April of '98. And Trey Martin was in the office, Charlie Higgs was in the office, and I believe Charlie Higgs was a blender that day, and M___ was loading trucks. Trey Martin happened to be in the office at the same time. I'm talking with Charlie and Trey, and M___ comes in and he's just—he comes in and interrupts the conversation and asks me about a truck that is to be loaded, a question, "What were we going to put on this truck to be loaded?" I stopped my

conversation and went to answer M___, and M___ is getting everybody in the room in the conversation like I didn't—I wasn't doing my job, "There's nothing to put on this truck and this guy hasn't got any loads to put on this truck." And I'm trying to explain and tell him what to put on the truck, and he doesn't hear it while he's running his mouth.

Q. How is he running his mouth? What do you remember him saying while you are trying to explain that to him?

A. He's explaining where I felt like that I was messing up and I didn't have anything to put on this truck. I didn't have a load.

Q. In other words, it was as if you were doing something wrong and he knows how to do it and he's right?

A. Yes.

Q. Okay. And who was present at that time?

A. Trey Martin and Charlie Higgs.

Mr. McDaniel testified about another incident on June 8, 1998 as follows:

*Mr. McDaniel:*

A. We were getting ready for a barge load and I called down to the lube plant to set aside this Tank 272 to load on the barge. M___ answered the phone, and I went to telling him not to load anything from this tank, and before I could explain myself—or he just cut me off right there and just said, "What do you think we're gonna be blending B200 with?" I mean, he just chopped me off right there, and it was done in a very smart aleck tone from him to me, "What do you think your are going to do with this B200? What are we gonna do that with?"

Q. And this is an employee to his immediate supervisor?

A. Right. I told M___—I told him to shut the hell up and I'd tell him what—if he would stop and listen, I would tell him what to do if he would just let me finish. Then I told him what to make the blend out of and I hung up. I called back thirty minutes later and finished my blends for the day, my orders to the guys at the lube plant, and M___ answered the phone again, and he asked me what I was pissed off about. I guess he—and then I told him, you know, it was his mouth and his popping off that I wasn't gonna—I didn't want to put up with it anymore. It was getting in the way of communications, and that he needed to keep it quiet. And he told me if—if I, you know, I cussed him like that again, that Cross Oil would have something to fire him over, and I told him again to shut up, that his mouth was his only problem. And then I asked him if he understood and he said, "Yes, sir," and he hung the phone up.

Q. Had you cussed him during that. . .

A. I told him to shut the hell up.

Q. Had he used any profanity at the same time?

A. No.

Q. Then he said, "Yes, sir," and hung up the phone after you told him that that could get him fired?

A. Right.

Q. Okay. Would you have the authority to fire M___?

A. No.

Q. That has to be done through Mr. Clark?

A. Yes, from Mr. Clark.

The third incident testified to by Mr. McDaniel regarding the grievant is as follows:

Q. Now, your next paragraph, you're talking about in April of '98 when shift managers were called to the lube plant to confront problems concerning M___ and truck drivers. What did you find then?

A. On the incident that I followed up on, I was working in a day shift. Tim Orr was the shift supervisor. I heard there was problems down there—I believe Tim come and told me—between M___ and a truck driver again. And I come in after the fact, after the dispute or whatever you call it was over with. I talked to M___ and asked M___ what happened, and I had called down there and asked M___ to pull one eighteen-wheeler in front of another to satisfy a customer order. M___ said that the truck driver used profanity toward him, got pissed off, got mad and was trying to cause trouble.

*Arbitrator:* Which one?

A. His name was W___.

*Arbitrator:* Was he the one in front and then you pulled somebody in front of him?

A. Right, right.

*Arbitrator:* Go ahead, I'm sorry to interrupt you.

A. W___ was still at Cross Oil, so I went and run him down. He was walking back to . . .

Q. That's the truck driver?

A. This is the truck driver, W___. He was walking from the scale house back to the lube plant, and I just pulled up and introduced myself and I told him, "I just wanted to know what—what went on down there," and explained to him I was the supervisor, that I told M___ to pull that truck around him, and W___ asked me, he said, "You didn't tell him to call me no motherfucker, did you?" I said, "No, I didn't."

Q. That's what the truck driver said?

A. That's what the truck driver said. Again, it's—I did, M___ said he did—didn't, and W___ said he did.

A fourth incident was one which involved a Kenneth Bailey and was testified to as follows:

Q. What is the custom and practice, or what are you supposed to do if M___ or another blender has a problem with a truck driver or has a problem with anybody, an outside contractor, what's supposed to happen?

A. Well, I personally talked with each of the loader blenders, and if they have any problem at all, they contact the shift manager which is—if I'm not at work—they'll either contact me or they'll contact the shift manager, which is a kind of a boss in the area of the operations. And he's there night and day. There's a shift manager there twenty-four hours a day, weekends, graveyards. He's kind of the boss when the supervisor is out of pocket. You're to contact him and let him handle any problems.

