Accordingly, the arbitrator finds and awards that the two employees were fully paid for the work they performed on the jobs in question, in accordance with the premium and overtime rates of the contract, and their claim for additional payment is disallowed and denied.

An award embodying the foregoing is hereby made.

## AWARD

I, The Undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named Parties, and dated August 3, 1949, and written stipulation, dated June 30, 1950, and having been duly sworn and having duly heard the proofs and allegations of the Parties, award as follows:

1. That the Company violated the written collective bargaining contract, dated August 3, 1949, between the parties above-named, by entering into separate, individual agreements, during the term of said contract, with the employees, Gustave Gengenbach and Alois F. Kopriva, members of the bargaining unit, for the performance by them of certain production work after regularly scheduled hours of work.

2. That the wages paid employees in the bargaining unit, covered by the written collective bargaining contract between the Parties, for all production work performed by them, must be computed and paid for by the Company on the basis of the wage rates and premium and overtime rate provisions of said written collective bargaining contracts for the actual hours that employees engage in such production work.

3. In light of the proof and evidence offered in this proceeding, the Arbitrator finds and awards that the employees, Gustave Gengenbach and Alois F. Kopriva, were fully paid by the Company for the work they had performed under their separate, individual agreements with the Company, in accordance with the wage rates and premium and overtime rate provisions of the written collective bargaining contract between the Parties.

Accordingly, the claim of the Union for additional wage payments to said two employees for the work they had performed under their separate, individual agreements, is disallowed and denied.

## PHELPS DODGE COPPER PRODUCTS CORP.—

### Decision of Arbitrator

In re PHELPS DODGE COPPER PRODUCTS CORPORATION, BAYWAY PLANT [Elizabeth, N. J.] *and* INTERNATIONAL UNION OF ELECTRICAL, RADIO & MACHINE WORKERS, LOCAL 441 (CIO), February 28, 1951.

Arbitrator: Jules J. Justin, appointed by parties.

**SENIORITY**

**—Retention of seniority after transfer within bargaining unit—Contract interpretation ▶117.2432**

Under contract providing that when employee transfers to different section he must wait 180 days before carrying over to new section seniority accumulated in old section, employer was not obligated to credit one employee with his accumulated seniority immediately after his transfer to different section, despite contention that supplemental agreement permitting employees in certain sections to be credited with accumulated seniority immediately after transfer is applicable to instant employee. Supplemental agreement specifies sections exempted from waiting period and instant employee was not in one of sections specified; claim that omission of employee's section was "purely inadvertent" may not be considered since language is clear.—Phelps Dodge Copper Products Corp., 16 LA 229.

---

*Appearances:* For the company—F. D. McGlinchey, vice-president and counsel; John J. Conlon, assistant plant manager; R. B. McLane, personnel manager; Walter Portman, employment manager; and Robert Mitchell, assistant personnel manager. For the union—Kapelsohn, Lerner, Leuchter & Reitman, Esqs. by Sidney Reitman, counsel; Joseph Iozzi, president, Local 441; and George Simpson, vice-president, Local 441.

## *Award of Arbitrator*

### SUBMISSION

JUSTIN, Arbitrator:—This arbitration proceeding arises under the written collective bargaining agree-

*Symbol ▶ indicates number under Index-Digest*

ment, dated September 7, 1946, between Phelps Dodge Copper Products Corporation (hereinafter referred to as the "Company") and Local 441, International Union of Electrical, Radio & Machine Workers, C.I.O., successor Union thereunder (hereinafter referred to as the "Union").

In accordance with said agreement, the Parties mutually appointed Jules J. Justin, of 21 East 40th Street, New York City, as arbitrator, to determine and award upon a dispute that had arisen between them.

Upon due notices given, a hearing was held on December 14, 1950, in the City of Newark, New Jersey. The Parties and their witnesses attended, and the proof and evidence on the issues in dispute were offered to and received by the arbitrator.

At the conclusion of the oral hearing, and upon their request and mutual consent, the Parties were afforded time within which to submit post-hearing briefs. The Company's brief was received on January 9, 1951, and the Union's brief on February 5, 1951. They were duly considered by the arbitrator.

## TRANSFER: ACCUMULATED SENIORITY

This dispute arises out of the Union's claim that the Company violated the seniority provisions of the contract by not permitting the employee, George Simpson, to use his full seniority rights under the contract, when he was displaced from the job of "Shipping Man" on April 21, 1949.

### Facts of Case

The material facts involved in the dispute are as follows:

For some time prior to March, 1949, Mr. Simpson had been employed as "Crane Truck Operator" in the Transportation Section. He had about fifteen years' seniority in that Section. He had previously worked in the job of "Shipping Man" in Section III of the ACP Division. He had a little over six and one-half years' seniority in that Section, which he retained under the seniority provisions of the contract.

On or about March 21, 1949, his job of "Crane Truck Operator" in the Transportation Section was temporarily eliminated. He had the option of exercising his fifteen years' seniority in the Transportation Section to get another available job in that Section. Instead, he exercised his retained seniority in Section III and "bumped" an employee with less seniority in that Section. He was placed in his former job of "Shipping Man" in Section III.

The job rate for "Shipping Man" at that time was $1.26 per hour. That job was also covered by an incentive plan, allowing for increased earnings. He worked in that job until April 21, 1949. On that date, another employee, Mr. Viskaskis, who had been laid off from his job as "Pipe Fitter" in Section II, exercised his seniority rights to a job in Section III. Mr. Viskaskis had greater seniority than Mr. Simpson in Section III, although he had less plant-wide seniority than Mr. Simpson.

### The Issue

On April 21, 1949, Mr. Viskaskis displaced Mr. Simpson in the job of "Shipping Man." Mr Simpson then exercised his seniority to return to a job in the Transportation Section. He was transferred to the job of "Truck Operator" in the Transportation Section. The rate for that job was $1.29 per hour, without any incentive plan. The Union claims that Mr. Simpson had been improperly displaced by Mr. Viskaskis from the job of "Shipping Man" on April 21, 1949, and that he is entitled to be paid the loss in wages he suffered by such displacement.

The Union contends that Mr. Simpson took with him the total seniority of about fifteen years that he had accumulated in the Transportation Section when he "bumped" into the job of "Shipping Man" in Section III, and that he, therefore, should not have been displaced by Mr. Viskaskis. The Union relies upon paragraph 5 of Supplemental Agreement "B" of the contract to support its position.

The Company contends that the only seniority an employee can use for "bumping" purposes is the seniority that employee had in that former Section; that when an employee leaves a Section, he retains, but does not continue to accumulate seniority for layoff purposes in his former Section; and that only after 180 days have expired on the job in the former Section is an employee credited with his accumulated seniority. The Company relies upon Article VI, Subsections 2(A) and (B) to support its position.

### Pertinent Contract Provisions

The seniority provisions of the contract, material to the dispute, are as follows:

"VI Layoffs, Transfers and Reemployment.

* * * * * *

"2. Decreasing Forces—

"(A) Whenever it is necessary to decrease forces, the following factors shall be taken into consideration:

"(a) Seniority in the Section in question as defined by Article V.

"(b) Seniority in other Sections in which he has worked.

"(c) Ability, skill and experience.

* * * * * *

"(B) If an employee is laid off in a Section and is then taken into another Section in line with Article VI, Section 2, and if this employee after a period of one hundred and eighty (180) days is able to perform the work to which he is assigned with the ability, experience and skill necessary in the judgment of the Employer, then the employee retains his seniority acquired in the other Section in which he worked plus the one hundred and eighty (180) days' trial period in the new Section, provided he has not lost his seniority rights as provided by Section V * * *."

*Supplemental Seniority Agreement*

Supplemental Agreement "B", annexed to and dated the same date as the contract, provides:

"Supplementing and clarifying their collective agreement the parties understand:

"1. If an employee is transferred from a section in one Bayway division to a section in the other division, he shall carry his seniority in the former with him to the latter, until he loses it pursuant to the provisions of Article V of the contract.

"2. Seniority within each division at Bayway shall be by sections.

"3. When an employee is transferred from one section in a division to another section in the division, he shall retain his seniority in the section from which he was transferred as of the time of transfer.

"(a) After he has worked in the new section one hundred and eighty (180) days and is retained there as a qualified employee, he shall receive in the new section his accumulated seniority in the old section as of the time of transfer plus the time that he has worked in the new section * * *."

Paragraph 5 of said Supplemental Agreement "B" provides:

"5. Since employees in the General and Maintenance sections at Bayway work in both plants an employee who is transferred from either of these sections to a section in one of the plants shall carry with him into the new section the seniority which he accumulated in the General or Maintenance sections without loss, however, of his seniority as of the time of transfer in these sections."