Q. As opposed to like M___ handling the problems himself?

A. Yes.

Q. I don't want you to tell me what he said, but did you talk to Jim Hawkins about M___?

A. I talked to Jim Hawkins and just asked him. . .

Q. Don't tell me. Did you talk to him about M___? Did he have some complaints about M___?

A. Yes.

Q. Who is Jim Hawkins?

A. He's the—I guess, he's the foreman of HMT Tank Builders that actually was a contractor at Cross Oil.

Q. In other words, they were a contractor there. He was a foreman of a group for HMT contract building tanks there on the Cross premises?

A. Right.

Q. And you talked to him about some contact or some problem he had had with M___?

A. Yes.

Q. All right. Then we move to Saturday, June the 13th, on loading the last of the barge shipment. Tell us about that.

A. We had—this was our first barge shipment, and I had promised the loader blenders that I would furnish dinner for them Friday night, breakfast and lunch for them Saturday. They're working around the clock. I believe it was eight-hour shifts. I've got all four of the loader—blenders working, and Saturday morning about 8:30 a.m. we have a couple of spills, oil spills, so we've got a—we're trying to get the barge loaded. I get my boots on, and I'm out there pushing oil, picking up oil off the ground. It's hot. I helped pick up oil from about 8:30 a.m. to 11:30 a.m., and it's hectic. There's a lot of work going on, and again, it's hot. But we get where we can handle it with one loader blender, so I let one loader blender go home, and I left one loader blender at the lube plant. And I went down to pick M___ up to give him a ride back up to his vehicle, and he's harassing and—I say harassing—he's giving me hell because I didn't furnish lunch Saturday. I spent all morning picking up lube oil. He says I lied to him about lunch, I didn't bring him lunch, I promised him lunch, he expected it, he thinks he deserved it. Like I say, I'd been knee deep in the oil spill which I didn't need to hear that right now.

Q. Had he been helping with the oil spill?

A. He was loading—I believe he was finishing loading trucks, vehicles, eighteen-wheelers.

Q. But not with the spills themselves that you were working?

A. Right. I was helping a crew clean up the spills.

Q. Was he cleaning up the spills, too?

A. He was continuing with his job of loading trucks.

Q. So, he didn't come help with the spills?

A. No, his job was to load trucks.

Q. And he said you were a liar because you didn't bring him lunch?

A. Didn't bring him lunch.

Q. And that bothered you because you were tired, hot and bothered?

A. Well, it's just—he was pushing the wrong button. He was just aggravating me. The way I felt just—he shouldn't have been running his mouth. He needed to keep it quiet. I get back—we get out at the lab at his vehicle, and he's still talking about—asking why he didn't get lunch, and I just walk off and leave him standing there. This is a Saturday. He calls me Sunday night, and he was trying to apologize because he knew I was pissed off and he said I must have taken him wrong.

Q. What did you say?

A. I told him that I was hot and tired and that wasn't the time to be bitching and

complaining to me and accusing me of being a liar.

However, Mr. McDaniel does have a high regard for the grievant's job efficiency.

Based upon certain conversations between the CEO of Cross Oil, Mr. Denny McConathy, it would appear that Mr. McDaniel was told to fire the grievant by higher authority as explained in the following testimony:

Q. Did anybody ever tell you that? Did Denny McConathy tell you to fire him?
A. Denny McConathy told me if the man can't do his job, get rid of him.
Q. Did he tell you to fire M__?
A. Yes.
Q. Who is Denny McConathy?
A. He is the CEO of Cross Oil.
Q. He is the one that got you to fire him?
A. No.
Q. Who got you to fire him?
A. It was a committee, me and Charlie Clark, Ronnie Jackson—came to the conclusion to fire him.
Q. Was that after Denny McConathy had made his remarks to you to fire him?
A. Yes.
Q. That's what I thought. So, Denny McConathy got pissed off at M__ and told you to get his head, right?
A. I don't know if he's pissed off. That's between Denny—Denny McConathy.
Q. Why did he tell you to fire him?
A. You'll have to ask that to Denny.
Q. That's it? But the decision to fire him was made without telling you? He just said fire him?
A. The decision to fire him was made when me, Charlie Clark, Ronnie Jackson—in the meeting.
Q. Uh-huh, after the CEO said to do it?
A. True.
Q. Is that correct?
A. Yeah.
Q. So, we might surmise that Mr. McConathy had a problem with him? Is Mr. McConathy going to testify today?
A. I have no idea.

Mr. McConathy, CEO, apparently was upset with the grievant over a particular problem with "Technical Chemical" and is evidenced by the following testimony:

Q. What was the problem with Technical Chemical? First, let me ask you. Who is Technical Chemical?
A. It's a customer that we sell to.
Q. A customer?
A. Yes.
Q. How do sell to them?
A. They have their own trucking company and their own drivers.
Q. And they pick up lube oil at the plant?
A. Yes.
Q. What kind of problem had there been between M__ and a Technical Chemical driver that you know about?
A. Not that I witnessed personally, but . . .
Q. Now, Mr. Thomason has opened this issue up now on Technical Chemical and what kind of problems there were. What kind of problem was there?
A. A problem with M__ and the driver getting into a conflict.