*Additional Supplementary Agreement*

Article V of the contract provides that the two Divisions of the Company's plant at Bayway, referred to as the ACP Division and the BAT Division, shall each have their own separate seniority classifications. Seniority classifications are by Sections. The Sections are set forth in Supplemental Agreement "C", annexed to and dated the same date as the contract.

In addition to the ACP Sections and the BAT Sections, Supplemental Agreement "C" contains five classification Sections under the heading "Maintenance, Transportation, and General Department."

Under this latter heading are: Section I—Transportation—All Trucks; Section II—Maintenance Department, with certain specified classifications; and Sections III, IV and V, with certain specified classifications, under the sub-heading "General Department".

**Union's Position**

The Union contends that Mr. Simpson's seniority is governed by paragraph 5 of Supplemental Agreement "B"; that the 180 day limitation expressed in Article VI of the contract does not apply to employees transferred from either the Maintenance or Transportation or General Sections to any other Sections or Divisions in the plant; that the omission of the word "Transportation" from paragraph 5 of Supplemental Agreement "B" should be considered "purely inadvertent"; and that the intent of the Parties was to have paragraph 5 of the Supplemental Agreement "B" apply to employees in the "Transportation" Section, as well as to employees in the "Maintenance" and "General" Sections.

The Union further claims that Supplemental Agreement "B" must be deemed a complete substitute for the more general seniority provision, Article VI, Subdivision 2B, of the contract; that the Parties intended Supplemental Agreement "B" to control all movements of seniority; and, therefore, under the Union's construction of Supplemental Agreement "B", Mr. Simpson carried over his accumulated fifteen years' seniority immediately upon his entry into the job of "Shipping Man" in Section III, and did not have to wait 180 additional days to be credited with his full accumulated seniority. Therefore, argues the Union, since Mr. Simpson's accumulated seniority was more than Mr. Viskaskis' accumulated seniority, he should not have been displaced by

Mr. Viskaskis from the job of "Shipping Man" in Section III.

**Company's Position**

The Company contends that Article VI, Section 2B, expressly provides that an employee must wait 180 days before he can be credited, in the Section to which he has been transferred, with the seniority accumulated in another Section; that paragraph 5 of Supplemental Agreement "B" does not mention the "Transportation" Section and cannot be construed, as the Union contends, to require that an employee transferred from the "Transportation" Section be credited immediately with his accumulated seniority; that paragraph 5 is clear and unambiguous and refers only to Sections in the "General" and the "Maintenance" Departments; and that the arbitrator has no authority to rewrite paragraph 5 or to insert, under the guise of interpreting it, reference to the "Transportation" Section.

The Company further claims that in all prior layoffs under the contract, layoffs of Transportation Section employees have been handled under the provisions of Article VI, Subdivision 2, of the contract; and that the only seniority that Transportation Section employees have been permitted to use to "bump" into a prior Section in which they had worked, was the seniority they had in that prior Section at the time they had left it.

**Discussion**

The basic issue in this dispute is whether Mr. Simpson was entitled to be credited with his full accumulated seniority *immediately* upon his being placed in the job of "Shipping Man" in Section III, or whether he had to wait 180 days after being placed on the job before his accumulated seniority could count. If Mr. Simpson did not have to wait the 180-day period, then he had greater seniority to the job of "Shipping Man" than Mr. Viskaskis. If he did have to wait the 180-day period, then Mr. Viskaskis had the greater seniority to that job, and Mr. Simpson was properly "bumped" by Mr. Viskaskis.

*Interpretation of Contract*

Under the seniority provisions of the contract, as written, the arbitrator finds and awards that Mr. Simpson had to wait the 180-day period on the job, before he could be credited with his accumulated seniority.

Article VI, Section 2, of the contract, sets forth the factors to be considered in applying seniority in cases of "Decreasing Forces". These factors are (a) seniority in the Section in question; (b) seniority in other Sections in which he had worked; and (c) ability, skill and experience.

Subdivision B of that Section 2 in effect provides that an employee laid off in one Section and then taken into another Section must wait 180 days before he is credited with his accumulated seniority.

*Pertinence of Supplemental Agreement*

The Union contends that Article VI is not controlling in this case, because Supplemental Agreement "B" changed it. The Union claims that under Supplemental Agreement "B", the 180-day waiting period was limited in its application to transfers from one Section to another Section, *within the same Division*. The Union arrives at this conclusion by arguing that Supplemental Agreement "B" was intended to cover all possible movements of seniority; and since the 180-day limitation was expressed only in connection with transfers within the same Division, it was not intended to be applied to any other transfers. The Union claims that Supplemental Agreement "B" was, in effect, a complete substitution for the seniority articles of the contract.

The arbitrator finds no basis in fact or in accepted rules of contract construction to support this conclusion. Supplemental Agreement "B", annexed to and executed on the same date as the contract, expressly states that its purpose is "supplementing and clarifying their collective agreement." The substantive paragraphs of the Supplemental Agreement then proceed to spell out in greater detail what the Parties intend by the seniority articles of the contract and how they "understand" those seniority articles are to be applied.

Supplemental Agreement "B" does not expressly limit the application of the 180-day waiting period to transfers within a Division. It does not eliminate the 180-day waiting period in Article VI of the contract from transfers between Divisions, except as paragraph 5 of Supplemental Agreement "E" provides, in connection with transfers from the "General" or "Maintenance" Sections.

Paragraph 5 of Supplemental Agreement "B" provides that an employee, transferred from either the "General" or "Maintenance" Sections, shall carry

with him into the new Section the seniority which he accumulated in the "General" or "Maintenance" Sections. The Union argues that the "Transportation" Section was intended to be covered by this provision, since employees in "Transportation" also work in both plants, and unless this provision is construed to cover them, these employees would have no rule governing movement of their accumulated seniority. The Union claims that the omission of the word "Transportation" from paragraph 5 was "purely inadvertent" and that the real intent of the Parties was to deal with the movement of seniority of employees in "Transportation" in the same way as employees in the "General" or "Maintenance" Sections.

*Analysis of Parties' Contentions*

There is logic to the Union's contention. Its argument is very persuasive. It appears that employees in the "Transportation" Section serve both Divisions, as do "Maintenance" and "General" employees. Yet, the language of paragraph 5 expressly accords only to employees in the "Maintenance" and "General" Sections the right to carry over immediately their accumulated seniority from either of these Sections into a new Section. Such right is not accorded to employees in the "Transportation" Section.

The Company says it was not intended by the Parties to accord such right to employees in the "Transportation" Section; and that in prior layoffs affecting "Transportation" employees it was not so applied. The Union says that the Parties intended paragraph 5 to apply to "Transportation" employees as well as to "General" and "Maintenance" employees. The Union puts in issue the Company's claim of the past application of this paragraph. It claims that it has never been applied as the Company contends, and it challenges the Company's facts in all instances of prior layoffs.

*Clarity of Paragraph 5*

The proof submitted by the Parties as to how the seniority provisions were applied to "Transportation" employees in prior layoffs is in sharp conflict. However, the clear and unambiguous wording of paragraph 5 makes it unnecessary to resolve this disputed fact. In light of the explicit language of paragraph 5, the arbitrator is constrained to find that paragraph 5 applies only to employees in the "General" and "Maintenance" Sections and not to employees in the "Transportation" Section.

Paragraph 5 is clear on its face. There is no ambiguity in this clause. An omission of words in a clause does not create an ambiguity. Plain and unambiguous words are undisputed facts. The conduct of Parties may be used to fix a meaning to words and phrases of uncertain meaning. Prior acts cannot be used to change the explicit terms of a contract. An arbitrator's function is not to rewrite the Parties' contract. His function is limited to finding out what the Parties intended under a particular clause. The intent of the Parties is to be found in the words which they, themselves, employed to express their intent. When the language used is clear and explicit, the arbitrator is constrained to give effect to the thought expressed by the words used. Here, the Parties expressly made provision allowing employees in the "General" and "Maintenance" Sections to carry over immediately their accumulated seniority. No similar provision is made for employees in the "Transportation" Section. They are not accorded the same seniority rights. While this may appear illogical, the omission cannot be supplied by an arbitrator under the guise of interpreting the clause. The arbitrator is bound by the clause, as written by the Parties. It is not within the arbitrator's authority to supply a logical intent or purpose, when the contract clause itself does not contain language sufficient to express it.

**Findings**

The arbitrator, therefore, finds and awards that the transfer of seniority rights of employees in the "Transportation" Section is covered by Article VI, Section 2B, of the contract, and not by paragraph 5 of Supplemental Agreement "B".

In light of the proof offered in this case, the arbitrator finds that Mr. Simpson had to wait, in accordance with Article VI, Section 2B, 180 days on the job of "Shipping Man" before his accumulated seniority rights could count. Since the employee, Mr. Viskaskis, had greater seniority than Mr. Simpson to the job of "Shipping Man", before the expiration of the 180-day waiting period, Mr. Simpson was properly displaced by Mr. Viskaskis. Therefore, the arbitrator finds and awards that the Company did not violate the

seniority provisions of the contract by displacing Mr. Simpson from the job of "Shipping Man" on April 21, 1949, and the claim of the Union in this case is accordingly denied and disallowed.