Q. What kind of conflict?
A. A conflict was in this one—one incident—is the driver wanted to get loaded and M__ was loading another load and the driver was in a hurry. M__ and the driver get in a argument.
Q. An argument about what?
A. Not being loaded, not being able—I believe not being able to use the telephone or—let me look it up to be specific. Here it says, "On the 16th of June '98, M__'s on the graveyard shift"—and I'm getting the information from Tim Orr—"Called to the lube plant." Tim Orr—by the time Tim Orr got down there they were both so upset with each other that he put the driver in one room and M__ in another room to keep them separated. The driver said that he pulled up in front of the loading dock and M__ was loading a truck. M__ asked Technical Chemical to pull around and get in line. The driver asked to use the phone. M__ told him to move his truck before he went to use the phone and the guy proceeded to the office to use the phone.
Arbitrator: Does that mean he did not move his truck?
A. He did not.
Arbitrator: Okay. Go ahead.
A. He came back to the door and asked M__ how to get a outside line. One word led to another and Tim Orr was called in, and that's when Tim came down there and they were both mad at each other, and he had to separ—put one in one office and one in another and told one to be quiet and get loaded, and told the other to load and get quiet.
Q. Is Technical Chemical a good customer of Cross?
A. They're all good, yes, sir. I mean, they're weekly.
Q. Would you say they're one of the larger customers, or one of the smaller customers, or how would you put them?
A. They're probably once a week. They're a pretty large customer.
Q. As I understand from your testimony, this information must have gotten back to Mr. McConathy that there had been some conflict with the Technical Chemical driver?
A. Yes.
Q. He knew about that, and he came to your office and he just said, "If the man can't do his job, well, fire him"? Did you feel like that M__, based upon that incident and several other incidents, could do his job?
A. Based on several other incidents, he is—he can't do his job correctly.
Q. Then who, after that statement by Mr. McConathy, all he said, "If he can't do his job, well, fire him," is that right? He didn't say, "Just fire him, period, regardless," or anything else?
A. Right.
Q. He said, "If he can't do his job, fire him"?
A. Right.
Q. Who did you meet with after that to do the firing?
A. Charlie Clark, and Ronnie Jackson, and myself.

Mr. McDaniel testified that the grievant executed his duties properly during the Technical Chemical incident which is indicated by the testimony as follows:

Q. And as I understand the management aspect of that, that you have a limited number of facilities that would actually load the lube oil into these tanker trucks?

A. Right. At the time we had one loading dock.

Q. Just one?

A. Truck loading dock.

Q. Just one, okay. So, it's important for your scheduling—I take it that it takes sometime to get the tank loaded. About how much time?

A. To get a truck driver—a tank loaded?

Q. Well, like Technical Chemical, their tanker truck.

A. Twenty-five, thirty minutes loading time.

Q. So, you attempt to schedule the loading times in a sequence where really nobody has to wait?

A. Right. True.

Q. So, what is the rule if someone is late?

A. They get in line.

Q. And they go to the back of the line?

A. That's right.

Q. I guess as we've heard earlier in the testimony, there are times, I suppose, when there may be several trucks lined up?

A. Yes.

Q. Well, let me ask you this question. Do you think it was inappropriate for M___ to have asked this gentleman to move his truck before he got out of it and walked inside to use the telephone?

A. No.

Q. That was probably the right thing to do?

A. I think it was the right thing to do.

Q. As I understand, you weren't present, but did Mr. Orr ever tell you anything that the driver had said that caused this incident or argument, whatever, that M___ and this truck driver had?

A. It wasn't any specific words other than they were both at each other's throat when he go there. He put one in one room and one in the other.

Q. Is he here today?

A. Yes.

Tim Orr, a shift manager at Cross Oil gave his first hand account of an incident involving the grievant and a customer as follows:

Q. You started out with, "M___ called me on the radio," and you were talking to R. Martin on the phone, and just go ahead and tell Mr. Bumpass what happened.

A. Well, I was—we had been having trouble with the unit, and R. Martin is Ronnie Martin. He's my direct supervisor, and I was talking to him about problems we was having on the unit, and M___ called on the radio and wanted me to come to the lube plant.

*Arbitrator:* What's the problem with the unit? I don't understand that.

A. I don't recall. On the crude unit we had

. . .

*Arbitrator:* On the piece of equipment?

A. In the process, yes, sir.

*Arbitrator:* Okay, gotcha.

A. Yeah, we'd had a upset in the process. I don't recall what it was, but there was something going on, and I told M___ that I would be there as soon as I could. I finished my conversation with Ronnie on the phone, and by that time M___ called again and said that I'd better come down there, and that's

when—M___ was up on the loading rack, the upstairs loading rack, the old loading rack. It's gone now, but . . . .