An award to this effect is hereby made.

**AWARD**

I, the undersigned Arbitrator, having been designated in accordance with the Arbitration Agreement entered into by the above-named Parties, and dated September 7, 1946, and having been duly sworn and having duly heard the proofs and allegations of the Parties, AWARD as follows:

That the transfer of seniority rights of employees in the "Transportation" Section is governed by Article VI, Subdivision 2(B) of the written collective bargaining contract, dated September 7, 1946, between the Parties above named, and not by paragraph 5 of the Supplemental Agreement "B" of said contract.

That on April 21, 1949, the employee, Mr. Viskaskis, had greater seniority than the employee, George Simpson, to the job of "Shipping Man" in Section III.

That the Company did not violate the seniority provisions of said contract between the Parties when it allowed the employee, Mr. Viskaskis, to displace the employee, George Simpson, from the job of "Shipping Man" in Section III, on April 21, 1949.

Accordingly, the claim of the Union that the Company violated the seniority provisions of the contract by displacing the employee, George Simpson, from the job of "Shipping Man" in Section III, on April 21, 1949, is disallowed and dismissed.

**BELL AIRCRAFT CORP.—**

**Decision of Arbitrators**

In re BELL AIRCRAFT CORPORATION [Wheatfield, N. Y.] *and* UNITED AUTOMOBILE, AIRCRAFT & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, LOCAL 501 (CIO), Grievance Nos. 2638 and 2639, March 2, 1951.

Board of Arbitration: Joseph Shister (chairman); N. Hainsey (employer-appointed arbitrator); and J. Newton (union-appointed arbitrator).

**DISCIPLINE**

**—Procedure in discipline cases—What constitutes "discipline" ►118.301**

Aircraft manufacturer was not obligated to observe procedure set forth in contract for "discipline" cases when he discharged employee because he was ruled poor security risk by Government. Since discharge was based solely on ruling by Government, it did not constitute "discipline" within meaning of contract.—Bell Aircraft Corp., 16 LA 234.

**—Discharge for security reasons—Propriety ►118.649**

Under contract permitting aircraft manufacturer to take any reasonable action which he may see fit to comply with his security obligations to Government, employer's action in discharging employee when Government restricted him from access to classified information and material is upheld. Even if contract should be interpreted, as contended for by union, to require employer to attempt to provide other employment for employees who are restricted from access to classified information and material, evidence shows that there were no jobs not requiring access to classified information and material to which instant employee could have been assigned.—Bell Aircraft Corp., 16 LA 234.

---

*Appearances:* For the company—James P. McNamara, manager, industrial relations. For the union—Richard Lipsitz.

***Award of Board of Arbitration***

**DISCHARGE: SECURITY RISK**

SHISTER, Arbitrator:—The employee in question, A—, claims he is entitled to back pay because his discharge was

*Symbol ► indicates number under Index-Digest*

Labor and Employment Law Library
ISSN 1527-7356

**H.J. Heinz Co., 122 LA 845 (Arb. 2006)**
122 LA 845
H.J. Heinz Co.
Decision of Arbitrator
FMCS Case No. 06/00601
May 31, 2006

H.J. HEINZ COMPANY, L.P. [Fremont, Ohio] and UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL 911

**Arbitrator(s)**

Arbitrator: Jerry A. Fullmer, selected by parties through procedures of the Federal Mediation and Conciliation Service

## Headnotes

**DISCHARGE**

**[1] Last chance agreements — Work rules ▶118.815 ▶118.25 ▶118.659**

Last chance agreement limiting arbitral review to whether employer's reinstatement of production worker's discharge was arbitrary or capricious applies to discharge of worker for violating (1) work rule requiring immediate notification of warehouse and adjustment of ketchup flow when hourly weight check shows that product is under weight specifications, and/or (2)safety rule requiring "lockout/tagout" of machine before working on it, where last chance agreement is incorporated by reference into "proper cause" article of collective-bargaining contract, and potential benefits of agreement for employer, employee, and union will only accrue if arbitrator enforces it.

**[2] Negligence — Work rules — Last chance agreements ▶118.651 ▶118.815 ▶118.25**

Employer's discharge of production worker under last chance agreement for failing to immediately notify warehouse and make adjustment of ketchup flow when hourly weight check showed that product was under weight specifications was not arbitrary or capricious, where worker admitted he input entry code into computer to trigger weight check at time warehouse should have been notified that product was under weight, and he implicitly admitted violation when he stated in grievance that "discipline is too high for the violations."

**[3] Safety — Work rules — Last chance agreements ▶118.659 ▶118.815 ▶118.25**

Employer's discharge of production worker under last chance agreement for failing to lockout and tag machine that tapes boxes containing ketchup bags before reaching into it was not arbitrary or capricious, where worker when confronted told supervisor "Oh I got caught" and pleaded not to be written up, and he implicitly admitted violation when he stated in grievance that "discipline is too high for the violations."

## Attorneys

Appearances: For the employer—Robert H. Shoop Jr. (Thorp, Reid and Armstrong), attorney. For the union—Ronald Rahal, staff attorney.

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

## Opinion Text

### LAST CHANCE AGREEMENTS

**Opinion By:**

FULLMER, Arbitrator.

This case [1] concerns the termination of the Grievant, J__, on July 30, 2005 for a claimed violation of his Last Chance Agreement.

---

[1] H. J. Heinz Company, L.P. (hereafter referred to as "the Company") and United Food and Commercial Workers Union, Local 911 (hereafter referred to as "the Union"), are parties to a collective bargaining agreement dated March 1, 2004. The agreement provides in Article 7 for settlement of disputes through a grievance and arbitration procedure. A dispute has arisen between the parties concerning the termination of the Grievant, J__on July 30, 2005 for a claimed violation of a last change agreement.

---

### I. Facts

#### *A. Background Facts*

The Company manufactures food products, including ketchup [2], at its Fremont, Ohio plant. The Union represents a unit of production, maintenance, single serve, and quality control employees. One of these, at least until July 30, 2005, was the Grievant. He has been employed for a number of years. At the time of the events in question, he was serving as a Lead Bagger Operator on Line #7 on the third shift. The hours of that shift were 10:00 p.m. to 6:30 a.m.. There were three bargaining unit employees on this line, an operator, a "bag-paced" employee and the Grievant. The Grievant reported to Production Supervisor Dan Blair. Mr. Blair in turn reported to Randall Keegan, General Shift Supervisor.

---

[2] The spelling is that of the Company and the Union, adopted in preference to the more mundane dictionary spelling of "catsup".

---

The Company maintains a set of "Factory Rules and Regulations". It covers such matters as "carelessness or inefficient work"; "safety rules" and "tardiness control".

The Grievant got into difficulties in 2004 with respect to the Rules and Regulations, specifically "Tardiness Control". These transgressions were described in what was eventually known as "the Last Chance Agreement":

> "the parties hereto agree that, by his violation of the following work rule—Rules and Regulations, Tardiness Control, J__ was tardy on 7/12/04 his 12th tardy in 2004—provided the Factory with proper cause, under the current Labor Agreement and Factory Rules and Regulations and otherwise for his immediate discharge."

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

However, instead of implementing the discharge, the Company, the Union and the Grievant himself agreed upon the terms of the Last Chance Agreement along the following lines, with quotations of the provisions most relevant to the present case:

"However, in consideration of the facts and circumstances involved in this case, the parties hereto agree that the discharge shall be suspended subject to the following terms and conditions:

* * *

D) J__ is placed at the following disciplinary steps:

* * *

From 7/1/04 through 12/31/05, placed at the last step of discipline for any and all Factory rules and regulations, procedures, and practices for a period of eighteen (18) months ... .

E) J__ agrees that in the event the discharge is reinstated, the issue shall be processed through the grievance and arbitration procedure of the Labor Agreement, but shall be limited to the question of *whether such reinstatement was arbitrary or capricious* ... ."

The Last Chance Agreement was signed on August 12, 2004 by the Grievant himself, by Factory Manager Jerome Kozicki and Human Resources Manager Gregg Gerber for the Company and by Chief Steward John W. Smith for the Union. All went well under the Agreement for almost a year.

***B. Facts Leading to the Grievance***

On the evening of July 25-26, 2005 [3] the Grievant was working his regular shift. During the shift there were two incidents in which the Grievant was found to have been in violation of the Company Rules. These two incidents were recorded in "E-14"forms which bore the date of July 30, 2005. They provided:

---

[3] The "July 25-26" reference is to the calendar days encompassed in a 10:00 p.m. to 6:30 a.m. shift. In the parties' nomenclature the shift straddling those two calendar days is referred to as the "July 25" shift.