Q. Excuse me. About what time of day was this?

A. Around 10:15.

Q. At night?

A. Yes, sir, at night. It took place there within a very few minutes, I don't know how long. I got down there and I walked up on the rack where M___ was at. He said the driver, the Technical Chemical driver, which his truck was sitting by the additive rack kinda in front of the lube rack, backwards from the way the other trucks would have to pull out. He said the driver had come in and was giving him hell about he wouldn't load him and—he started talking to M___ up on the rack is what they told me, and he couldn't hear him for the pumps, and M___ was talking to him, and he told him to come up there and he didn't come up there, and then they got words exchanged, and when I got up there to talk to M___, M___ said the driver was pissed off because he couldn't talk and he wanted to use the phone and he told him he'd let him use the phone when he got through. I told the driver, "Just go on in there and I'll be in there in a minute to help you use the phone, in the dog house." Well M___ finished loading the truck, or was finishing loading the truck, and I went down and Jewel Overstreet that drives for Ellsworth, and there was a colored fellow—I can't recall his name—standing there. I said "Jewel, what's the matter? M___ being a smart ass to that driver?" He said, "No, M___ wasn't no smarter ass than he always is. I just tell him to kiss my ass and we go about our business, you know." I went in the room, in the dog house, and M___ had finished loading Overstreet in the meantime. Well, I'd told the driver to use the phone on M___'s desk, the Technical Chemical driver. Well M___ come in and said he needed his desk to fill the paperwork out. So, I put the driver over there in Ryker's old office which is two rooms to the dog house, and Ryker's is—there's just a door between the two offices. Well, the driver got on the phone with his dispatcher. We'd showed him how to use the phone, and that's when he go to talking to his dispatcher about the only problem he had—the only person he has a problem with at Cross was this little dickhead.

Q. Meaning M___?

A. Yes, sir. I suppose he was—I suppose he was. That's who the conversation was taking place with. That's when—well, there was three of us there and I assume he wasn't talking to me. But anyhow, I told M___ and M___—it made M___ mad when he called him a dickhead. I told M___, "Go out and load that other truck, and if you'll line this truck up I'll load it, if you'll fill the paperwork out," because, you know, the driver was mad. M___ had done got mad at the driver by that time anyway. So, M___ goes out and finishes, or loads the other truck on the new rack. In the meantime this driver has got his truck around. After I talked to the dispatcher and told hem we just had two people overworked and aggravated, and we'd see that his truck got loaded, and I was going to instruct his driver not to say another word to M___, and was going to tell M___ not to say another word to the driver. We'd get the truck loaded and get it

111 LA 1020                                    CROSS OIL REFINING CO.

out of here. Well, then the driver got his truck around and M__ had to line up for the oil. I loaded the Technical Chemical truck, M__ filled his paperwork out and that was the end of that one, I thought. But like I say, I talked to the dispatcher myself and told him I'd work it out and get his tuck loaded tonight. He said, "Well, it'll be okay." I thought that was the end f it. Apparently not.

Q. What was the rest of it?

A. Well, all this is the rest of it.

Q. Why did you make—I mean, write down those notes? What was the—what brought about that?

A. Charlie had asked me about it a couple days later if I had made notes. I said, "No, I hadn't made them yet, you know, but I know what happened. I'll write them down." So, that's the reason I made these.

Q. Do you know the name of the Technical Chemical driver?

A. No, sir, I do not know his name. I know him when I see him, but I don't know his name.

Q. Had you observed similar conflicts or confrontations between M__ and truck drivers before this?

A. There was one, I don't know, a month or so before, in particular, when M__ called me down. It was on days. He had tried to get a hold of Ryker, and Ryker had moved the schedule around on the trucks and M__ had had one—tow trucks back out of the way so he could load the truck Ryker told him to load, and that's when—I got down there and the driver was all fuzzed up and mad because M__ supposedly called him a dumb motherfucker?

Q. Who told you that M__ called him a dumb motherfucker.

A. He did.

Q. The driver did?

A. The driver did, yes, sir. I don't know his name. He's a big black man.

Q. A black man or white man?

A. He's a black man, older black man.

Q. Did you ask M__ if he called him that?

A. Yes, sir.

Q. What did M__ say?

A. He really didn't. He just said he was mad because he made him move out of the hole.

Q. But he didn't say he hadn't called him that name?

A. I didn't really ask him, no, sir.

Q. Did M__ say that either of these incidents that he had any faults in any way, or did he say it was somebody else's fault. What position did he take?

A. Well, he was defensive, you know, like it was it—he was defensive.

Q. Defensive?

A. That the driver started it, especially with the Technical Chemical. He told me the driver was mad when he come in the plant.

Q. M__ then got mad?

A. After the conversation took place, yeah.

Q. And they had words?

A. They had very little words while I was there, but apparently they had had words before I got down there.

Q. Did you have to actually separate them, put one in one room, one in the other?

A. Well, I told the driver to go over and use the phone over there, and M__ was filling the paperwork out in his office part,

and I was standing in the door between them.