---

"On Tuesday, 7/26/05, J__was in violation of the Factory "Careless/Inefficient" rules;specifically J__ while performing his Lead Bagger Operator job, failed to perform a recheck on line #7 weight check had a "MAV"which calls for a hold and an automatic 'recheck'. The recheck was not completed until 94 minutes later which resulted in a larger quantity of held product.

This E-14 is issued as official discipline and J__ is notified that the level of discipline for violation of the Factory Careless/Inefficient rule would be a written warning in this case the issuance of official discipline puts J__ in violation of his last chance letter dated 8/12/04 and therefore his employment with Heinz North American Fremont Factory is terminated.

OF NOTE: Last chance agreement stated any official discipline for violation of Factory rules/regulations would immediately involk the termination of employment status."

"On Tuesday, 7/26/05, J__was in violation of the Factory 'Safety (Lockout/Tagout) rule; specifically J__ was on line #7 as the Lead Bagger Operator. J__was observed by Supervisor Blair reaching into the taper area with the doors open and the machine not properly locked out ..."

[last two paragraphs not quoted as being identical to the preceding quotation]

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

The Union did not agree with the Company's action. The applicable grievance was filed on July 27, 2005. It provided:

"J__ feels the discipline in this case is to high for the violations."

The grievance was thence processed through the steps of the grievance procedure to arbitration.

**II. Potentially Applicable Contract Provisions**

***ARTICLE I***
***RECOGNITION AND RESTRICTIONS***

* * *

Section 5 Management Rights.

Except to the extent that is limited and modified by the specific terms of this Agreement, the Company reserves the exclusive rights to manage the plant; to regulate the use of all its equipment and property;to determine the products to be handled, produced or manufactured; to determine the schedule, methods, processes, means and location of such production; and to assign, schedule and direct the work force in accordance with its best interests, including but not limited to the right to select and hire, promote, demote, transfer, classify, reclassify, suspend, lay off for lack of business, suspend or discharge for proper cause, take action to maintain discipline and efficiency among its employees and to establish and enforce plant rules, provided that no action so taken will be in violation of any other provisions of this Agreement.

**III. Issue**

Was the termination of the Grievant, J__, on July 30, 2005 for proper cause? If not, what shall be the remedy?

**IV. Positions of the Parties**

***The Company Position***

The Company urges arbitral precedent to the effect that last chance agreements are to be considered valid and enforceable. The Company's action must only be non-arbitrary and non-capricious. The grievance admits the violation.

On the merits the Company asserts that its actions were not arbitrary or capricious. The failure of the Grievant to properly check and record the weights was cause for discipline. The Grievant did not deny not doing the check. Having done so, he should have done an immediate recheck. His failure caused the product to be held for over an hour.

The actions of the Grievant in placing his head and arm in the taper machine without properly locking out similarly constitute actions for discipline. The Grievant never denied having his head and arm inside the machine. This constitutes a failure to comply with the lockout/tagout procedure. The Grievant did not deny this. The actions are cause for discipline and others have been similarly disciplined.

The Grievant was not called as a witness and the Union's defenses are based on wild speculations. None of the other Union members who worked on Line #7 were called either. The Company's witnesses

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

actually testified and they were subject to cross-examination. Their testimony fully supports the disciplinary action taken.

***The Union Position***

The Union states the issue both in terms of proper cause and whether the termination was arbitrary and capricious. It asserts that the grievance should be sustained whether the arbitrator applies either standard. The provisions of Section 5, Management Rights are emphasized. The approach should not be unbending. *Northrup Corp.*, 96 LA 149 (Weiss, Arb., 1990). It should be recalled that the last chance agreement was for tardiness.

Certainly the Company failed to prove that the Grievant was careless and inefficient. Adequate training is a prerequisite to efficiency. The Company never established what he should have seen on the screen to indicate a hold. The Grievant maintains that he did not do the weights at 2:26. It is improper to discharge an employee when the Company shares the responsibility for the alleged infraction. *Zinsco Electrical Products*, 65 LA 487 (Erbs, Arb., 1975). Other employees had difficulties completing their duties on line seven.

Neither has the Company proved that the Grievant violated the lock out rule. There was no one specific rule put in evidence. The testimony of Dan Blair was vague as to the precise point where the non-rule kicked in. It was only on a post-facto basis that the Company tried to modify its rules. Certainly its rules on the subject were not disseminated. There is a requirement that the rules "unambiguously establish the scope of the prohibited conduct". *Discipline and Discharge and Arbitration*, pp. 72-80 (BNA, 1999). Certainly there was no proof of the violation of any known lockout rule.

**Page 848**

The grievance should be sustained in its entirety and the Grievant returned to work and made whole.

**V. Discussion**

***A. Introduction***

The present case is a termination case centering on the application of a Last Chance Agreement dated August 12, 2004. The overall issue concerns the somewhat specialized application of the "proper cause" standard of Article I, Section 5 of the parties' agreement. The following sub-issues are presented. One is the establishment of the standard to be applied in this case. The second is whether the evidence is sufficient under that standard to establish the "failed to perform a re-check" offense. The third is whether the evidence is sufficient under that standard to establish the "machine not properly locked out" offense. The discussion will then turn to a conclusion. We turn to these issues in the order stated.

***B. The Overall Standard.***

***1. "Proper" Cause and the Last Chance Agreement.***

The parties differ concerning the applicable standard governing the resolution of this case. The Union views the standard as involving only the application of the "proper cause" standard of Article I, Section 5 of the parties' agreement. The Company views the standard as involving only the application of the terms of the Last Chance Agreement.

[1] The arbitrator views the formulation of the standard as resting somewhere between these two extremes. The starting point of the inquiry *does* lie with the proper cause standard of Article I, Section 5. That governs all the discharges under the agreement. But the "proper cause standard" can only be applied with reference to *other* agreements between the parties. If, hypothetically, the parties had agreed

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

to a set of rules providing for discharge for the first tardy, such a discharge would, by definition, be for proper cause. Here the parties have agreed to a Last Chance Agreement which establishes the standard for any terminations of the Grievant between the dates of August 12, 2004 and April 12, 2006. The Last Chance Agreement is thus incorporated by reference into the "proper cause" standard of Article I, Section 5.

There is no reason not to apply the Last Chance Agreement as written and so incorporated. Beyond the "legal" aspects there are policy reasons for doing so. When a last chance agreement is entered into, it has the potential for benefiting all three parties. Each is spared the uncertainty of taking *that* termination to arbitration with the concomitant cost, burden and uncertainty. The employee gets to retain his/her job and retain his/her income. The Union is spared the possible loss of a member and dues income. The Company gets to retain an employee who presumably was satisfactory up until the events leading to the discharge. It also has the hopes that the employee will benefit and improve from what is the ultimate in progressive discipline, i.e. the sword hanging over the employee during the period that the last chance agreement governs. But, these benefits will only accrue if arbitrators enforce the last chance agreements as written. If arbitrators do not do so, employers will be reluctant to enter into them and will simply take their chances with the first discharge in arbitration.[4]

---

[4] See *Porcelain Metals Corp.*, 73 LA 1133, 1138 (Roberts, Arb., 1979) and *The Sherwin-Williams Company* (Arb., Fullmer, February 4, 1987) (unpublished).

The Union, in its comprehensive post-hearing brief, cites the case of *Northrup Corp.,* 96 LA 149 (Weiss, Arb., 1990). There Arbitrator Weiss wrote:
"There is a further element involved here, however, and I refer to the 'last chance' agreement signed by the Grievant upon his reinstatement ... That says that '*Any* further infraction of *any* of the rules ... will result in your immediate discharge without further consideration.' Does this agreement give the Company free rein to disregard 'Working with Northrop' in terminating the Grievant for his next offense. I hold that it does not." (96 LA 151).

The minds of reasonable arbitrators can differ on this point. But, it seems to the present arbitrator that Arbitrator Weiss's view essentially disregards the terms of the last chance agreement signed by Northrup and the grievant. If the Northrup grievant did not intend to abide by the terms of the last chance agreement, he should not have signed it and should have taken his chances with his earlier termination.

---

### *2. The Standard Required Under the Last Chance Agreement.*

The Last Chance Agreement put the Grievant "at the last step of discipline for any and all Factory rules and regulations, procedures and practices"for a period of eighteen months. The last step of these rules and regulations is termination. It is not argued to the contrary. Thus, any violation of the rules under this standard is to be considered cause for termination.

**Page 849**

Beyond this is the standard by which a violation of the rules is to be adjudged. The normal standard in discipline cases is "beyond a reasonable doubt", "clear and convincing" or a "preponderance", depending upon the nature of the offense and the interpretations of the arbitrator involved. But, in this Last Chance Agreement, none of these three standards is specified for weighing the evidence of the claimed violation[s] of the Company's rules. Instead, the standard is whether such "reinstatement was arbitrary or capricious". The claim of a violation of rules must therefore only withstand the test of not being "arbitrary or capricious".