Q. After you separated them, did the driver and M__ have any more contact?

A. No, sir.

Q. That was end of it right there?

A. That was the end of it right there.

Mr. Orr further explained the situation in testimony as follows:

Q. As I understand your description, first of all, you were called by M__?

A. Yes, sir.

Q. I'm talking about the Technical Chemical incident.

A. Okay.

Q. You were called by him to come down and solve a problem that had occurred, and when you got down there you saw the Technical Chemical truck parked in, what I understood you to say, was the wrong direction.

A. Yes, sir, he was—the way—the traffic flow at the lube rack, you come in, you turn by the additive rack between two sets of tanks and make the loop and then you're headed back out—the way you go out—the way you came in after you load.

Q. And this is the standard way to come in and get loaded?

A. It's been that way since I've been at Cross Refinery.

Q. Did you ask the driver why he was coming in the wrong way?

A. No. He was stopped there in the road where you make the turn and he could go either way, but instead of pulling on around and getting in line, he had stopped right ahead of the truck that was loading and went up and went to the rack. I don't think he ever went up on the rack, and that's where their conversation taken place.

Q. Did he tell you anything else that M__ had told him to do?

A. He told him to back in the hole, go around there and back in the hole, he didn't have the orders. M__ didn't know whether he even had an order for him or not and that he'd work him in as best he could is what M__ told him.

Q. And he was disappointed with that news, the Technical Chemical driver?

A. Yes, sir. He thought he was on time apparently and he could load when he wanted to.

Q. If faced with the same situation, would you have asked the driver to back in the hole?

A. I did ask him to back in the hole that night. I didn't ask him, I told him. I said, "Pull your truck around there and get out of the way and we'll see what we can do," and that's what we done.

Q. Then, I guess when you heard him talking to the dispatcher, you heard him call M__ a dickhead. Did you hear him say anything else about what their conversation had been?

A. No, he just told his dispatcher, "This little son of a bitch is the only one I have a problem with. This little dickhead is the only one that ever gives me any problem, and if he's got to load me, then I'd as soon not come back down here." He's talking to his dispatcher. He's not talking to me. He's talking to his dispatcher. And that's when I told him, "Before you hang up your phone, I want to talk to your dispatcher." Well, I thought it smoothed everything over, and

everybody—that's what I was trying to do, you know, and I thought it was.

Q. Did you ask the dispatcher or tell the dispatcher that the driver was late?

A. Yes, sir.

Q. Did he have a comment on that?

A. No, sir. Technical Chemical, I mean, they've got an appointment time, but in the history that I've dealt with them—they're a company owned truck. They're not a contract trucker, and they come in whenever they can get here, and then generally we work them in as quick as we can.

Mr. Orr's testimony is further expounded on as follows:

Q. Well, if a matter usually gets out of hand with a truck driver or somebody, what would M__ usually be supposed to do? Is he supposed to handle it himself or call you?

A. Call me.

Q. Did he call you to come down there?

A. Yes, sir, on the radio.

Q. M__ called you on the radio?

A. Yes, sir.

Q. When you mention the radio, have you had any occasion to hear M__'s improper use of the radio, of profanity, or statements, or a conversation that you would consider out of line as far as company business?

A. I've heard some profanity, yes, sir.

Q. From M__?

A. Yes, sir.

Q. That's a radio that anybody in the Company can be tuned into?

A. Yes, sir.

Q. Ladies, too?

A. Yes, sir.

Q. Customers, too?

A. If a customer happens to be standing by one of the employees that has a radio.

Q. Then looking at your notes, your typed notes, you said—when you said that you talked to the dispatcher and said that the truck driver said he only had problems with him when he came to Cross; that if he had not had to load his truck, he would not come back here, and then I see this statement that you wrote, "At that time M__ was standing by the desk like he was going to jump on the driver, and I told him to go outside and load the other truck and under—under the other rack. He went outside. I thought he was going to try to go through me for a minute but he did not." Did you think that there was possibly going to be a fistfight or an altercation between he and the driver?

A. I don't know. It made M__ mad when that fellow called him a dickhead.

Q. What is it that you thought he was going to go through you?

A. Well, in the door he was ready.

Q. He was ready to fight?

A. Well, yeah, I would say so. I don't know about if it'd have ever come to blows or not, but M__, you know, it made him mad.

Q. Was the Technical Chemical truck blocking a road or blocking a drive or anything?

A. It would have made it difficult to come through the road, yeah. You could have got around it, but he was parked the wrong way in the road, yes, sir.

Q. But you still could have pulled around it and gotten around it, if necessary?

A. If necessary, yes, sir.

Q. And then on this second occasion that you talk about, on this elderly black man, this was before the Technical Chemical matter, and these were two Ellsworth trucks, and the driver told you that M__ had cursed him and that he didn't have to take that. He told you that M__ had called him a dumb motherfucker?