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

Obviously the standard governing the termination of the Grievant in this case is an extremely low standard. One violation of the rules justifies the reinstatement of the Grievant's prior termination. That violation need only be proven by evidence indicating that the conclusion was not "arbitrary or capricious".

We turn to that inquiry with respect to each of the claimed violations.

***C. The Alleged "Fail to Perform Recheck" Rule Violation.***

On Line 7 the ketchup comes down the line in big plastic bags.[5] They have a requisite weight of around 28.5 lbs. It is important that the bags not weigh too much or too little. If the former, the Company is wasting ketchup. If the latter, customers are disappointed and FDA regulations violated. Checks are to be made of the weights periodically to avoid these difficulties.

---

[5] Called "Scholly" bags, as opposed to "Cryovac" bags.

---

There is a scale at a point in the line which is used for making weigh checks. The Lead Bagger Operator is to make a weigh check once every hour, as near to on the hour as possible. The Quality Control Head, a bargaining unit position, is to make a similar weigh check a few times a shift.[6] The scale is computerized. To gain access to the computer the operator utilizes an input code such as BJW or TES. The evidence indicates that Quality Control Head Warner had her own code, i.e. "BJW". The Grievant did not. The evidence indicates that he had been utilizing a generic code "TES"which was emblematic of the lab.

---

[6] On the night in question this was Brenda Warner.

---

The weigh check includes weighing five bags which are taken off the conveyor as it flows past. The operator presses a button which reads "Do". When one of the bags or the average of the five is too heavy or light, the computer reacts adversely. One of its worst reactions is the word "Hold"which comes up on the screen and means that some product is to be held for checking in the warehouse.

On the shift in question, things went smoothly until the 2:00 a.m. weight check which was made by "TES" at 2:26 a.m.. The print-out for the shift indicated that the weight was only 28.18 lbs, which is under weight. The notation of "Hld"appeared. Under these circumstances the warehouse is supposed to be notified to make the necessary "holds" and weight checks. Adjustments should also be made or requested in the flow from the ketchup spigot filling the bags. Nothing was done. Eventually, at 3:34 a.m. another weight check was made by "TES". It came up as a "recheck" because of the lingering effects of the earlier 2:26 a.m. weight check. This time the appropriate checks were made. But, the production from 2:00 a.m. to 3:34 a.m. had to be checked in the warehouse instead of just the production from 2:00 a.m. to 2:26 a.m., a difference of some one hour and eight minutes.[7] Additional labor was required, at cost to the Company.

---

[7] The arithmetic in the testimony of Quality Control Head Warner was somewhat different, but the principle is the same.

---

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

The Union makes several defenses as to this issue:

One is that the Grievant was not trained in the use of the computer at the scales. But, the extent of his alleged non-training was difficult to assess because he did not testify at the arbitration hearing. Quality Control Head Warner, a bargaining unit member, testified that she had seen the Grievant make weight checks and that he seemed to handle the computer properly. In any event, the Grievant had performed the Lead Bagger Operator job for some 1 1/2 years. It is thus difficult to credit an argument, in the absence of evidence, that the Grievant did not understand the performance of such a basic element of his job after 1 1/2 years.

A second is that the Grievant was overworked on his shift and thus either did not have time to make the weight check or did not have time to properly react to the low-weight "hold" which showed up at 2:26 a.m. The claim of overwork is based on the fact that the other employees on his line (i.e. the operator and the bag-paced) had been scheduled for

breaks totaling 90 minutes (30-30-30) instead of the requisite total of 60 minutes(15-30-15). The fact of such a scheduling by a different leadman was stipulated. But, if the "TES" input codes are to be credited, the Grievant found time to make seven weight checks during the course of his shift. If he had time to make those weight checks, the logic would be that he had time to make them properly. This would include following through on an important matter such as 34 minutes worth of bags being 1/3 of a pound short of ketchup.

A third defense is that the *Grievant* did not make the particular weight check in question. Since the Grievant did not testify at all, there is no assertion to this effect on the record. But the argument is that since the "TES"code was used, "anyone" in the plant could have make the check. This may be, but it ignores the evidence from Quality Control Head Warner that the Grievant customarily utilized this input code. The other question is that if the Grievant did not make the 2:34 a.m. weigh check, when *did* he make the required 2:00 a.m. weigh check? If he did not make *any* such check it would appear to be a violation of the rules, of the same variety as his not following through on the one which he apparently did make.

[2] Beyond these factors, are two forensic factors. One is that Supervisor Blair testified that when he confronted the Grievant about his improper follow through on the 2:34 a.m.. weigh check, the Grievant claimed that he didn't see the "MAV" on the screen which was emblematic of the problem; that the Grievant acknowledged he had used the entry code of "TES" and that the Grievant did not claim that he had any problems understanding the computer punches required or what to do. In the absence of testimony from the Grievant to the contrary, these assertions by Supervisor Blair must be credited. In addition, the grievance itself is pregnant with the admission of a violation, i.e. that the assertion of the defense that the "discipline is to high for the violations."

Given the above discussion, it cannot be held that the Company's conclusion that the Grievant engaged in the "failed to perform a recheck" violation was arbitrary and capricious. We turn to the "machine not properly locked out" allegation.

***D. The Alleged "Machine Not Properly Locked Out" Rule Violation.***

As indicated in the above quotation from the August 2, 2005 E-14) the Grievant is also alleged to have violated the "Safety (Lockout/Tagout)" rule when he did not "Lockout/Tagout" the taper machine on July 26, 2005. "Lockout/Tagout"procedures are familiar in the industrial relations and safety field. The procedures are utilized as safeguarding that a given machine does not start up accidentally and in warning those coming upon the machine that these procedures have been followed.

[3] The facts are fairly conclusively established by the evidence. Later in his shift, the Grievant apparently

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

experienced difficulties with the operation of the "taper" machine. This machine, when working properly, extrudes tapes which shut the tops of the boxes containing the ketchup bags. The machine has two front doors which overlap each other slightly. Inside there are gears and belts which move the tape and a cutter which cuts the tape to the proper length for each bag. The Grievant had opened the doors and turned off the machine. But, he had not taken the steps prescribed by the "Lockout/Tagout") procedure. He was observed by Supervisor and had his head and arm inside the doors. Supervisor Blair's estimate in his testimony was that the Grievant had his hand approximately eight inches from the moving parts of the machine. Since the Grievant did not testify, the testimony of Supervisor Blair on these facts must be credited.

The more hotly disputed issue is whether the Grievant was *required* under these circumstances to implement the "Lockout/Tagout" procedure. The following factors appear important:

First, the rule in question, i.e. that concerning "Safety Rules" is definite as to the consequences of a violation of the "Lockout/Tagout"standards, but not definite as to the precise application of the standards to particular machines:

> "Lockout/tagout standards will be followed in their entirety. Failure to follow the procedures may result in immediate discharge, depending upon the severity of the offense."

Second, there is a label on the inside door of the taper machine which explains the "lockout/tagout"procedures. There is perhaps an implication from its being on the inside of the door that when the door is open and the procedures can be read, that the "lockout/tagout"procedures should be followed. But, this implication is not expressly set out in the label.

Third, the video slides which are used in the Company's training on "lockout/ragout"

**Page 851**

procedures are expansive and include the following:

> "*When Do I Use Lockout/Tagout?*
>
> During servicing and/or maintenance work.
>
> When a guard or other safety device is removed during normal operations When an employee is required to place a part of their body into the point of their body into the point of operation"

Fourth, there is evidence with respect to other machines on other lines, that sometimes supervisors have tolerated maintenance work on machines with doors open, without requiring that the "lockout/tagout" procedures be followed. But, there seems to be no specific evidence of this sort as to the "lockout/tagout"machines on Line #7.

It seems to the arbitrator the proper conclusion given this state of the factual evidence and the evidence concerning the rule is essentially as follows. The implication of application of the procedures from the "tag" is credited. Beyond this, if an employee has his head and arm inside a machine only eight inches from the dangerous moving parts, as is established by the facts of this case, prudence requires that the "lockout/tagout" procedures be followed. Should the machine start up by accident, the noise and motion could have a startling effect and might well result in the employee's head, arm or hand being caught up in the moving parts.

In this case the foregoing conclusion is bolstered by the same two "forensic"factors discussed with respect to the preceding issue.[8] First, when Supervisor Blair confronted the Grievant about the violation of the "lockout/tagout"issues on the evening of July 27, the Grievant, according to Supervisor Blair's testimony, stated "Oh, I got caught" and said "Don't write me up. I am on a last chance letter. If you write me up, I'll get fired."There is no evidence that the Grievant claimed that his position inside the taper

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

machine was not a violation of the "lockout/tagout" rules. Since the Grievant did not testify, Supervisor Blair's testimony as to these admissions must be credited.