A. That's what he told me.

The Union presented the testimony of Mr. Maurice Faulkner, which primarily dealt with the termination meeting. His explanation was as follows:

Q. There's been introduced in evidence, and I forget which evident—which—it's from Ryker McDaniel, Product Manager, and it talks about a meeting that was held on June the 22nd, 1998, with Charlie telling Maurice and M__, "That he would like for this meeting to be held in a orderly manner. Maurice agreed. M__ said nothing. Charlie got right to the point with M__ saying that because of his current actions along with M__ being in the second year of a five-year probation, Cross regretfully terminates M__ effectively immediately. Charlie went on to say that, 'We at Cross Oil gave M__ plenty of chances to clean up his act; that he did a good job of it for two years, but since April of this year he's started falling back into that old M__ routine.' He then read to M__ the terms of the probation that he was serving and reminded M__ that he and his Union Representative had signed the agreement. M__ began to take issue with Charlie. M__ was raising his voice saying that Charlie had been trying to get his job for years and that Charlie had had him whipped down to a little sissy. Charlie told M__ to cool down and reminded M__ that this meeting will be held orderly. Maurice said, 'M__ had every right to ask questions; that anybody would be upset at this time.' And then Charlie told M__ that we would gather his belongings and get them to him. He asked Maurice to gather his uniforms and turn them in. Charlie told Maurice that Cross had plenty of cases on M__'s behavior and would be available for discussion Monday June 22nd, 1998. Maurice asked to hear the cases because he and M__ would like to know what he was being fired for. Then Charlie opened M__'s folder and began to give different incidents. M__ denied each incident. After four or five Maurice said, 'This was going no where and that they would be in touch,' and they left the room.' Is that a correct statement or do you remember? This is June 22nd, 1998, signed by Ryker McDaniel, Product Manager.

A. Charlie wouldn't—he wouldn't give specific incidents. He said, "Have you had trouble with a truck driver?" And M__ asked him, "Which truck driver?" Well, I hadn't got the time to go into that right now." I asked Charlie, I said, "Is there anything that we can say right now that will change this?" Is there anything that we can say to keep M__ from getting fired?" "No." I said, "Okay, there's no sense in raising everybody's blood pressure setting here and arguing. Have a civil meeting." And that's when Charlie said he would get back with me later. We got up and left.

Q. Was later what's shown in Exhibit 2F, a memorandum to you from Charlie Clark dated July 23rd, 1998, giving events leading to M__'s discharge? Said, "Listed below are the items that we began to discuss but did not complete in our meeting of June 19th,

111 LA 1022          CROSS OIL REFINING CO.

1998, which led to M__'s discharge." Did you get that memorandum?

A. Yes, sir. I want to make a note that M__ didn't raise his voice in that meeting.

Q. So, you disagree with the statement that is made here by Ryker McDaniel that he raised his voice and took issue with whatever Charlie said?

A. Well, he took issue at it.

Q. But he didn't raise his voice?

A. No, sir. But I don't know anybody that wouldn't. He was trying to find out what he was getting fired for.

The grievant testified regarding a number of the incidents. Specifically the Technical Chemical incident was testified to as follows:

Q. M__, you heard the testimony of the various people concerning your conduct with other folks. The truck driver with chemical—the chemical company, what was it the name of it?

A. Technical Chemical out of Dallas.

Q. Relate your problem with that particular driver.

A. Well, the driver beforehand that come in there was a big old boy named Johnny. He was just the nicest, most accommodating fellow you'll ever want to meet in your life. Then one night this guy and his brother come in there and they didn't know anything, didn't know how the trailer loaded or nothing else, and I got out there and showed him where he could find out on his trailer, where he went other places, and helped him as best I could and loaded him. Well, the next time he come back in he was gonna tell me how to do it, which, you know, that's his prerogative, however he wants to load it, load it. Well, it was overweight and then he come back in and griped about it because it didn't axle out. And he just—I kept trying to be nice to him, nice to him, and he's just a person that was just obnoxious and overbearing. And if the two drivers hadn't of been on a ru—them depositions—was sitting there and heard every word of it, word for word. But for some cause or reason they ended up on a run to where they couldn't make it, and one of them dang sure wanted to make it because he ain't got to pull nothing out of. . .

Q. Well, they're not here. Now, did he indicate any of the problems you've had, the driver?

A. All I know is he come in that night and evidently he was ticked off. I told him, I said, "Buddy, if you don't mind, pull your truck out of the way and let the other driver get in here. I can get him started; you go on around there," and I said, "Right now I don't even know of a order." I said, "I'm sure you do and it's probably in the pass stack, and let me see what I can do. I'll get you just as soon as I can." And he unraveled on me, and I never said a cross word, or a cuss word, to him whatsoever. And he kept on getting more irate, and Jewel Overstreet looked, and I asked him, I said, "Since"—you know, this long distance, I thought maybe that was aggravating him from me trying to talk to him up there with the pumps rattling too down there. So, I asked him, I said, "Would you mind coming up here where we can talk?" No, he wasn't coming up there where we could talk, and he just turned around and made the statement, "We're fixing to have a throw down

tonight." So, I was still nice to him, and I got Timothy down there. And the boy,—well, he turned around and he jumped up and down when he went out there and couldn't get out on the phone because it's got a code. You have to punch a code in to call out. So, he come back and jumped up and down on me again, and I told him, I said, "Buddy, if you would please go out there and move your truck out of the way where I can get this other one started, I'll dial it for you, show you what to do or anything. You do whatever you want to, but would you please, please"—he said, "Now, you're about to get there"—"move your truck where I can do my job." And he wouldn't move it until Tim got there. And Tim was wrong. There was no way a truck could get through the hallway where he was parked. Well, a truck could, but a trailer couldn't. So, then we go out in the office and he's gonna let him use my phone. I said, "Well, Tim, if you don't mind, let him use the phone in there in the computer room and he won't have to use a code." So, I went to trying to do my paperwork, and he got whoever was on the other end of the line and he cussed me for the whole time that I was trying to do my paperwork, and that's in Tim's report, I believe; is it not, Charlie?