---

[8] I.e. the failure to perform re-check issue.

---

Second, as indicated above, the grievance only stated:

"J__ feels the discipline in this case is to harsh for the violation"

Again, this language is pregnant with the admission that the Grievant's actions *were* a violation of the "lockout/tagout" rules.

The conclusion both as to the evidence and the "forensic" factors is that the Grievant violated the "lockout/tagout" rules.

**VI. Conclusion**

The present case involves the application of the terms of the Last Chance Agreement of August 12, 2005 through incorporation in the "proper cause"standard. The evidence concerning the facts of the Grievants two alleged violations, i.e "fail to perform re-check" and "lockout/tagout"procedures is largely undisputed. The conclusion based both from this evidence and the "forensic" factors concerning the Grievant's admissions and the admissions in the phrasing of the grievance is that the Grievant violated both rules. Under the terms of the Last Chance Agreement, the Company was entitled to take the action which it did, i.e. his termination, or, more technically, the reinstatement of his original termination of July 12, 2004.[9] Certainly the Company's action cannot be held to have been "arbitrary or capricious" under the extremely low standard set out in the last chance agreement.

---

[9] One of the Union's defenses is that the Employer was "picking" on the Grievant and that he was a "marked man" as the term of his Last Chance Agreement drew to a close. But, this accusation would seem to be belied by the fact that Supervisor Blair, in the presence of a witness, caught the Grievant sleeping during work hours the night before the events of July 27. The Grievant pleaded for a "break" on that occasion and was given one by Supervisor Blair. These facts stand of record since the Grievant did not take testify and deny them. The "break" afforded the Grievant the night before tends to undercut any accusation by the Union of prejudice and hasty accusation on the part of the Company.

---

To the extent that it may not be otherwise clear, the issue concerning the merits is answered in the affirmative, i.e. the termination of the Grievant, J__, on July 30, 2005 was for proper cause. The award draws its essence from the arbitrator's interpretation of Article I, Section 5 of the parties' agreement and the terms of the Last Chance Agreement dated August 12, 2004.

**VII. AWARD**

Grievance denied.

**Page 852**

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

- End of Case -

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as
permitted by the BNA Copyright Policy.  http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

Source: Arbitration Decisions > Labor Arbitration Decisions > Lehigh Cement Co., 122 LA 643 (Arb. 2006)

# Lehigh Cement Co., 122 LA 643 (Arb. 2006)

122 LA 643
Lehigh Cement Co.
Decision of Arbitrator
April 30, 2006

In re LEHIGH CEMENT COMPANY [Mason City, Iowa] and LOCAL LODGE D106, INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, CEMENT, LIME, GYPSUM AND ALLIED WORKERS DIVISION

**Arbitrator(s)**

Arbitrator: David Gaba

## Headnotes

**EVIDENCE**

**[1] Burden of proof ▶94.60509**

Employer has burden of proving through clear and convincing evidence that it had just cause to discharge employee.

**DISCHARGE**

**[2] Last chance agreement — Profanity ▶118.815 ▶118.6523**

Employer had just cause to discharge employee who used profanity toward his supervisor for extended period of time, even though that offense alone would not warrant penalty of discharge, where employee was subject to last chance agreement that warned him against using profane language.

## Attorneys

Appearances: For the employer—John W. Polley (Faegre & Benson), attorney. For the union—Michael Atchison, international representative.

## Opinion Text

**LAST CHANCE AGREEMENT**

**Opinion By:**

GABA, Arbitrator.

**Issue**

The parties stipulated to a submission. Thus, the only issue that the arbitrator has before him is the following:

> "Was there just cause for the discharge of D__?"

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

**Relevant Portions of the Contract**

***Art. II, § 3(b)***

Any employee ... subject to discharge shall be first suspended pending discharge ....

***Art. II, § 3(c)***

"Disciplinary Action.... Any record of disciplinary action which was taken with an employee shall remain intact as a permanent record and a part of the employee's file, except for those which are rescinded by the Company. Any disciplinary action, however, which occurred within thirty (30) months before a subsequent disciplinary action may only be considered by the Company as a basis for the progression of additional disciplinary action or for presentation in the grievance and/or arbitration procedure to support the Company's continued disciplinary actions....

***Article IX (3) 2***

The arbitrator's award shall be final and binding on the parties. It is understood that no arbitrator has the authority to change, ad to, or subtract from any of the provisions of the submitted agreement or of the Collective Bargaining Agreement.

***Article XIX***

Except to the extent expressly abridged by an express and specific provision of this agreement, the Company reserves and retains all of its Common

**Page 644**

Law or other rights to manage its business as such rights existed prior to the execution of this or any previous agreement with the Union.

The Rights of Management which are not abridged by this Agreement shall include, but are not limited to:

- the right ... to make and enforce rules for the maintenance of discipline and safety; [and]
- [the right] to suspend, discharge, or otherwise discipline employees for just cause."

Further, in pertinent part, the Plant Conduct Rules state:

*THE FOLLOWING OFFENSES ARE CAUSE FOR DISCIPLINARY ACTION, WHICH MAY INCLUDE SUSPENSION OR DISCHARGE.*

* * *

9. Use of *profane*, *abusive* or threatening language *toward* subordinates, fellow employees, or officials of the Company or persons on plant property."

**Facts**

The Lehigh Cement Company manufactures cement at a Plant in Mason City, Iowa (the "Plant"), where it produces approximately 2500 to 3500 tons of cement each day. It employs approximately 100 production and maintenance employees at the Plant, and those employees are represented by Local Lodge D-106, Cement, Lime, Gypsum and Allied Workers, Division of International Brotherhood of Boilermakers (the "Union"). Lehigh and the Union are parties to a collective bargaining agreement that governs the terms

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

and conditions of employment for all production and maintenance employees, the "Agreement"). The Agreement was in effect at all relevant times.

Lehigh hired the Grievant, D__, in 2001, and had employed him for approximately four and one-half years. D__ worked in the classification of "Serviceman"and was not a long-term employee by industry standards. The job description for a Serviceman states, *inter alia*, that servicemen are expected to "perform a variety of basic maintenance and general clean-up duties,"and describes the expected exertion level as "heavy work."

D__had previously been subject to discipline. Specifically, in October 2003, the Employer issued a written warning and last chance agreement [1] to the Grievant that was signed off on by both the Union and the Grievant.[2] That warning was issued on the basis of a female, bargaining-unit member's complaint that the Grievant had sexually harassed and assaulted her. The disciplinary action, which was stipulated to by the parties, states that the terms and conditions of the Grievant's continued employment require that he not "use any profane, abusive or threatening language toward fellow employees [or] officials of the Company ..."The Union did not grieve that disciplinary action and both D__and a Union representative signed it. D__ had also been disciplined for excessive absenteeism.

---

[1] The agreement was titled "terms and conditions of D__'s continued employment with Lehigh Cement Company."

[2] This written warning was revised in March 2004, and again signed by both the Grievant and the Union. Those revisions are not material to any of the instant issues.

---

***Events Of October 5, 2005.***

On Wednesday, October 5, 2005, the clay weigh-feeder in the Proportioning Building broke down shortly before the day shift began at 7 a.m. The Process Supervisor, V__ ("V__"), and the Kiln Engineer, Doug Johnson ("Johnson"), went to the Proportioning Building that morning to inspect and try to resolve the problem. They found a huge pile of clay on the weigh-feeder belt and in the hopper that feeds the clay onto the belt. The weigh-feeder belt was not running, and access to the start/stop switch was obstructed by the pile of clay, which Johnson described as weighing 2,000 to 3,000 lbs. The belt would not start, and Johnson and V__ decided that they first needed to get the pile cleaned up with the hope of unclogging the belt. They also determined that raw mill feedstock that supplies the Kiln was so low that the weigh-feeder's outage would cause the Plant's Kiln to be shut down if the weigh-feeder were not fixed within the next 45 to 90 minutes. The problem was "critical"in that a Kiln outage would cause a lost profit of approximately $3,000 per hour, given that the Plant was selling into a "sold out market,"in addition to shutdown costs of approximately $37,000 due to loss of refractory life.

V__ directed D__ and two burner helpers to come over to the Proportioning Building to

**Page 645**

shovel out the clay pile. V__ issued that directive by calling them on the two-way radios that they had been issued for use in an emergency, The two burner helpers, Mike Lorentzen and Perry Richey, together with D__, arrived within a matter of a few minutes. D__, Richey and Lorentzen were aware of the gravity of the situation. Lorentzen had to leave briefly to get a couple of more shovels so that all three could shovel. Lorentzen returned with two *square*-nosed shovels, and the three of them began digging out the pile with the three square-nosed shovels.