*Mr. Compton:* Well, he's testified here today.

Q. You go ahead and testify.

A. He's cussed me over the phone to that guy the whole time, and all I was trying to do is find out where his order was, if he had an order. I already had a full house. I'm talking about stacked back to back, plus two double time loads. And the only reason I could do the two double time loads was on account they moved the Transformer around to the new rack where I could—and it happened to be Transformer to where I could seesaw two trucks out, and I didn't even eat that night.

The grievant testified regarding another incident as follows:

Q. Now, there were two or three other incidents here that they've mentioned. But that Number 8, I think is very important. It says, "The Company's concern that future confrontations may lead to violent acts between M__,"—that's you—"and truck drivers or Cross employees." Were there any acts of violence between you and any truck driver or any employee on the Cross property?

A. No, sir. I don't think I'm a violent person unless I've got a split personality, then maybe I don't know it.

## Discussion

An American Bar Association Committee has stated that "the function of the Arbitrator is to decide whether or not an allegation of non-arbitrability is sound, could be compared to that of a trial judge who is asked to dismiss a complaint on motion for directed verdict or failure to state a cause of action. This analogy indicates that a preliminary decision relating to arbitrability by the Arbitrator is an inherent part of his duty." That Arbitrator's are capable of self-restraint is evidence by the committee's conclusion, based upon exami-

nation of many awards, that "arbitrators generally are well aware of the limitations of their authority and scrupulously try to avoid any transgression of those limitations", citing Arbitrability 18 LA 942, 950 (1951).

[1] The issue then is whether or not the last chance agreement removes the grievant from the Collective Bargaining provision that permits arbitration under these circumstances? It is my ruling that this grievance is arbitrable. My reasoning is based upon the following:

"If the Company can discharge without cause, it can lay off without cause. It can re-call, transfer, or promote in violation of seniority provisions simply by evoking it's claimed right to discharge. Thus, to interpret the agreement in accord with the claim of the Company would reduce to a nullity the fundamental provision of a labor-management agreement—the security of a worker and his job." See Elkouri and Elkouri Third Edition page 611, quoting Atwater Manufacturing Company, 13 LA 747 @ 749 (Donnelly, 1949). Quoting at length from a similar view express by Arbitrator Wallen in another case.

It is uncontradicted in the testimony in this particular case that the grievant did not violate any "specific grounds for discipline". The specific agreement set forth the terms of the probation from June 10, 1996 to June 10, 2001. It states; "if any further incidents occur during the probation period in regards to your personal conduct with employees, customers, truck drivers, dispatchers, etc. while on the job, then you will be terminated immediately."

Arbitrator Platt set forth a standard for reviewing discipline assessed under agreements as follows:

"It is ordinarily the function of an Arbitrator in interpreting a contract provision which requires sufficient cause as a condition precedent to discharge not only to determine whether the employee involved is guilty of wrong-doing and, if so, confirm the employers right to discipline where the exercise is essential to the objective of efficiency, but also to safeguard the interest of the discharged employee by making reasonably sure that the causes for discharge were just and equitable and such as would appeal to reasonable and fair minded persons as warranting discharge. To be sure, no standards exist to aid an Arbitrator in finding a conclusive answer to such a question and, therefore, perhaps the best he can do is decide what a reasonable man, mindful of the habits and customs of industrial life and of the standards of justice and fair dealing prevalent in the community, ought to have done under similar circumstances and in that light to decide whether the conduct of the discharged employee was defensable and that the disciplinary penalty just." (Citing Elkouri and Elkouri page 626, citing Riley Stobber Inc., 7 LA 1764 (1947).

An Arbitrator's view of his function in reviewing discipline may vary ac-

cording to the nature of the offense. For instance, Arbitrator Robert G. Howlett has stated that an Arbitrator should be more hesitant to over-rule penalties where the offense is directly related to the Company's product than where it involves primarily the personal behavior of the employee and is only indirectly related to production. (Citing Valley Steel Casting Company, 22 LA 520, Elkouri and Elkouri, 3rd Edition page 627)

Arbitrator Spaulding stated in the Fruehauf Trailer Company case 16 LA 666 as follows:

"Three answers to this line or argument seem appropriate. The first is that arbitrators very frequently do step in and upset the decisions of Management. The second is that, if arbitrators could not do so, arbitration would be of little import, since the judgment of management would in so many cases constitute the final verdict. Finally, the more careful statement of the principle would probably run to the effect that where the contract uses such terms as discharge for 'cause' or 'good cause' or for 'justifiable cause' an arbitrator will not lightly upset a decision reached by competent careful management which acts in the full light of all the facts, and without any evidence of bias, haste or lack of emotional balance. Even under these conditions, if the decision is such as to shock the sense of justice of ordinary reasonable men, we suspect that arbitrators have a duty to interfere. Since the acts of Management in this case do shock our sense of emotional tension, in haste, and without a very careful weighing of the facts, we find ourselves inevitably driven to overthrow the decision of the Management."