Shortly after the three started digging, Johnson went up to the next level in the Proportioning Building (the "hopper level") to inspect the hopper and determine whether the clay was jammed up inside the hopper.

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

Then, an even more critical emergency arose that resulted in the Burner Operator, who controls all of the Kiln equipment, calling Lorentzen and Richey away on the two-way radio system. Accordingly, Lorentzen and Richey left the Proportioning Building, and D__ was left to shovel out the pile on the weigh-feeder level by himself.

V__then joined Johnson up on the hopper level to assess the problem. They determined that the hopper was plugged full, and V__ went back down to get D__ to shovel it out; D__, however, had left to find a different type of shovel (round nosed). He had not asked V__for permission to leave. When Johnson came back down to the weigh-feeder level, he asked V__ where D__ was; V__did not know. V__ then attempted to call D__ on the emergency two-way radio system, but D__ did not answer. Because there was no other employee available to assist, and because the situation was so critical, Johnson decided that he and V__ would have to do the shoveling themselves.

Johnson then "locked-out" the hopper and climbed down into the hopper to shovel it out with a square-nosed shovel. The hopper, which is seven feet tall, five feet long, and has a depth of about three feet, was jammed with material, and it took Johnson approximately fifteen minutes to dig it out. Johnson and V__ then went back down to the weigh-feeder level and started the weigh-feeder belt down. The belt ran for about two minutes, and then stopped again. V__ then called Mike Brand, the Shift Utility Person, to determine whether the belt was stopping because of an electrical malfunction, as opposed to the weight of the clay still on the belt. D__was still looking for a round nosed shovel. Thinking that the belt problem might have been caused simply by the weight of the clay, Johnson and V__then started shoveling on the weigh-feeder level. After a couple of minutes, Scott Kunz, the Maintenance Planner arrived on the scene, at which point there was probably 800 to 1,000 pounds of clay remaining to be shoveled out on the weigh-feeder level.

Brand and Johnson then went up to the Motor Control Center to further trouble shoot the problem, and Kunz started helping V__ shovel the remaining pile on the weigh-feeder level so that they could get to the start/stop switch before the Kiln ran out of material, and managed to clear a three-foot pathway to the stop-start switch using the square-nosed shovels before D__returned.

When D__ reappeared, V__ asked him where he had been. D__ responded that he had been looking for a round-nosed shovel. V__ then replied that they had done the shoveling with square-nosed shovels and D__ need not have left to look for a round-nosed shovel. Kunz and V__ each testified that D__ angrily responded, "Fuck you, V__!" Kunz testified that D__ was yelling insubordinately and added, "I'm not shoveling that pile with a [square-nosed shovel]." Both say that D__ also told V__ to "fuck off' and then stated that he was going home sick. V__ replied that he was being sent home for insubordination, and D__ replied, "Fuck you, I'm sick, you can't send me home...."

D__admits that he used the word fuck at least four times during this exchange, and also admitted that he used the word "shit in a derogatory way towards V__" at least three times. But, at the hearing, D__testified that he was feeling poorly because he had bronchitis; and that V__provoked him by yelling and swearing at him.

**Position of the Union**

It is the Union's position that the Evidence and testimony show that D__ was not properly discharged and that progressive discipline was not followed since the use of profane language usually only results in a one or two day suspension. Testimony from management and union committee members also confirmed that former plant manager Vern Stuzzi used swear words and that they were part of normal conversation at the plant.

**Page 646**

The Union also believes that Management was also at fault and that where an employee is guilty of

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

wrongdoing, but management (ordinarily the supervisor) is also at fault in some respect in connection with the employee's conduct, the arbitrator may be persuaded to reduce or set aside the penalty assessed by management.

**Position of the Employer**

The Employer primarily argues the facts and posits that they support termination.

**Decision**

***The Applicable Standard is Just Cause.***

Where there is no contractual definition, it is reasonably implied that the parties intended application of the generally accepted meaning that has evolved in labor-management jurisprudence: that the "just cause" standard is a broad and elastic concept, involving a balance of interests and notions of fundamental fairness.[3]

---

[3] *Rabanco Recycling*, 118 LA 1411 (2003).

---

Described in very general terms, the applicable standard is one of reasonableness:

> ... whether a reasonable (person) taking into account all relevant circumstances would find sufficient justification in the conduct of the employee to warrant discharge (or discipline) [4]

As traditionally applied in labor arbitrations, the just cause standard of review requires consideration of whether an accused employee is in fact guilty of misconduct. An employer's good faith but mistaken belief that misconduct occurred will not suffice to sustain disciplinary action.[5] If misconduct is proven, another consideration, unless contractually precluded, is whether the severity of disciplinary action is reasonably related to the seriousness of the proven offense and the employee's prior record. It is by now axiomatic that the burden of proof on both issues resides with the employer.[6]

---

[5] *Fluor Hanford*, 122 LA 65 (2006).

[6] *State of Alaska*, 114 LA 1305 (2000).

---

The just cause standard has been seminally defined by Arbitrator Carroll Daugherty, and incorporates the following seven tests:

1. Did the company give the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct?

2. Was the company's rule or managerial order reasonably related to (a) the orderly, efficient, and safe operation of the company's business and (b) the performance that the company might properly expect of the employee?

3. Did the company, before administering discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

4. Was the company's investigation conducted fairly and objectively?

5. At the investigation, did the "judge"obtain substantial evidence or proof that the employee was guilty as charged?

6. Has the company applied its rules, orders, and penalties evenhandedly and without discrimination to all employees?

7. Was the degree of discipline administered by the company in a particular case reasonably related to (a) the seriousness of the proven offense and (b) the record of the employee in his service with the company? [7]

If one or more of these questions is answered in the negative, then normally the just cause requirement has not been satisfied.[8]

***The Applicable Burden of Proof is Clear and Convincing Evidence.***

[1] In a case involving the discharge of an employee, the burden is on the employer to sustain its allegations, and to establish that there was just cause for the termination. As the leading treatise in the area noted:

> Discharge is recognized to be the extreme industrial penalty since the employee's job, seniority and other contractual benefits, and reputation are at stake. Because of the seriousness of the penalty, the burden generally is held to be on the employer to prove guilt of wrongdoing, and probably always so where the agreement requires "just cause"for discharge.[9]

In this context, it is appropriate for an arbitrator to demand clear and convincing evidence. As Arbitrator Richman explained:

> The imposition of a lesser burden than clear and convincing proof fails to give consideration

**Page 647**

to the harsh effect of summary discharge upon the employee in terms of future employment.[10]

Only if misconduct in the instance that led to the termination is proven can an arbitrator go on to address the question of appropriateness of disciplinary action.[11]

---

[11] *Rabanco Recycling*, 118 LA 1411 (2003).

---

***Has the Just Cause Standard Been Met?***

There is no question that just cause exists to discipline the Grievant, the decision in this case hinges on the question of whether there was a reasonable relationship between the degree of discipline imposed on D__ and the seriousness of the offense.

***The Penalty***

In the instant case the Employer has chosen to terminate D__. As stated by Elkouri:

> Where the Agreement fails to deal with the matter, the right of the arbitrator to change or modify

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

> penalties found to be improper or too severe may be deemed to be inherent in the arbitrator's power to decide the sufficiency of cause, as elaborated by Arbitrator Harry H. Platt: In many disciplinary cases, the reasonableness of the penalty imposed on an employee rather than the existence of proper cause for disciplining him is the question an arbitrator must decide.... In disciplinary cases generally, therefore, most arbitrators exercise the right to change or modify a penalty if it is found to be improper or too severe, under all the circumstances of the situation. This right is deemed to be inherent in the arbitrator's power to discipline and in his authority to finally settle and adjust the dispute before him.[12]

The Supreme Court has long agreed with the statement of Elkouri above. As stated in *Paperworkers v. Misco*:

> Normally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. In *Enterprise Wheel*, for example, the arbitrator reduced the discipline from discharge to a 10-day suspension. The Court of Appeals refused to enforce the award, but we reversed, explaining that though the arbitrator's decision must draw its essence from the agreement, he "is to bring his informed judgment to bear in order to reach a fair solution of a problem. *This is especially true when it comes to formulating remedies.*" 363 U.S. at 597 (emphasis added by the court).[13]

Where an employer seeks to impose a penalty against an employee, the penalty must be consistent with other penalties imposed for similar offenses, under similar circumstances. Where an employer imposes different disciplinary treatment for similar offenses, the arbitrator must examine whether the employer had a valid reason for treating the employees differently. Where disciplinary distinctions cannot be accounted for, just cause is lacking).[14] In this case the Union provided evidence to show that the penalty imposed was greater than that imposed previously in cases involving the same conduct. If the previous employees had been "similar" to D__, the discipline should be reduced to what had historically been imposed.

---

[14] *Alan Wood Steel Co.*, 21 LA 843, 849 (Short, 1954) (discharge for fighting not appropriate where other employees guilty of fighting received only suspensions). See also *B-Line Sys.*, 94 LA 1047 (Fowler, 1990).