It is said to be "axiomatic that the degree of penalty should be in keeping with the seriousness of the offense." In this regard, Arbitrator McCoy explained:

"Offenses are of two general classes: (1) those extremely serious offenses such as stealing, striking a foreman, persistent refusal to obey a legitimate order, etc., which usually justify summary discharge without the necessity of prior warnings or attempts at corrective discipline; (2) those less serious infractions of plant rules or of proper conduct such as tardiness, absence without permission, careless workmanship, insolence, etc., which call not for discharge for the first offense (and usually not even for the second or third offense) but for some milder penalty aimed at correction."

[2] The Company's complaint against the grievant is not that he failed to do his job or that he did not do it well. The complaints have to do with his interpersonal relationships between customers and, to some extent, co-workers. The particular incident which obviously gives rise to the Company's action in discharging the grievant has to do with whether he followed the proper protocol in dealing with a truck driver who disputed the instructions of the grievant which were within his authority so to do.

CROSS OIL REFINING CO.

In this particular case, there is no question that the grievant followed protocol and called his shift leader to intercede in his difficulty with a customer, *when the customer was obviously at fault*. There is no question that the customer for whom the truck driver worked was a valued customer and important to the continued economic well being of the Company. The Arbitrator understands the Company's position is that this particular incident is the "straw that broke the camel's back". However, I find that the specificity of "incident" is vague as it relates to this particular incident.

[3] The rule which was clearly established between the supervisors and the position that the grievant held was that if there was a problem with a customer, that could not be satisfactorily resolved by the employee, the employee was to seek interdiction by his supervisor. This did occur. No violence occurred. Further, the refusal by the grievant to load the truck as demanded by the truck driver for the customer was the result of the employee's understanding of what he should be doing in performing his job in terms of filling the truck in an orderly fashion based upon scheduling which is also important to management. Therefore, I am ordering the reinstatement of the employee. My reinstatement will be conditioned upon proof of mental and emotional fitness by a certified psychologist or psychiatrist to be selected jointly by the parties to determine whether or not the grievant is mentally and emotionally fit to perform his duties without disruption to the workplace. Secondly, management may require re-training of the employee with a counselor to improve the grievant's ability to relate to the customers of the Company.

This re-training can take the form of a management consultant or counselor as well as any marketing or public relations concept that would aid him in his position.

The grievant and the Union have specifically requested that he be reinstated to a different job. I urge the Company to consider his re-assignment to a job which would screen him from contacts with the public or its customers in order to avoid future problems or personality conflicts with customers or co-workers.

[4] He has been an employee for 20 years and has been lauded for his job performance, i.e., "productive" and "efficient", by at least two management witnesses. Payment for all testing and counseling should be borne through the health insurance provided by the Company. Should the health insurance of

the grievant not cover the evaluations contained in this order, the Company shall bear the expense. Provided the grievant cooperates in all respects with the evaluations, the re-training, and public relations which the Company desires for him to have as a component of his background and experience, then he shall be reinstated to his prior position or a position that is agreed upon between the parties. Because I find that the grievant is in fact responsible for his own personal behavior and because he was a party to the 'last chance agreement', I will not award any back pay.

Rules of conduct for the grievant in the work place should be specific and a violation of which can be the basis for discharge. For example, if the grievant is having problems with the truck drivers who are in line to be loaded with the Company's product he should always follow management's instruction to contact a supervisor rather than to engage in hostile or volatile comments with the customer; but he should not be punished for seeking the assistance of a supervisor if a particular incident occurs. In the crucial "incident" he was confronted with a truck driver who was "wrong", "overbearing" and profane. He was angry with his own dispatcher for giving the wrong time to load the product. I am sure he gets paid for miles driven rather than sitting in line and waiting.

[5] The grievant should be warned that while profanity and vulgarity may be part of the industrial "shop talk" at the Company, he should eliminate harassing comments, vulgarity, and profanity from his vocabulary and its usage at the work place. The grievant is further ordered to take extraordinary care in keeping his sugar levels under control, by frequent testing and to obey the instructions of his physician in keeping his sugar in balance. The Company may have to accommodate the grievant with some additional breaks for snacks or medicine as needed. He should not be required to work through "lunch" or miss a meal. It is well known that failure to medicate and eat timely can cause attitude and personality changes in a diabetic. The Arbitrator will retain jurisdiction in this case if there are any disputes regarding this particular order.

**DECISION**

The grievance is conditionally granted.

IT IS SO ORDERED.