---

This is truly a close case: both parties provided well-written briefs with a number of cases on point cited to support their positions. The Union was correct in its analysis of the contract provisions in question and the weight of arbitral authority. Unfortunately for D__, this case turns on a number of factual findings that differentiate his situation from past cases.

***Was the Language Profane?***

A rule against profanity does not prohibit mere swearing. The language must be "profane" *and*, according to the plain text of Rule 9, the profane language must be directed "toward" one of the persons specified in Rule 9.

**Page 648**

The undisputed record evidence establishes that, at the time Rule 9 was written, "profane" meant: "to treat with abuse, irreverence or contempt" (*Webster's Ninth New Collegiate Dictionary*, p. 939 (Merriam-Webster 1985)). Thus, casual or conversational swearing—sometimes referred to as "shop talk"—is not prohibited by the rule; the language must be abusive, irreverent or contemptuous. This is clear not just from the definition of "profane," but also from the grouping of this prohibition with the prohibition against using "abusive or threatening language toward [others]." Testimony from management and union committee members confirmed that former plant manager Vern Stuzzi used conversational swearing on a regular basis and one could assume that if every employee who swore were sent home there would be no one left to man the plant.

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

The Union in its brief did an excellent job of arguing that termination is too serious a penalty in the instant situation because in the past insubordination and swearing had resulted only in brief suspensions. However, it is also immediately obvious to any reasonable person that D__'s conduct in using profanity towards his supervisor for an extended period of time was unacceptable; the only question concerns the penalty.

Of course it is not the goal of the arbitrator to be overly pedantic, but rather to interpret the Collective Bargaining Agreement in the manner the parties intended. "Arbitrators must strive to determine what the parties were attempting to accomplish by the contract language used and to effectuate that intent." [15] All employees have bad days and make mistakes. This is not a simple case of an employee telling his boss to "fuck-off." [16] If it were, D__ would be coming back to work. While some arbitrators would uphold the termination based solely on the use of profanity in a cement plant, I am not one of them.[17]

---

[15] *City of Davenport*, 91 LA 855 (Hoh, 1988).

[16] As stated by Arbitrator Tilbury: "Unless this plant differs from the norm, it is probable that the King's English is hammered several times a day. It has also been noted by more than one grammarian of late that the use of profanity has, unfortunately, increased in quantity and in tone in recent years. This is especially true among those who have served in the military for extended periods of time. D served in one of the most highly decorated divisions during the Vietnamese conflict. From all indications, much of the language used routinely by our troops in the field could not be found in the Book of Common Prayer. Like many others, I deplore the cavalier way in which our language has been kicked around. However, it would be wrong to adopt a sanctimonious approach or to pretend that we live in the best of all possible worlds." *Freightliner Corp.*, 95 LA 302 (1990).

[17] *See Rockwell Int'l.*, 88 LA 418 (Scholtz, 1986), the grievant was terminated for twice telling his supervisor to "fuck off" after being constructively criticized for poor performance (termination upheld). *See also, Freightliner Corp.*, 95 LA 302 (1990). "Mere cursing or the use of obscene and vulgar language in and of itself is not sufficient basis for discipline of an employee according to many decisions. Much depends on the manner and spirit of its use, the exact language used, the extent to which profanity is used and/or tolerated in this particular plant, and in the community at large. Forty years ago the use of the word "damn"was regarded as bad form. Today much stronger four-letter words seem to be accepted in mixed company by much of the community. Though I personally deplore this trend, one would have to be both blind and spavined not to realize that this has been the trend. It may, for example, be used to lend color to one's remarks, or it may be hurled as slurs and epithets designed to goad or jeer another into a fight."

---

While some arbitrators would uphold the discharge based on D__'s dereliction of his job on the day in question (since it created the possibility of a serious disruption to the Employer's production and a concomitant loss of revenue) I do not believe that the quantum of proof on this allegation rose to the level of "clear-and-convincing." In general I agree with the legal arguments made by the Union's representative; progressive discipline was not followed. However, there is one undisputed fact that does not support his argument.

[2] There is no question that D__ was subject to a last-chance-agreement, which was titled "terms and conditions of D__'s continued employment with Lehigh Cement Company,"and which states: "D__ will not use any profane, abusive or threatening language toward fellow employees [or] officials of the Company ..."Further the agreement informs D__ and the Union that: "any alleged violation will result in your immediate suspension pending discharge."

I am then left with two options; either, ignore the clear terms of the agreement that was negotiated between the Union, D__, and the Employer, or, enforce the agreement and uphold a termination for misconduct that would normally warrant a two day suspension. When discussing last-chance-agreements Elkouri states:

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy.   http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

> (W)hen considering whether there is just cause for discharge under such agreements, arbitrators do not apply the same due process considerations or procedural protections as under a normal discharge or disciplinary matter.[18]

The reason for this is that if arbitrators begin setting aside last-chance-agreements there will be no incentive for employers to use them and more employees will lose their jobs. As stated by Arbitrator Daniel:

> Arbitrators encourage such progressive programs of salvage and rehabilitation by strict enforcement of such "last chance agreements' in accordance with the terms which the parties, including the employee, have been willing to accept. However harsh or strict such terms and even though the arbitrator might well regard such conditions as unfair;that cannot be his concern.[19]

If I were running Lehigh Cement I very well might not have terminated D__. However, no matter how badly I feel for the grievant, I feel that it would be irresponsible for me to send him back to work given the prior agreement of the parties. As stated by Arbitrator Jules J. Justin:

> Plain and unambiguous words are undisputed facts. The conduct of Parties may be used to fix a meaning to words and phrases of uncertain meaning. Prior acts cannot be used to change the explicit terms of a contract. An arbitrator's function is not to rewrite the Parties' contract. His function is limited to finding out what the Parties intended under a particular clause. The intent of the Parties is to be found in the words which they, themselves, employed to express their intent. When the language used is clear and explicit, the arbitrator is constrained to give effect to the thought expressed by words used.[20]

For me to set aside the clear desire of the parties as compiled in D__'s Last Chance Agreement would require me to substitute my judgment for that of the parties and render their agreement inconsequential.

**Conclusion**

The burden is on the Employer to show by clear and convincing evidence that just cause existed to terminate the Grievant, D__. The Employer has met its burden of proof.

**AWARD**

The grievance is denied.

All fees and expenses charged by the Arbitrator shall be "shared equally by both parties," as provided for in Section 19(3)3, of the parties Collective Bargaining Agreement.

- End of Case -

---

[4] *RCA Communications, Inc.*, 29 LA 567, 571 (Harris, 1961). See also *Riley Stoker Corp.*, 7 LA 764, 767 (Platt, 1947).

[7] *Enterprise Wire Co.*, 46 LA 359, 363-4 (1966).

[8] *Enterprise Wire Co.*, 46 LA 359, 362 (1966).

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Labor and Employment Law Library
ISSN 1527-7356

[9] Elkouri and Elkouri, *How Arbitration Works* 905 (5th Ed. 1987).

[10] *General Telephone Co. of California*, 73 LA 531, 533 (Richman, 1979). See also: *Atlantic Southeast Airlines, Inc.*, 101 LA 515 (Nolan, 1993) (using clear and convincing standard); *J.R. Simplot Co.*, 103 LA 865 (Tilbury, 1994) (same); *Collins Food International, Inc.*, 77 LA 483, 484-485 (Richman, 1981) (same), *Fluor Hanford*, 122 LA 65 (2006) (same). The Employer bears this burden of proof both with respect to proving the alleged violation, and with respect to demonstrating the appropriateness of the penalty. *Pepsi-Cola Co.*, 104 LA 1141 (Hockenberry, 1995).

[12] Elkouri & Elkouri, *How Arbitration Works* (6th Ed., 2003), See also, Arbitrator Kossoff in 76 LA 300, 308; Volz in 50 LA 600, 603; Gilbert in 45 LA 580, 584; Dworkin in 36 LA 124, 128. Also see *Amoco Oil. v. Oil, Chem. & Atomic Workers Local 7-1*, 548 F.2d 1288, 94 LRRM 2518, 2521, 2524-25 (7th Cir. 1977). For discussion of other court cases on this aspect, see Fogel, "*Court Review of Discharge Arbitration Awards*," 37 Arb. J. No. 2, pp. 22, 32 (1982).

[13] *Paperworkers v. Misco Inc.*, 484 U.S. 29 [126 LRRM 3113] (1987).

[18] Elkouri & Elkouri, *How Arbitration Works* (6th Ed., 2003).

[19] *Kaydon Corp.*, 89 LA 377 (1987).

[20] *Phelps Dodge Copper Prods. Corp.*, 16 LA 229, 233 (1951).

---

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy.  http://www.bna.com/corp/index.html#V